UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SEATON INSURANCE COMPANY, f/k/a UNIGARD MUTUAL INSURANCE COMPANY,<br>Plaintiff,<br><br>v.<br><br>ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 07-332-S-DLM |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ILLINOIS UNION INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND TO SEATON'S CONFLICT OF INTEREST WAIVER ..... 3

A. Crowell & Moring's Relationship with the ACE USA Companies ..... 3

B. The Conflict Waiver ..... 4

C. Randall/Cavell Confirms Crowell & Moring's Broad Waiver ..... 7

D. The ACE USA Companies Retain Crowell & Moring with Regard to Reinsurance Disputes Involving Seaton ..... 8

1. Crowell & Moring Puts Into Place an Ethics Wall ..... 8

2. Subsequent Discussions Concerning the Conflict Waiver ..... 9

ARGUMENT ..... 11

I. Seaton's Conflict of Interest Waiver is Valid and Enforceable ..... 13

A. Conflict of Interest Waivers of the Type Entered into Between Crowell & Moring and Seaton Are Well-Recognized as Valid and Enforceable ..... 13

B. Seaton's Agent Randall/Cavell Had Authority to Waive Conflicts on Behalf of Seaton ..... 17

C. Seaton's Misstatements about Thomas Ryan ..... 20

D. Even if Seaton Had Not Explicitly Authorized Randall/Cavell to Waive Conflicts on Its Behalf, Crowell & Moring's Reliance on Randall/Cavell's Apparent Authority Would Have Been Appropriate ..... 22

E. Seaton's Waiver Remains Effective ..... 24

II. Crowell & Moring Can Provide Competent and Diligent Representation to Each Client ..... 27

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

### CASES

*Falvey v. A.P.C. Sales Corp.*, 185 F.R.D. 120 (D.R.I. 1999) .......... 29

*Fisons Corp. v. Atochem North America, Inc.*, No. 90 Civ. 1080, 1990 WL 180551 (S.D.N.Y. Nov. 14, 1990) .......... 16, 25

*Fla. Ins. Guaranty Ass'n v. Carey Canada, Inc.*, 749 F. Supp. 255 (S.D. Fla. 1990) .......... 16

*Fraioli v. Lemcke*, 328 F. Supp. 2d 250 (D.R.I. 2004) .......... 22, 23

*Grange Mut. Fire Ins. Co. v. Commons, Inc.*, 146 F.2d 788 (1st Cir. 1945) .......... 23

*Interstate Proper. v. Pyramid Co of Utica*, 547 F. Supp. 178 (S.D.N.Y. 1982) .......... 26

*McBurney v. Roszkowski*, 875 A.2d 428 (R.I. 2005) .......... 19

*Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys. Inc.*, 539 A.2d 523 (R.I. 1988) .......... 23

*O'Hare v. Gen. Marine Trans. Corp.*, 740 F.2d 160 (2d Cir. 1984) .......... 24

*Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996) .......... 23

*Putnam Resources v. Sammartino, Inc.*, 124 F.R.D. 530 (D.R.I. 1988) .......... 29

*Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42 (1st Cir. 1984) .......... 24

*Unified Sewerage Agency of Washington County, Or. v. Jelco Inc.*, 646 F.2d 1339 (9th Cir. 1981) .......... 16, 25

*Univ. of Rochester v. G.D. Searle & Co., Inc.*, No. 00-6161, 2000 WL 1922271 (W.D.N.Y. Dec. 11, 2000) .......... 16, 28

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221 (7th Cir. 1978) .......... 16

### RULES

Rhode Island District Court Local Rule of Civil Procedure 208 .......... 12

Rhode Island Rules of Professional Conduct Rule 1.0(b) .......... 14

Rhode Island Rules of Professional Conduct Rule 1.7(b) .......... 13, 15

Rhode Island Rules of Professional Conduct Rule 1.9, cmts. 3 and 9 .......... 28

### TREATISES

3 Am. Jur. 2d *Agency* § 72 (2007) .......... 19

Restatement (Second) of Agency § 27, cmt. a (1958) .......... 23

Restatement (Third) of Agency § 2.01 (2006) .......... 18

Restatement (Third) of Agency § 2.02 (2006) .......... 19

Restatement (Third) of Agency § 8.09, cmt. b (2006) .......... 23

## INTRODUCTION

Defendant Illinois Union Insurance Company ("Illinois Union") opposes the motion of Plaintiff Seaton Insurance Company ("Seaton") to disqualify Paul W. Kalish and Jennifer R. Devery of Crowell & Moring LLP from representing Illinois Union in this case. The conflict of interest asserted by Seaton as the basis for the disqualification was validly waived by it, and there is no other reason that justifies the extreme remedy of a disqualification of counsel.

Indeed, Seaton's motion has little if anything to do with any real concern by Seaton about conflicts of interest. Rather, it appears to be an attempt by Seaton to obtain some perceived leverage in this case and multiple separate disputes that are not before this Court.

First, the assertions in Seaton's motion concerning the actions and authority of its agent, Randall America now known as Cavell America ("Randall/Cavell") – with Seaton now claiming that Randall/Cavell had no authority to grant a conflict waiver – are just the most recent volley in an ongoing dispute between Seaton and Randall/Cavell that is now playing out in an action pending in Federal Court in New York. *See Seaton Ins. Co. v. Cavell USA, Inc. f/k/a Ken Randall America*, No. 07:CV07302 (S.D.N.Y.). That New York action – which has nothing to do with either Illinois Union or Crowell & Moring – involves accusations by Seaton that Randall/Cavell committed fraud in connection with the administrative agreement between Seaton and Randall/Cavell that Seaton has attached to its motion to disqualify. Tellingly, and as discussed below, the statements made by Seaton in its motion to disqualify concerning the scope of Randall/Cavell's authority are at odds with the allegations that Seaton had made about Randall/Cavell in that New York action.

Second, this action is just one piece of a far larger series of reinsurance disputes between Seaton and the ACE USA Companies (a family of insurance companies of which Illinois Union is one) and for which Crowell & Moring has been retained by the ACE USA Companies since

2006.[1] Although issues concerning the Crowell & Moring conflict waiver have been discussed with Seaton representatives on a number of occasions since then, it was not until 15 months later, when Seaton apparently decided that the disputes between the companies could not be resolved and switched from settlement-mode to litigation attack-mode, that Seaton chose to assert a conflict. Even then, it was not until Seaton filed the present motion that Seaton ever contended that Randall/Cavell somehow did not have authority to waive conflicts of interest on behalf of Seaton.

Even if Seaton's motion is taken at face value (and not as the litigation tactic that it is), which it should not be, it fails on its own terms because Seaton cannot meet its heavy burden and prevent Illinois Union from being represented by its counsel of choice. To the contrary, the facts material to Seaton's motion firmly establish the propriety of Crowell & Moring's representation of Illinois Union:

- Seaton's agent, Randall/Cavell, in connection with retaining Crowell & Moring on behalf of Seaton, waived the conflict that Seaton now asserts. The letter confirming the waiver specifically confirmed the "understandings and waivers that have enabled [Crowell & Moring] both to represent Randall America carriers and other firm insurance clients" and that "Crowell & Moring can continue to do such present and future cases for other carriers as a matter of course where Crowell & Moring is not in such cases representing Randall-administered carriers," including Seaton.

