**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

SEATON INSURANCE COMPANY, f/k/a UNIGARD MUTUAL INSURANCE COMPANY,

Plaintiff,

v.

ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY

Defendant.

Civil Action No. 07-332-S-DLM

**DECLARATION OF CLIFFORD B. HENDLER IN SUPPORT OF DEFENDANT ILLINOIS UNION'S OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL**

I, CLIFFORD B. HENDLER, declare as follows:

1. I am a partner at Crowell & Moring LLP. I make this declaration in support of Illinois Union's Opposition to Plaintiff's motion to disqualify counsel.

2. I am over the age of twenty-one years and am otherwise competent to give this declaration. I have personal knowledge of the matters stated herein and know them to be true and correct.

3. I joined Crowell & Moring in 1988 and have led the firm's insurance practice since that time. Today, I am co-chair of the firm's insurance group.

4. I began representing what are now the ACE USA Companies (originally Insurance Company of North America and related companies, and after that CIGNA and related companies) in 1982 and have continued to represent them through today.

5. Although Crowell & Moring currently represents numerous insurance companies, the vast majority of its work for almost twenty years has been for the ACE USA Companies and predecessors ("the ACE USA Companies"). Indeed, prior to 2001, the insurance group worked almost exclusively for the ACE USA Companies.

6. Throughout most of that period, the ACE USA Companies, taken together, were one of Crowell & Moring's largest clients. In return for that volume of business, the ACE USA Companies insisted that Crowell & Moring work almost exclusively for them in the insurance area. One reason for that insistence was that the ACE USA Companies wanted to maximize the chances that if they referred a new matter to us, we would be able to take it on. They were concerned that if we represented other carriers, and a new matter also involved other carriers represented elsewhere by Crowell & Moring, those other carriers might try to object on conflicts grounds to Crowell & Moring taking on the new matter for the ACE USA Companies and thus potentially have a veto power over the ACE USA Companies use of Crowell & Moring.

7. In short, up until the time that Randall America (later Cavell) ("Randall/Cavell") retained us, the ACE USA Companies had resisted the idea of Crowell & Moring taking on other insurance clients, for fear that Crowell & Moring might find itself in the position of having to decline work requests from the ACE USA Companies.

8. In 2001, Randall/Cavell sought to retain Crowell & Moring to represent Seaton and other Randall/Cavell carriers.

9. At that time, the ACE USA Companies agreed that Crowell & Moring could take on work for Randall/Cavell, with the clear understanding that we could only do so if it would not preclude the ACE USA Companies from turning to us, as they always had, to represent them in any dispute in which we were not already representing a Randall/Cavell-administered carrier. It is against this background that my negotiations with Randall/Cavell must be viewed.

10. Given that context, when my partner Andy Marks and I worked out terms of engagement with Randall/Cavell back in 2001, I had no choice but to obtain an agreement with Randall/Cavell that satisfied the ACE USA Companies' requirements. (Indeed, the ACE USA Companies originally insisted upon approving new Randall/Cavell representations on a case-by-case basis and insisted upon a right of first refusal, if a case were filed against both the ACE USA Companies and a Randall/Cavell-administered carrier.)

11. Robert Burns, an experienced, legally trained senior claims official, took the lead on these original negotiations for Randall/Cavell and the carriers for whom Randall/Cavell acted as a third-party administrator. Mr. Burns represented and I understood that he had authority to speak for the Randall/Cavell-administered carriers with respect to matters such as retention of counsel, billing rates, and waivers of conflicts. During the negotiations, I made clear the ACE USA Companies-imposed limitations that we had to operate under and Randall/Cavell understood and accepted that Crowell & Moring had to remain as free to take on new matters for the ACE USA Companies after we started representing Randall/Cavell-administered carriers as we had been before we started representing Randall/Cavell-administered carriers, which meant we had to be free to represent the ACE USA Companies adverse to Randall/Cavell-administered carriers. (Indeed, Mr. Burns already knew of our firm's historical role as National Coordinating Counsel for the ACE USA Companies' predecessors from when Mr. Burns had previously run a coverage litigation management unit for an the ACE USA Companies' predecessor that made extensive use of our firm.)

12. Accordingly, with this conflict waiver understanding in place, Crowell & Moring's insurance group undertook to represent Randall/Cavell-administered carriers, such as Seaton.

13. Importantly, we could never have taken on the representation of Randall/Cavell-administered carriers absent the conflicts waivers and assurances I received at the outset of this

representation. Nor would we have taken on these representations if Seaton, or any other Randall/Cavell-administered carriers, had tried to reserve an ability to revoke these conflicts waivers and assurances, since that could have threatened our ability to take on new matters for the ACE USA Companies without the ACE USA Companies having to worry about conflicts with other carriers.

14. This advance conflict waiver is confirmed in the June 30, 2003 letter I wrote to Thomas D. Ryan, Esq., who then was in charge of Randall America, with a copy to Robert A. Whitney, Esq., also of Randall America, confirming the understanding and agreement that Seaton (along with other entities, such as Stonewall and OneBeacon, for which Randall/Cavell is also responsible) waives any conflicts in connection with the firm's representation of other insurance carrier clients of the firm, such as ACE (which is mentioned by name in the letter), in unrelated matters in which Seaton may have an adverse interest. A copy of the June 30th letter is attached as Exhibit A.