- When Randall/Cavell sought to retain Crowell & Moring to represent Seaton and other insurers, the ACE USA Companies had been a Crowell & Moring client for nearly 15 years and until then had insisted that Crowell & Moring work almost exclusively for the ACE USA Companies in the insurance area. In consenting to the dual representation, Randall/Cavell understood and accepted that Crowell & Moring could continue to represent the ACE USA Companies in any dispute in which it was not already representing a Randall/Cavell-administered insurer such as Seaton. Moreover, Randall/Cavell accepted and understood that its consent to the dual

---

1 In its motion, Seaton briefly describes its views as to the nature of the dispute in this action. (*See* Seaton Br. at 2.) While we will not address those issues here, and we expect the Court will want to hear from the parties more specifically at the Rule 16 conference on February 8, Illinois Union obviously does not agree with Seaton's statements concerning, for instance, its allegedly timely notice.

representation and waiver of conflicts applied to future litigation in which Crowell & Moring might represent the ACE USA Companies in matters directly adverse to Seaton.

- Randall/Cavell was fully authorized to waive conflicts. As Seaton has explicitly stated in litigation against Randall/Cavell in separate action in New York, Seaton entrusted Randall/Cavell to manage virtually all of Seaton's affairs including the retention of counsel on Seaton's behalf. Whether the Court approaches the issue in terms of Randall/Cavell's express, implied or apparent authority, the waiver is valid.

- Crowell & Moring does not have in its possession any confidential information from Seaton related to this case and has put in place an ethics wall to isolate attorneys representing the ACE USA Companies from attorneys representing Seaton.

- Finally, even assuming Seaton has attempted to revoke the waiver (which is not the case), it may not do so: both the ACE USA Companies and Crowell & Moring have relied on the waiver to their detriment.

## FACTUAL BACKGROUND TO SEATON'S CONFLICT OF INTEREST WAIVER

### A. Crowell & Moring's Relationship with the ACE USA Companies

For almost 20 years, Crowell & Moring has represented the ACE USA Companies or their predecessors. (*See* Declaration of Clifford B. Hendler ("Hendler Decl.") at ¶ 4.)[2] Although Crowell & Moring currently represents numerous insurance companies, the vast majority of its insurance company work for almost twenty years has been for the ACE USA Companies. (*Id.* at ¶ 5.) Indeed, prior to 2001, the insurance group worked almost exclusively for the ACE USA Companies, of which Illinois Union is one. (*Id.*)

Throughout most of that period, the ACE USA Companies were not simply the largest client of Crowell & Moring's insurance group, but also one of the largest clients of the overall firm. (Hendler Decl. at ¶ 6.) In return for that volume of business, the ACE USA Companies

2 The relationship between the ACE USA Companies and particular lawyers at Crowell & Moring stems back even farther still. Indeed, Clifford Hendler, the senior partner and leader of Crowell & Moring's insurance practice, began representing the ACE USA Companies in 1982 and brought them as a client to Crowell & Moring when he joined the firm in 1988. (Hendler Decl. ¶ 3-4.)

insisted that Crowell & Moring work almost exclusively for them in the insurance area. (*Id.*) In particular, the ACE USA Companies wanted to maximize the chances that if they referred a new matter to Crowell & Moring, the firm would be able to take it on. (*Id.*) They were concerned that if Crowell & Moring represented other carriers, and a new matter also involved other Crowell & Moring-represented carriers, that those other carriers might try to object on conflicts grounds to Crowell & Moring taking on the new matter for the ACE USA Companies. (*Id.*)

In short, up until the time that Randall/Cavell retained the firm, the ACE USA Companies had insisted that Crowell & Moring not take on other insurance clients, for fear that Crowell & Moring might find itself in the position of having to decline work requests from the ACE USA Companies. (*Id.* at ¶ 7.)

Randall/Cavell is a third-party claims administrator, responsible for the handling of claims of insurers that are no longer writing any new insurance policies but are simply running off their existing claims obligations. Seaton was among the "run-off companies" for which Randall/Cavell administered claims. In 2001, Randall/Cavell sought to retain Crowell & Moring to represent Seaton and other Randall/Cavell carriers. (*Id.* at ¶ 8.) The ACE USA Companies permitted Crowell & Moring to take on work for Randall/Cavell, with the clear understanding that Crowell & Moring could only do so if it would not preclude the ACE USA Companies from turning to Crowell & Moring, as they always had, to represent them in any dispute in which Crowell & Moring was not already representing a Randall/Cavell-administered carrier. (*Id.* at ¶ 9.)

**B. The Conflict Waiver**

As a result, when Crowell & Moring worked out the terms of engagement with Randall/Cavell in 2001, the ACE USA Companies required Crowell & Moring to obtain Randall/Cavell's agreement on certain non-negotiable points. (Hendler Decl. at ¶ 10.) Robert

Burns, a legally trained senior claims official, took the lead on these original negotiations for Randall/Cavell. (*Id.* at ¶ 11.) During the negotiations, Crowell & Moring made clear that the ACE USA Companies imposed limitations under which Crowell & Moring had to operate. (*Id.*) Randall/Cavell understood and accepted that Crowell & Moring had to remain as free to take on new matters for the ACE USA Companies after the firm started representing Randall/Cavell-administered carriers as it had been before Crowell & Moring started representing Randall/Cavell-administered carriers. (*Id.*) Indeed, even before these negotiations took place, Mr. Burns was well aware of the relationship between Crowell & Moring and the ACE USA Companies, because prior to his employment with Randall/Cavell, Mr. Burns had run a coverage litigation management unit for an ACE USA Companies predecessor that made extensive use of Crowell & Moring. (*Id.*)

In keeping with these negotiations, at the outset of Crowell & Moring's relationship with Randall/Cavell, the ACE USA Companies insisted upon approving new Randall/Cavell representations on a case-by-case basis and insisted upon a right of refusal, if a case were filed against both the ACE USA Companies and a Randall/Cavell-administered carrier. (*Id.* at ¶ 10.)

The basics of this advance conflict waiver are reiterated and memorialized in a June 30, 2003 letter from Clifford Hendler of Crowell & Moring to Thomas D. Ryan, Esq. of Randall America, with a copy to Robert A. Whitney, Esq., also of Randall America, (the "June 2003 Waiver Letter") confirming the understanding and agreement that Seaton (along with other entities, such as Stonewall and OneBeacon, for which Randall/Cavell was also responsible) waives any conflicts in connection with the firm's representation of other insurance carrier clients of the firm, such as the ACE USA Companies (mentioned by name in the letter), in matters in which Seaton may have an adverse interest, where Crowell & Moring was not already representing Seaton. (*See* Hendler Decl. at ¶ 14 and Exh. A (June 2003 Waiver Letter).)

Specifically the letter makes clear that Randall/Cavell was granting Crowell & Moring a broad conflicts waiver:

> Lastly, as we formally renew our business relationship with you for 2003, our Professional Responsibility Committee requests that we reiterate that the same conflicts understandings and waivers that have enabled our firm both to represent Randall America carriers and other firm insurance clients will remain in effect. Thus, you will recall that Crowell & Moring also represents other carriers such as ACE Companies, RiverStone-administered entities, United Educators, St. Paul, and Liberty in numerous multi-carrier insurance matters, including matters in which Randall-administered companies may have an adverse interest, and that it is understood that Crowell & Moring can continue to do such present and future cases for other carriers as a matter of course where Crowell & Moring is not in such cases representing Randall-administered carriers. Also, with respect to the ACE Companies, Randall has agreed (1) that Crowell & Moring would not itself bring cross-claims or bad faith/extracontractual claims against ACE-related companies, (2) to case by case approval from ACE for new Randall representations (with ACE reserving a right of first refusal and/or to propose a counsel sharing arrangement, but also pledging to act reasonably and expeditiously); and (3) that Crowell & Moring itself would not take positions for Randall on substantive matters that would create positional conflicts with ACE. As you and I discussed last fall in connection with Thorpe, such conditions do not preclude Randall from advocating position opposite to ACE's (or bring cross-claims or bad faith claims against ACE), so long a Randall uses one of its other law firms to do so.