15. Consistent with our approach to Randall/Cavell, and in light of Crowell & Moring's above-described relationship with the ACE USA Companies, we have insisted on and received an advance conflict waiver from each new insurance industry client that has retained Crowell & Moring's insurance group since then.

16. Seaton's continued agreement to its advance conflict waiver is and has been a condition of our firm continuing to represent Seaton; we would not have accepted the engagement without it.

17. Randall/Cavell, is and has been aware of this waiver, on which our firm has relied on more than one occasion.

18. For example, Brian Bendig, at the time a senior lawyer at Randall/Cavell, had previously acknowledged the waiver after he raised a conflict issue in the Spring of 2006 regarding

our firm's representation of another insurance carrier in a matter involving OneBeacon (an insurer that was also subject to the same waiver as Seaton). After initially asserting that there was a conflict with our firm's participation in that matter, Mr. Bendig acknowledged to my partner Mark Plevin that the waiver controlled and characterized it as a "broad waiver."

19. Although I have not worked on the reinsurance disputes that are going on between the ACE USA Companies and Seaton, I am generally aware that there are disputes going on.

20. In particular, I am aware that the firm has taken measures to protect the confidential information of both the ACE USA Companies and Seaton. Since 2006, a wall has been in place between individuals working on matters for Seaton, on the one hand, and those individuals working for the ACE USA Companies in the matters adverse to Seaton, on the other. This wall precludes any discussions of the substance of the firm's Seaton representations with the attorneys handling the ACE USA-related matters adverse to Seaton.

21. In the August to September 2006 time period in which the ACE USA Companies reinsurance arbitrations against Seaton were initiated, Mr. Ryan, to whom my June 2003 letter was addressed, called me about my firm's initiation of what I understand to be collection activity by the ACE USA Companies against Seaton. Mr. Ryan expressed concern that our undertaking these reinsurance arbitrations could place him in an awkward position politically, but did not dispute the validity of the waiver. Although it was clear that Mr. Ryan would have preferred it if our firm had declined to take on the ACE USA Companies work as a matter of client relations, Mr. Ryan did not contest the validity of the waiver.

22. Several weeks later, I learned from Mr. Burns (who at that time had gone to work in the same office in Rhode Island with Seaton's Joe Follis) that Mr. Follis was troubled by the firm's initiation of the arbitrations. Mr. Burns also did not dispute the validity of the wavier, but did suggest it might be a good idea if I tried to address Mr. Follis' concerns. In response, I emailed Mr.

Follis, with a copy to Mr. Burns, to explain to Mr. Follis the history and the terms of the waiver, the absolute right of the ACE USA Companies to have us initiate these proceedings against Seaton, and the existence of an ethical wall that would protect confidential Seaton information from being compromised by my partner's representation of the ACE USA Companies in these Seaton-related matters. A copy of this e-mail is attached as Exhibit B.

23. Mr. Follis responded that Seaton was concerned about the firm's filing of the arbitration against it on behalf of the ACE USA Companies and requested that I provide him with an explanation of the waiver and copy of the conflict letter. A copy of this e-mail is attached as Exhibit C.

24. In response to this, I then forwarded to Mr. Follis the June 2003 waiver letter. I also reiterated to Mr. Follis that, notwithstanding his concern, the firm's ability to represent the ACE USA Companies, even in matters adverse to Seaton, had been a critical agreement upon which Crowell & Moring had relied from the very beginning as a necessary precondition to our ability to represent Seaton. I noted specifically that those historical conflicts understandings, as negotiated with Mr. Burns, did not give Seaton a right to veto the ACE USA Companies having Crowell & Moring act adversely to Seaton. A copy of this e-mail is attached as Exhibit D.

25. Upon receiving my e-mail and waiver letter, Mr. Follis did not then respond that the waiver was ineffective.

26. Accordingly, there was no basis for me to believe that Mr. Follis was attempting to revoke the agreed to advance conflict waiver. To the contrary, I understood him to have accepted the fact that the advance conflict waiver was the cornerstone of Crowell & Moring's representation of Seaton, even if it was also clear that Mr. Follis probably wished that the waiver had not been given.

27. In fact, I did not hear anything more about this conflict waiver until late 2007, over a year later, when it was brought to my attention that Seaton might be challenging Crowell & Moring's representation of the ACE USA Companies in the connection with the ACE USA Companies reinsurance disputes with Seaton. At that point I called Mr. Bendig, who – along with the majority of people who had previously worked at Randall/Cavell – now worked for Resolute New England. Once again, I reiterated the existence of the advance waiver. During this call, Mr. Bendig stated that Seaton was taking the position that Crowell & Moring was conflicted from representing the ACE USA Companies adverse to Seaton. He did not, however, provide any reason that the advance waiver should not apply.

28. Shortly thereafter, Mr. Bendig called me to request a copy of the waiver letter. I provided him with another copy of this letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 1, 2008
in Washington, D.C.

Clifford B. Hendler