(*Id.* (emphasis added).)[3]

This advance conflict waiver is and has been a condition of Crowell & Moring's continued representation of Seaton and the other Randall/Cavell-administered carriers. Crowell & Moring could not have accepted the engagement without it. (Hendler Decl. at ¶ 13.) Consistent with its approach to Randall/Cavell, and in light of the firm's above-described

---

3 Seaton makes a passing comment that while the letter has a "Privileged and Confidential" legend it was filed with Court as part of the reply brief in support of the pending *pro hac* motions. But Seaton has placed the extent of the waiver at issue, *see* Rhode Island Rule of Professional Conduct 1.6(b)(2), and they do not claim the letter is privileged; instead Seaton, having claimed there was no waiver, does all it can to distance itself from the letter. Nor does Seaton move to put the information under seal. Nevertheless, in attaching certain materials to the declarations accompanying this Opposition, Illinois Union has redacted certain information out of an abundance of caution. Unredacted materials can be provided to the Court for *in camera* review at the February 8 hearing upon the Court's request.

relationship with the ACE USA Companies, Crowell & Moring has insisted on and received an advance conflict waiver from each new client group that has retained Crowell & Moring's insurance group. (*Id.* at ¶ 15.)

### C. Randall/Cavell Confirms Crowell & Moring's Broad Waiver

Randall/Cavell is, and has been, aware of this waiver, on which Crowell & Moring has relied on more than one occasion. (*Id.* at ¶¶ 17-18.) For example, in 2006 Crowell & Moring undertook the representation of Maryland Casualty Company in connection with *In re Lloyd E. Mitchell*, No. 06-13250-NVA (Bankr. D. Md.). (*See* Declaration of Mark D. Plevin ("Plevin Decl.") at ¶ 1 and Exh. A (Notice of Appearance).) After Crowell & Moring entered its appearance in the matter, Brian Bendig, then a senior lawyer at Randall/Cavell, wrote to Mark Plevin, a partner in the Crowell & Moring insurance group, objecting to the firm's representation of Maryland Casualty in this bankruptcy case. (*Id.* at ¶¶ 5-6 and Exh. B (6/14/06 email from Mr. Bendig to Mr. Plevin).) Mr. Bendig expressed the view that "[Crowell & Moring] has a clear conflict," apparently because Crowell & Moring also represented CU (a Randall/Cavell-administered carrier) in unrelated matters. (*Id.*) Mr. Bendig further stated, "CU does not waive the conflict." (*Id.*)

In response, Mr. Plevin explained in detail that Randall/Cavell had executed a "blanket conflicts waiver agreement" on behalf of the Randall/Cavell-managed companies (of which CU was one) that permitted Crowell & Moring to represent Maryland Casualty in the *Lloyd E. Mitchell* case "even if Maryland Casualty's interests are in conflict with CU's," "so long as [Crowell & Moring] is not already representing a [Randall/Cavell]-administered company in that particular matter." (Plevin Decl. at ¶¶ 7-8 and Exh. C (6/15/06 email from Mr. Plevin to Mr. Bendig).) Additionally, Mr. Plevin provided Mr. Bendig with a copy of the June 2003 Waiver

Letter from Cliff Hendler of Crowell & Moring to Tom Ryan of Randall/Cavell that set the terms of this "broad advance waiver." (*Id.*)

Stating that he had not seen the Hendler-Ryan June 2003 Waiver Letter, Mr. Bendig acknowledged that Crowell & Moring had been granted a "broad waiver" by Randall/Cavell. (*Id.* at ¶¶ 9-10 and Exh. D (6/16/06 email from Mr. Bendig to Mr. Plevin).) Moreover, not only did Mr. Bendig not question the fact that the June 2003 Waiver Letter memorialized a waiver permitting Crowell & Moring to represent Maryland Casualty, neither CU nor Randall/Cavell ever sought to disqualify Crowell & Moring from that representation. (*Id.*)

Likewise, Crowell & Moring represented one of the ACE USA Companies adverse to a Randall/Cavell-administered carrier in *Cleaver-Brooks, Inc. v. AIU Ins. Co., et al.*, Case No. 04-CV-002852 (Circuit Ct. of Wisconsin, Milwaukee Cty.). In that case, Randall/Cavell-administered CU filed cross-claims against Century Indemnity Co., an ACE USA Company. Crowell & Moring, on behalf Century Indemnity, moved to dismiss those cross-claims. (*See* Declaration of Lori T. Hildebrand ("Hildebrand Decl."), Exh. 1 (1/30/07 letter to court).) Crowell & Moring was clearly identified on all pleadings, and yet CU never moved to disqualify Crowell & Moring or otherwise allege that Crowell & Moring had a conflict that would hinder its ability to represent the ACE USA Companies against CU.

### D. The ACE USA Companies Retain Crowell & Moring with Regard to Reinsurance Disputes Involving Seaton

#### 1. Crowell & Moring Puts Into Place an Ethics Wall

In 2006, the ACE USA Companies retained Crowell & Moring to represent them with regard to a series of related reinsurance arbitrations adverse to Seaton.[4] (Crowell & Moring has

---

[4] Seaton suggests that there is something somehow sinister about Illinois Union's change of counsel from the Mound Cotton law firm to Crowell & Moring in this action. Nothing could be further (continued...)

not represented Seaton in any of those matters.) In connection with this representation, Crowell & Moring put in place measures to protect the confidential information of both the ACE USA Companies and Seaton. Thus, since 2006 an ethics wall has been in place between individuals working on matters for Seaton, on the one hand, and those individuals working for the ACE USA Companies in the matters adverse to Seaton, on the other. (Hendler Decl. at ¶ 20.) This wall precludes discussions of the substance of the firm's Seaton representations with the attorneys handling the ACE USA Companies-related matters adverse to Seaton. (*Id.*)

### 2. Subsequent Discussions Concerning the Conflict Waiver

In the August and September 2006 time period during which the ACE USA Companies' reinsurance arbitrations against Seaton were initiated, Mr. Ryan, to whom the June 2003 Waiver Letter was addressed, called Mr. Hendler about Crowell & Moring's initiation of the arbitrations on behalf of the ACE USA Companies. (*Id.* at ¶ 21.) During the discussions between Mr. Ryan and Mr. Hendler, Mr. Ryan did not contest the validity of the waiver, but expressed that Crowell & Moring's representation of the ACE USA Companies in these reinsurance disputes would place him in an awkward position with Seaton. (Hendler Decl. at ¶ 21.) Several weeks later, Mr. Hendler learned from Mr. Burns (who negotiated the conflict waiver from Randall/Cavell, but by that time had gone to work in the same office in Rhode Island where Seaton employees worked) that Joseph Follis, Vice President of Seaton, was troubled by Crowell & Moring's initiation of the arbitrations. (*Id.* at ¶ 22.) Mr. Burns did not dispute the validity of the waiver,

---

(. . . continued)

from the truth. The story is rather simple: Although Mound Cotton was initially retained to protect Illinois Union's interests in this case, when the ACE USA Companies recognized that this action was related to the series of ongoing reinsurance disputes between Seaton and the ACE USA Companies for which Crowell & Moring had already been retained in August 2006, the ACE USA Companies retained Crowell & Moring for this action as well.

but did suggest it might be a good idea if Mr. Hendler tried to address Mr. Follis' concerns. (*Id.*) In response, Mr. Hendler emailed Mr. Follis, with a copy to Mr. Burns, to explain to him the history and the existence of the waiver, the absolute right of the ACE USA Companies to have Crowell & Moring initiate these proceedings against Seaton, and the existence of the ethics wall. (*Id.*, Exh. B (10/2/06 email from Mr. Hendler to Mr. Follis).)

Mr. Follis responded that Seaton was concerned about the firm's filing of the arbitration against Seaton on behalf of the ACE USA Companies and requested further explanation of the waiver and copies of any relevant conflict letters. (*Id.* at ¶ 23 and Exh. C (10/3/06 email from Mr. Follis to Mr. Hendler).)

Mr. Hendler then forwarded to Mr. Follis the June 2003 Waiver Letter and reiterated that the ability to represent the ACE USA Companies – even in matters adverse to Seaton – had been a critical agreement upon which Crowell & Moring and the ACE USA Companies had relied from the very beginning as a necessary precondition to Crowell & Moring's ability to represent Seaton. (Hendler Decl. at ¶ 24 and Exh. D (10/3/06 email from Mr. Hendler to Mr. Follis).) Mr. Hendler also explained that those historical conflicts understandings, as negotiated with Mr. Burns, did not give Seaton the right to veto the ACE USA Companies having Crowell & Moring act adversely to Seaton. (*Id.*) Upon receiving this information, Mr. Follis did not argue that the waiver was ineffective and Mr. Hendler understood Mr. Follis to have accepted the fact that the advance conflict waiver was the cornerstone of Crowell & Moring's representation of Seaton. (*Id.* at ¶ 25.)

In fact, Crowell & Moring did not hear anything more about conflict issues until November 2007, nearly 15 months later, when Mr. Bendig raised the issue in a letter to Crowell & Moring's William O'Neill who is representing the ACE USA Companies in the reinsurance disputes with Seaton. (Hildebrand Decl., Exh. 2 (11/13/07 letter from Mr. Bendig to Mr.

O'Neill).) Mr. Bendig's letter made clear that, knowing that Crowell & Moring had been representing the ACE USA Companies adverse to Seaton in the reinsurance disputes for 15 months, he was only pushing the conflict issue because the companies had not been able to resolve their disputes to Seaton's liking:

> Please note Seaton takes the position that Crowell & Moring ("the firm") is precluded from representing Century against Seaton. Now that settlement discussions have broken down and the matter will proceed to active arbitration, Seaton asserts that the firm has a conflict due to its representations of Seaton on numerous other matters, historically and currently. Seaton accordingly requests that the firm withdraw.

(*Id.* (emphasis added).)

At that point, Mr. Hendler called Mr. Bendig to reiterate the existence of the advance waiver. Mr. Bendig did not provide any reason that the advance waiver should not apply (Hendler Decl. at ¶ 27) and at no point did Seaton ever contend (until the present motion) that Randall/Cavell did not have the authority to waive conflicts. Seaton's present motion followed.

## ARGUMENT

Seaton's motion presents an issue that is clear-cut and should be resolved in Illinois Union's favor: Randall/Cavell, validly acting as Seaton's agent, granted a broad conflicts waiver to Crowell & Moring that encompasses Crowell & Moring's representation of Illinois Union in this action. Seaton offers no evidence to plausibly suggest that Randall/Cavell was not Seaton's agent or that the waiver executed by Randall/Cavell should not be enforced, much less sufficient evidence to satisfy its heavy burden in seeking to disqualify Illinois Union's choice of counsel in this case.

Indeed, in a recent case cited by Seaton, Senior District Court Judge Torres articulated the heavy burden born by a movant in order to disqualify a party's selected counsel. *See*

*Haffenreffer v. Coleman*, No. 06-299T, 2007 WL 2972575, *2 (D.R.I. October 10, 2007).[5] The reasons for this high burden are threefold. First, a party's right to choose its own counsel is an important factor in weighing a motion to disqualify. *Id.* Second, courts view motions to disqualify with disfavor because, "in addition to delaying litigation and having significant adverse effect on the client, such motions are often advanced for 'tactical, not substantive, reasons.'" *Id.* (citation omitted). And third, Judge Torres emphasized that "the mere appearance of impropriety or the possibility of a conflict are insufficient to warrant disqualification of chosen counsel." *Id.*

In the face of this standard, Seaton asks the Court to disqualify Crowell & Moring despite: (1) the existence of a valid and enforceable advance waiver that was issued by Seaton, through its agent Randall/Cavell, (2) the reliance by both the ACE USA Companies and Crowell & Moring on that waiver, and (3) the fact that Seaton is not unfairly prejudiced by Crowell & Moring's representation of Illinois Union in this matter. Simply stated, Seaton cannot come close to meeting its burden.

---

[5] The pending motion presents a choice of law question: does District of Columbia law, where Crowell & Moring practices and where the relationship with Seaton was created, apply; or does the law of Rhode Island, the forum jurisdiction, apply? At the time Crowell & Moring negotiated its conflict of interest waiver with Seaton, this litigation had not commenced, and the only law that either party could reasonably expect to govern their relationship was that of the District of Columbia. On the other hand, the rules of this Court state that the Rhode Island Rules of Professional Conduct apply in matters before it. *See* Rhode Island District Court Local Rule of Civil Procedure 208.

As the motion to disqualify has thus far been presented to the Court by Seaton and there does not appear to be a material difference between Rhode Island and District of Columbia law, the choice of law question may be only an academic one. Should Seaton, in a reply brief or otherwise, raise issues in which material differences in the ethics laws of these two jurisdictions do exist, Illinois Union reserves the right to argue that this motion should be decided under District of Columbia law.

## I. Seaton's Conflict of Interest Waiver is Valid and Enforceable

### A. Conflict of Interest Waivers of the Type Entered into Between Crowell & Moring and Seaton Are Well-Recognized as Valid and Enforceable

Under Rhode Island law, a client may consent to its lawyer's conflict of interest and thereby permit the lawyer to undertake a representation that would, without consent, be prohibited. The relevant conflict of interest rule is stated concisely in Rule 1.7(b) of the Rhode Island Rules of Professional Conduct:

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) <u>each affected client gives informed consent, confirmed in writing.</u>

(emphasis added.)[6]

As discussed above, Seaton (through its agent, Randall/Cavell) agreed to waive any objections it might have to Crowell & Moring's representation of the ACE USA Companies adverse to Seaton in unrelated matters.[7] In pertinent part, the June 2003 Waiver Letter makes

---

6 Although Seaton initially took the position that this conflict was "not waivable," it has now backed away from that assertion. (*See* Hildebrand Decl., Exh. 3 (12/12/07 letter from Mr. Hoerrner to Ms. Devery).) Indeed, the Rules of Professional Conduct are very clear that the majority of conflicts are waivable and that this case is not one of the exceptions (*e.g.*, a lawyer may not represent a plaintiff and a defendant in the same case). Thus, it comes as no surprise that Seaton has not pressed this argument.

7 Seaton argues that it never signed the waiver letter. As noted above, the June 2003 Waiver Letter memorialized and confirmed the agreement and the Rhode Island Rules of Professional Conduct make clear that a client's signature is unnecessary:

> "Confirmed in writing," when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent.

(continued...)

clear that, at the request of Crowell & Moring's "Professional Responsibility Committee," Crowell & Moring was confirming that the "same conflicts understandings and waivers" that enabled Crowell & Moring's representation of Randall/Cavell carriers and Crowell & Moring's insurance clients remained in effect. (Hendler Decl., Exh. A.)

The letter first acknowledges the historical relationship between Crowell & Moring and Randall/Cavell when the firm also represented other carriers, including the "ACE Companies":

> in numerous multi-carrier insurance matters, including matters in which Randall-administered companies may have an adverse interest.

(*Id.*) The June 2003 Waiver Letter goes on to specifically state:

> [I]t is understood that Crowell & Moring can continue to do such present and future cases for other carriers as a matter of course where Crowell & Moring is not in such cases representing Randall-administered carriers.

(*Id.*) Then, underscoring the importance of Crowell & Moring's relationship with the ACE USA Companies, the letter details additional "understandings," including that:

> Randall has agreed (1) that Crowell & Moring would not itself bring cross-claims or bad faith/extracontractual claims against ACE-related companies, (2) to case by case approval from ACE for new Randall representations (with ACE reserving a right of first refusal and/or to propose a counsel sharing arrangement, but also pledging to act reasonably and expeditiously); and (3) that Crowell & Moring itself would not take positions for Randall on substantive matters that would create positional conflicts with ACE.

(*Id.*)

Given this language, Seaton's assertion that "[t]he letter is not a conflict waiver by Seaton and there is no language in the letter which provides the Court with a basis to give it such effect" (Seaton Br. at 6) is puzzling to say the least. The letter expressly refers to "the conflicts

(. . . continued)

Rule 1.0(b). Thus, Seaton's argument is a non-starter. Moreover, after the letter was sent, Randall/Cavell acknowledged the "broad waiver." (Plevin Decl., Exh. D (6/16/06 email from Mr. Bendig to Mr. Plevin).)

understandings and waivers" between Crowell & Moring and Randall/Cavell. Thus, on the face of the letter, the parties understood that Crowell & Moring could take on matters adverse to Seaton (and other Randall/Cavell-administered carriers) so long as Crowell & Moring was not representing Seaton (or other Randall/Cavell-administered carriers) in that same case. Indeed, the very letter was subsequently described by Randall/Cavell as a "broad waiver." (Plevin Decl., Exh. D (6/16/06 email from Mr. Bendig to Mr. Plevin).)

The type of waiver granted to Crowell & Moring is referred to in ethics law as an "advance waiver" because it applies to conflict situations that have not specifically arisen at the time the conflict waiver was entered into by the client. Advance waivers are enforceable under Rhode Island law. The Rhode Island Rules of Professional Conduct discusses them as follows:

> Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the test of paragraph (b). The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. . . . if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective, particularly if, *e.g.*, the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation.

Rule 1.7, cmt. 21 (emphasis added).

Here, the nature of the waiver was specifically discussed between Crowell & Moring's Clifford Hendler and Randall/Cavell's Bob Burns. Mr. Hendler explained the nature of the advance waiver and the reasons for it. (Hendler Decl. ¶ 11.) Mr. Burns was a legally trained senior claims official, who understood the nature of the business involved and the nature of the risks created by the agreed-upon advance waiver. And Randall/Cavell is a sophisticated insurance organization that Seaton does not dispute was authorized to, among other things, retain counsel. Moreover, the June 2003 Waiver Letter memorializing "the conflicts under-

standings and waivers" was addressed to a lawyer (Thomas Ryan) with another lawyer (Robert Whitney) copied. This is exactly the type of scenario in which advance waivers are permitted.

While Rhode Island state and federal courts have not addressed advance waivers directly, other courts have approved them in circumstances similar to the facts of this case. For example, in *Fisons Corp. v. Atochem North America, Inc.*, the court denied plaintiff's motion to disqualify defense counsel. No. 90 Civ. 1080, 1990 WL 180551 (S.D.N.Y. Nov. 14, 1990). Applying standards similar to those applicable in Rhode Island, the *Fisons* court examined whether counsel had obtained consent after full disclosure of the dual representation and whether counsel could adequately represent the interests of each client. Atochem's counsel met both factors. First, it obtained informed consent from a "knowledgeable and sophisticated client" by explaining the possible adverse effects of dual representation. Second, Atochem's counsel proved that it could adequately represent both clients by explaining the nature of the competing representations. The court noted that a client should be allowed to consent to dual representation because of the importance of "the client's right to take a calculated risk and, with full knowledge, engage the attorney of his choice." *Id.* at *6 (*quoting Unified Sewerage Agency of Washington County, Or. v. Jelco Inc.*, 646 F.2d 1339, 1350 (9th Cir. 1981)).[8]

---

8 Seaton cites a number of cases for the proposition that "courts are critical of 'blanket' future conflict waivers and loath to give them effect." (Seaton Br. at 7.) But those cases either *support* Illinois Union's position that Seaton's motion should be denied, or are easily distinguished because of very different facts than are present here. *See, e.g.*, *Univ. of Rochester v. G.D. Searle & Co., Inc.*, No. 00-6161, 2000 WL 1922271 (W.D.N.Y. Dec. 11, 2000) (discussion *infra* at p. 29); *Fla. Ins. Guaranty Ass'n v. Carey Canada, Inc.*, 749 F. Supp. 255, 260 (S.D. Fla. 1990) (holding future waiver unenforceable under the circumstances because the alleged "standing consent defense derives not from any written agreement between the firm and FIGA or from any stated permission of FIGA management or counsel, but instead from the failure of low-level claims adjusters to object to adverse representation."); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 227-229 (7th Cir. 1978) (court determined that, where confidential information could and likely would be used against a client, "consent to the mere representation of a client with adverse interests does not amount to either consent to breach of confidential disclosure or to the use of that information against the consenting party in litigation").

### B. Seaton's Agent Randall/Cavell Had Authority to Waive Conflicts on Behalf of Seaton

Seaton acknowledges that Randall/Cavell was its agent, and nowhere do they dispute that Randall/Cavell had the authority to retain Crowell & Moring to represent Seaton. Nevertheless, Seaton contends that Randall/Cavell did not have the authority to waive conflicts on Seaton's behalf in connection with the Crowell & Moring retention. Thus, Seaton seeks to convince this Court that Randall/Cavell was "merely responsible for the administration of insurance and reinsurance claims for Seaton." (Affidavit of Joseph P. Follis in Support of Plaintiff's Motion to Disqualify ("Follis Aff.") at 7.) Of course for a run-off company like Seaton – which meant that Seaton was not writing any new insurance policies but was simply running off its existing claims obligations – the "administration of insurance and reinsurance claims" was effectively the only business Seaton had.

Notwithstanding the assertions in Seaton's motion to this Court, it has told a very different story about Randall/Cavell's authority to a federal court in New York. *See Seaton Ins. Co. v. Cavell USA, Inc. f/k/a Ken Randall America*, No. 07:CV07302 (S.D.N.Y.). In an ongoing dispute between Seaton and Randall/Cavell, in which Seaton alleges that Randall/Cavell acted fraudulently in connection with the run-off administrative agreement between Seaton and Randall/Cavell ("Run-Off Agreement"), Seaton states that it "retained [Randall/Cavell] to provide comprehensive run-off management services for Seaton," and that Randall/Cavell had broad authority to act on Seaton's behalf. (Hildebrand Decl., Exh. 4 (First Amended Complaint) at 22.) Specifically, in December of last year Seaton asserted to the Southern District of New York that:

> [u]nder the Seaton Administration Agreement, Seaton entrusted Cavell to manage virtually all of Seaton's affairs . . . .

(*Id.*, at 23 (emphasis added); *see also* Hildebrand Decl., Exh. 5 (Seaton's Memo. of Law in Opp. to Cavell's Motion to Dismiss) at 5) ("Seaton entrusted [Randall/Cavell] to manage virtually all of Seaton's affairs").) The primary reason for granting Randall/Cavell this broad authority was no doubt because after a series of transactions leading up to the agreement between Seaton and Randall/Cavell, Seaton "no longer had any staff of its own." (Hildebrand Decl., Exh. 4 (First Amended Complaint) at 21.)

The question of actual authority centers on the agent's reasonable belief of the principal's wishes as expressed to the agent. Restatement (Third) of Agency § 2.01 (2006). The agent's belief can arise from the express terms of an agreement or be implied as part of the agent's responsibilities naturally related to the authority expressly granted. In this case, this distinction is largely inconsequential because Randall/Cavell's authority, whether express or implied, is plain.

Thus, putting aside Seaton's own admissions in a New York court, the plain language of the Run-Off Agreement between Seaton and Randall/Cavell – the only document that Seaton attaches to its motion that addresses the relationship with Randall/Cavell – expressly grants broad authority to Randall/Cavell, and that broad authority clearly extends to Randall/Cavell's ability to waive conflicts in connection with the retention of counsel on behalf of Seaton. Pursuant to paragraph 8.1 of the Run-Off Agreement, Randall/Cavell had the express and actual authority to "delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement." (Follis Aff., Exh. A (Run-Off Agreement).) Further, Randall/Cavell was specifically authorized to participate in any "arrangement designed to mitigate or avert Claims," "carry out any ancillary Claims processing work," and "liaise with professional advisers." (*Id.* (Schedule 1, Paragraph 3.1).)

Seaton argues that because the exact words "conflict waivers" are not specifically identified in the Seaton-Randall/Cavell administrative agreement, Randall/Cavell has no actual

authority to grant conflict waivers. But as noted above, Seaton does not dispute that Randall/Cavell was authorized to retain Crowell & Moring, nor does Seaton dispute that Randall/Cavell had the authority to negotiate billing rates, staffing, and other matters with Crowell & Moring, and to pay Crowell & Moring for its work (although none of these words are found in the Run-Off Agreement either). Therefore, certainly the negotiation and granting of conflict waivers is included within that actual authority.

In any event, under even the most strained reading of the agreement, such activity falls within Randall/Cavell's implied authority. Generally, an agent's implied authority includes the authority to do "whatever acts are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." 3 Am. Jur. 2d *Agency* § 72 (2007). In other words, Randall/Cavell can take those actions that are necessary or incidental to achieving Seaton's objectives – one undisputed objective for Seaton being the retention of counsel. *See* Restatement (Third) of Agency § 2.02 (2006).

The Rhode Island Supreme Court recently applied this concept in *McBurney v. Roszkowski*, 875 A.2d 428 (R.I. 2005). In that case, the principal had expressly authorized his agent-attorney to settle a lawsuit with the defendant. But the principal argued that he did not grant his agent the authority to sign a stipulation specifying "judgment for the defendant" rather than the more common "dismissal with prejudice." The Court found that, "in the absence of any evidence that [the principal] specifically advised his attorney not to enter into the stipulation . . . [his agent] had, at a minimum, the implied authority to enter into the judgment stipulation necessary to carry into effect the main authority conferred, *viz.* to settle the case." *Id.* at 438 (relying on agency law expressed in the Restatement (Second) of Agency). Likewise, Randall/Cavell had both the expressed and implied authority to enter into a conflicts waiver with Crowell & Moring,

which was necessary to carry out the primary authority conferred, the retention of counsel for Seaton.

### C. Seaton's Misstatements about Thomas Ryan

Seaton suggests that the conflict waiver is somehow less effective because, according to Seaton, the recipient of the June 2003 Waiver Letter, Mr. Ryan, was not a Randall/Cavell employee. (*See* Follis Aff. at ¶ 9 ("Thomas M. Ryan is not an employee of Randall America and has never worked for Randall America").) Notwithstanding the fact that the waiver was originally negotiated with Mr. Burns (a Randall/Cavell employee), copied to Mr. Whitney (same), and subsequently ratified by Mr. Bendig (same), Mr. Ryan clearly held himself out as a Randall/Cavell employee.

Mr. Ryan worked in the Randall/Cavell offices in Cambridge, Massachusetts and communicated through a Randall/Cavell email address. (Hildebrand Decl., Exh. 9 (emails evidencing Mr. Ryan's position).) He signed discovery on behalf of Randall/Cavell insurers, which stated that "*Mr. Ryan's employer, Randall America*, is a third-party administrator responsible for handling claims." (*Id.*, Exh. 6 (discovery in the case of *In re J.T. Thorpe*, 02-41487 (S.D. Tex.) executed by Mr. Ryan in 2002, before the June 2003 Waiver Letter was sent to Mr. Ryan) (emphasis added).)[9]

This is because Mr. Ryan did work for Randall/Cavell. The agreement under which Seaton retained Randall/Cavell as Seaton's agent states that Randall/Cavell will

---

[9] In the correspondence attached to the Follis affidavit, even Seaton's counsel appears to refer to Mr. Ryan as a Randall/Cavell employee: Seaton's attorneys at Stroock requested interviews of "Cavell representatives" including Mr. Ryan (12/1/05 Cohen letter.) As noted above, there is an ongoing dispute between Seaton and Randall/Cavell that has nothing to do with either Crowell & Moring or the ACE USA Companies. The letter from Seaton's counsel attached to the Follis affidavit appears to be one of the initial skirmishes in that dispute.

> provide a representative of [National Indemnity Company] with full time access to the Company's offices and records and to allow such representative to monitor the payment of claims and to assist [Randall/Cavell] and the Company in the settlement of such claims. In addition, [Randall/Cavell] will pay NIC for all salary, benefits and like costs and expenses associated with such representative.

(Follis Aff., Exh. A (Run-Off Agreement) at ¶ 2.3.) To the extent that Seaton is claiming in its motion that Mr. Ryan was technically an employee of National Indemnity Company ("NIC")[10] – and not a Randall/Cavell employee – that statement is simply incorrect. Ken Randall, who helped form Randall America, explained to the Pennsylvania Insurance Department, that under an agreement between Randall/Cavell and NIC (what he refers to as a Collaboration Agreement), NIC employees were Randall/Cavell employees.

> The Collaboration Agreement was intended to reflect what is in the UK known as "secondment" whereby an employee of one entity can be allocated, on a full- or a part-time basis, to work for another. The employer remains responsible for the administrative side of the employment but the entity to whish (s)he is seconded takes responsibility for the actions or omissions of the employee when acting according to its instructions. . . The fact is that they <u>are</u> Cavell employees.

(Hildebrand Decl., Exh. 8 (5/26/06 Letter from Ken Randall of Randall & Quilter Investment Holdings Ltd. to Amy Daubert of the Pennsylvania Dept. of Ins.) (emphasis in original).[11] And while Seaton appears to try and distance itself from Mr. Ryan in its motion, through 2006 and even as late as last as November 2007, Mr. Ryan apparently continued to work on behalf of

---

10 There has also been litigation between Seaton and NIC arising out the business transactions that included the administrative agreement between Seaton and Randall/Cavell. (*See* Hildebrand Decl., Exh. 7 (NIC's Petition to Confirm Arbitral Award, dated November 15, 2007, *National Indemn. Co. v. Seaton Ins. Co.*, No. 07:CV10349 (S.D.N.Y.) (NIC seeking confirmation of arbitration award rejecting Seaton's demand for rescission of certain reinsurance contracts and granting NIC's request that it continue as claims servicer.).)

11 The letter from Ken Randall apparently concerned issues in the dispute between Seaton and Randall/Cavell, which by 2006 apparently had reached both the Delaware and Pennsylvania insurance departments.

Seaton with regard to the very matters in dispute in this action. (*See id.*, Ex. 9 (emails evidencing Mr. Ryan's position).)

### D. Even if Seaton Had Not Explicitly Authorized Randall/Cavell to Waive Conflicts on Its Behalf, Crowell & Moring's Reliance on Randall/Cavell's Apparent Authority Would Have Been Appropriate

Even if it were true that Randall/Cavell did not have an actual grant of authority to waive conflicts on Seaton's behalf, which it is not, Seaton held Randall/Cavell out to Crowell & Moring, and the industry at large, as its agent entrusted to manage virtually all of Seaton's affairs. Indeed, even now Seaton does not argue that Randall/Cavell was not authorized to retain Crowell & Moring, only that that authority did not extend to granting a waiver incidental to that retention. Accordingly Randall/Cavell had, at a minimum, apparent authority to grant the Crowell & Moring waiver and, in so doing, bind Seaton to this waiver.

Apparent authority exists under Rhode Island law when:

(1) the principal manifestly consented to or knowingly permitted the agent to exercise the principal's authority;

(2) a third person knew of this fact and, acting in good faith, had reason to believe and actually did believe that the agent possessed such authority; and

(3) in reliance on this appearance of authority, the third person changed his position and will be injured or suffer a loss if the act or transaction does not bind the principal.

*Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 278 (D.R.I. 2004). Here, all three requirements are easily demonstrated.

Nor does it matter that Crowell & Moring did not receive direct instructions from Seaton. Rather, a principal's consent to its agent's actions can be manifested by indirect indicia of authority and is not required to be direct communication with the third party. *See, e.g.*, *Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys. Inc.*, 539 A.2d 523, 526 (R.I. 1988) (agent's undisputed authority to enter into original contract with subcontractor was indicia that it also

had authority to orally modify that contract); *Fraioli*, 328 F. Supp. at 281 (finding indicia of authority where third party received checks from principal and contacted principal regarding the lapse of his policy); *Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58 (D.R.I. 1996) (finding apparent authority based on indicia of authority including life insurance company logo on each page of proposal, indicating that it was written by someone at the company).[12]

Thus, in addition to actual authority, Randall/Cavell had apparent authority to negotiate Crowell & Moring's retention and agree to any terms (including waiver) necessary to allow the engagement to proceed. Crowell & Moring believed in good faith that Randall/Cavell possessed the authority to retain counsel and waive conflicts. (*See* Hendler Decl. at ¶ 11.) And the ACE USA Companies and Crowell & Moring relied on Randall/Cavell's authority to retain the firm and waive conflicts. (*See id.* at ¶¶ 11-13.)

Crowell & Moring's reliance was properly reinforced by the fact that retaining counsel is a common activity for agents, such as Randall/Cavell, entrusted with running off insurance and reinsurance business. *See* Restatement (Second) of Agency § 27, cmt. a (1958) (when an agent holds a position with generally recognized functions, the agent may be found to possess apparent authority to perform the duties ordinarily entrusted to one occupying that position). The First Circuit applied this principle to a dispute over an insurance salesman's authority to enter into an oral contract for fire insurance. *Grange Mut. Fire Ins. Co. v. Commons, Inc.*, 146 F.2d 788 (1st Cir. 1945). Even though the agent did not have express authority to issue policies directly for the defendant insurance company, the court found apparent agency where the

---

[12] To the extent Randall/Cavell acted beyond the scope of its actual authority, there might be a dispute between Seaton and Randall/Cavell, but the consequences would not affect the ACE USA Companies and Crowell & Moring as third-parties relying on that agency. Restatement (Third) of Agency § 8.09, cmt. b (2006).

authority was based on "settled custom uniformly acted on" in the industry. *Id.* at 791. Having met this standard, the burden shifted to the alleged principal to demonstrate that the third party relying on the agency had actual knowledge that the agent had less authority than agents like him usually exercised.[13] Seaton has not and cannot meet this burden.

**E. Seaton's Waiver Remains Effective**

Neither Seaton's termination of Randall/America, nor any of the communications between Seaton and Crowell & Moring alter the binding nature of the waiver given.

First, Seaton's conflict waiver, agreed to by its agent Randall/Cavell, was not somehow revoked when Seaton terminated its business relationship with Randall/Cavell several years later. Actions taken by an agent that bind a principal continue their binding effect after the authority of the agent has been revoked. *See O'Hare v. Gen. Marine Trans. Corp.*, 740 F.2d 160, 168-69 (2d Cir. 1984) (holding principal could not repudiate agent's authority to enter into agreement on principal's behalf after the agent had already entered into the contract). Any other rule would, for example, allow a corporation to be relieved of a contractual obligation simply by terminating the employment of the person who signed the contract on behalf of the corporation.

Second, any such attempted revocation could not have been effective here. Mr. Follis' Affidavit – the only "evidence" proffered by Seaton – speaks only in conclusory terms and points to no action by Seaton that would have informed Crowell & Moring or the ACE USA Companies that Seaton was withdrawing its consent. Crowell & Moring did learn in August 2006 that Seaton would prefer that the ACE USA Companies be represented by a different firm

13 The one and only case cited by Seaton on the issue of agency actually supports Illinois Union's argument. In *Transurface Carriers, Inc. v. Ford Motor Co.*, the court found the agent had apparent authority because the agent's action was "usual and necessary" to the primary conduct for which the agent had actual authority from the principal. 738 F.2d 42, 45-46 (1st Cir. 1984) (person authorized to pick up truck on behalf of employer had the apparent authority to sign warranty agreement that was contained in a boilerplate order form).

in connection with its reinsurance disputes with Seaton. (Hendler Decl. at ¶¶ 21-25.) However, in response to Seaton's concern, Crowell & Moring forwarded to Seaton the June 2003 Waiver Letter and reiterated that, notwithstanding Seaton's concern over this issue, the ability to represent the ACE USA Companies, even in matters adverse to Seaton, had been a critical agreement upon which Crowell & Moring had relied from the very beginning as a necessary precondition to Crowell & Moring's ability to represent Seaton. (*Id.*) Seaton did not disagree with this plain statement or further respond that the waiver was ineffective. (*Id.*) In fact, Seaton gave no further indication that it objected to Crowell & Moring's representation until negotiations between the ACE USA Companies and Seaton broke down over a year later. (*See* Hildebrand Decl., Exh. 2 (11/13/07 letter from Mr. Bendig to Mr. O'Neill).)

Thus, there was no basis for Crowell & Moring to believe that Seaton was attempting to revoke the agreed-to advance conflict waiver. (*See* Hendler Decl. at ¶ 26.) To the contrary, Crowell & Moring understood Seaton to have accepted the fact that the advance conflict waiver was the cornerstone of Crowell & Moring's representation of Seaton. (*Id.*)

Even if Seaton had actually attempted to retroactively revoke the conflicts waiver, Seaton was aware that both the ACE USA Companies and Crowell & Moring were relying on Seaton's consent to the dual representation. In this situation, Seaton's waiver cannot simply be "revoked." A leading Ninth Circuit decision states expressly that revocation of consent does not preclude continuing representation of the other client where the law firm and other client had relied upon the waiver. *See Unified Sewerage Agency of Washington County, Or. v. Jelco Inc.*, 646 F.2d 1339, 1346 n.6 (9th Cir. 1981) (assuming that waiving client's motion to disqualify acted as a revocation of consent, that client "would be estopped from revoking its consent by everyone's reliance on its long-standing position"); *accord Fisons Corp*, 1990 WL 180551 at *8, n.6 (dismissing

a client's attempted revocation of its consent for law firm to represent non-waiving client's representation due to that client's reliance).

In determining the extent of the reliance, courts typically consider the longstanding nature of a firm's representation of a non-waiving client as compared to the relatively circumscribed nature of the representation for the waiving client. For example, the court in *Interstate Proper. v. Pyramid Co of Utica*, while not expressly mentioning reliance, focused heavily, in denying the disqualification motion, on the law firm's long and continuous relationship with the non-revoking client and the revoking client's knowledge of that relationship before engaging the law firm. 547 F. Supp. 178, 182 (S.D.N.Y. 1982).

The same is true here. Crowell & Moring's representation of the ACE USA Companies has been the cornerstone of its insurance practice. (*See* Hendler Decl. at ¶¶ 4-6.) It is undisputed that, to satisfy a necessary condition to the ACE USA Companies agreeing to Crowell & Moring's representation of Seaton, Crowell & Moring required an advance waiver of potential conflicts from Seaton. (*See id.* at ¶¶ 9-13.) Seaton knew of this condition as it has been expressed at the time of retention and on a number of occasions since then. (*See id.* at ¶¶ 17-18; Plevin Decl. at ¶ 10.)

Furthermore, given the length of time that has lapsed since Seaton has been on notice of Crowell & Moring's representation of the ACE USA Companies in matters adverse to Seaton, Seaton's motives for bringing its objection at this late hour are questionable. *Interstate Proper*, 547 F. Supp. at 182 (given unambiguous waiver, delay of two years for objection to representation could "only be interpreted as a litigation ploy and not as a genuine complaint"). Seaton knew of Crowell & Moring's representation of the ACE USA Companies adverse to Seaton as of August 2006, but waited 15 months before asserting its conflict argument. (*See* Hildebrand Decl., Exh. 2 (11/13/07 letter from Mr. Bendig to Mr. O'Neill).)

## II. Crowell & Moring Can Provide Competent and Diligent Representation to Each Client

Notwithstanding all of the foregoing, Seaton appears to believe the only interest to be weighed here is its own. In fact, the only client that would actually be affected by the disqualification would be the ACE USA Companies, which would not have allowed Crowell & Moring to represent Seaton without a waiver and acted in reliance on Seaton's waiver. Indeed, without the express representation that Seaton (or any Randall/Cavell-administered company) would consent to the ACE USA Companies' use of Crowell & Moring in future matters, even in matters adverse to Crowell & Moring's prospective clients such as Seaton, the ACE USA Companies would not have permitted Crowell & Moring to undertake such representation.

By contrast, Crowell & Moring's representation of Illinois Union in this matter will do nothing to affect Crowell & Moring's representation of Seaton in other matters (Hendler Decl. at ¶ 20) and Seaton does not allege that Crowell & Moring's representation of Seaton in other matters has suffered in the slightest.

Furthermore, Seaton does not argue that Crowell & Moring has confidential Seaton information concerning the matters in this dispute, nor could it. Seaton simply states that Crowell & Moring has confidential information about Seaton generally but the issue is not whether Crowell & Moring may have confidential information about the handful of matters in which Crowell & Moring has represented Seaton; if that were the test then no waiver involving a current client could ever be effective, as a law firm undoubtedly almost always obtains confidential information about other representations performed for that client. And the Rhode Island Rules of Professional Conduct are clear that "general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation." *See* Rhode Island Rules

of Professional Conduct Rule 1.9, cmts. 3 and 9 (applying standard to advance waivers under Rule 1.7(b)).

Instead, the issue for this Court is whether Seaton has proven that Crowell & Moring has any "knowledge of specific facts gained in a prior representation that are relevant to the matter in question" (*id.*) and as a result Seaton will suffer any unfair disadvantage in this action. The answer is no. The moving party made a similarly unsuccessful attempt to disqualify counsel in *Haffenreffer*. There, Judge Torres remarked that the movant had proffered neither any information regarding that nature of the allegedly privileged communications the targeted law firm would have received nor any support for the assertion that the law firm would have been privy to those communications. *Haffenreffer*, 2007 WL 2972575 at *4. Likewise, in the case cited by Seaton for the proposition that courts are "loath to give [future waivers] effect" (Seaton Br. at 7), the court upheld the waiver and did not disqualify counsel. *See Univ. of Rochester*, 2000 WL 1922271. In doing so, the court stated that:

> in order to justify the harsh remedy of disqualification, [Defendant] must come forward with facts tending to show that [counsel's] representation of the [Plaintiff] has tainted the trial by affecting counsel's presentation of the case, by placing counsel in a position to use privileged information, or by otherwise allowing counsel to gain an unfair advantage against [Defendant]. The record before the court contains no such facts. Instead, [Defendant] contends simply that the trial has been tainted by [counsel's] obvious breach of its duty of undivided loyalty to [Defendant].
>
> Without minimizing the importance of "the duty of undivided loyalty which an attorney owes to each of his clients . . .," this contention is not sufficient to sustain [Defendant's] burden as movant, in light of the facts and circumstances set forth above. There has been no showing, or even the suggestion, that [counsel] have been placed in the position to use any privileged information or to otherwise gain an unfair advantage against [Defendant] in the pending action.

*Id.* at *7 (citations omitted). Like the movants in *Haffenreffer* and *Univ. of Rochester*, Seaton has not established that Crowell & Moring has received any information (privileged or not) that is relevant to this dispute.[14]

Moreover, Seaton has also failed to show that the attorneys working on this litigation would now have had access to such information, if it even existed. In fact, Seaton cannot make such a showing, as an ethics wall has been in place since Crowell & Moring was retained by the ACE USA Companies to represent them in the reinsurance disputes adverse to Seaton. (*See* Hendler Decl. ¶ 20.) Because Crowell & Moring has only represented Seaton in unrelated matters and has put in place an ethics wall, Illinois Union could not and will not have an unfair advantage in this dispute.

**CONCLUSION**

Seaton has not met its heavy burden in seeking to deny Illinois Union of its counsel of choice. Seaton's agent granted Crowell & Moring a broad waiver that specifically allowed Illinois Union (and the ACE USA Companies) to retain Crowell & Moring adverse to Seaton in this case.[15] Randall/Cavell had the authority to grant that waiver. And because both the ACE

---

14 The cases regarding confidential information cited by Seaton are also easily distinguishable. In *Falvey v. A.P.C. Sales Corp.*, 185 F.R.D. 120 (D.R.I. 1999), the court disqualified counsel only after finding that an attorney (associated with the defendant's counsel) had material information directly related to the plaintiff's case because the attorney had actually worked on the plaintiff's case during his prior employment. Likewise, in *Putnam Resources v. Sammartino, Inc.*, 124 F.R.D. 530 (D.R.I. 1988), counsel was disqualified only after the judge found that a substantial relationship existed between plaintiff creditor's instant lawsuit and prior representation by the same attorney of a competing creditor. Again, Seaton has not asserted that the instant reinsurance disputes bear a "substantial relationship" to Crowell & Moring's representation of Seaton in other matters.

15 To the extent the Court does not deny the pending motion, at a minimum, discovery – including presumably the depositions of Mr. Follis, Mr. Ryan, Mr. Burns, Mr. Bendig and others and the production of documents concerning the Seaton-Randall/Cavell relationship – would be necessary before Seaton's motion could be granted.

USA Companies and Crowell & Moring relied on that waiver, it cannot simply be revoked. In short, nothing in Seaton's motion supports its request that Crowell & Moring be disqualified.

DATED: February 4, 2008

ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY,

By Its Attorneys,
PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor

Robert K. Taylor (#6514)

Partridge Snow & Hahn LLP
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8200 (FAX)
rkt@psh.com

Attorneys for Defendant Illinois Union Insurance Company, f/k/a GATX Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ILLINOIS UNION INSURANCE COMPANY'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY COUNSEL was filed with the Clerk of the United States District Court for the District of Rhode Island this 4th day of February, 2008 and is available for viewing and downloading to the following ECF registered counsel of record:

John T. Harding / Morrison Mahoney LLP
jharding@morrisonmahoney.com

Thomas M. Robinson / Morrison Mahoney LLP
trobinson@morrisonmahoney.com

/s/ Robert K. Taylor