CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York , NY 10281
(212) 504-6000

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800

Attorneys for Plaintiffs,
Seaton Insurance Company and
Stonewall Insurance Company

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEATON INSURANCE COMPANY and STONEWALL INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>CAVELL USA INC. f/k/a KEN RANDALL AMERICA, INC. f/k/a EASTGATE, INC. and KEN RANDALL, individually,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil Action No. 07:CV07032 (RMB) (KNF) |

Plaintiffs, Seaton Insurance Company ("Seaton") and Stonewall Insurance Company ("Stonewall"), by and through their attorneys, for their complaint against defendants Cavell USA Inc. f/k/a Ken Randall America, Inc. and, earlier still, as Eastgate, Inc. ("Cavell") and Ken Randall, individually ("Randall"), allege as follows:

## I. Nature of Action

1. This action seeks to redress frauds perpetrated by Cavell and Randall upon Seaton and Stonewall in connection with the negotiation, amendment and operation of

Agreements Relating to Administration of Run-Off Business (the "Administration Agreements") pursuant to which Cavell was to provide run-off services, including claim administration, to Seaton and Stonewall. Prior to the inception of the Administration Agreements, Cavell represented that it would exercise independence in its role as claim administrator and, at all times, would safeguard Seaton's and Stonewall's economic and other interests. The Seaton and Stonewall Administration Agreements were executed in or about March 1999 and September 2000, respectively. Seaton and Stonewall now know that Cavell's and Randall's representations were false and that, at all material times, Cavell and its principal, Randall, intended to cede control over the administration of Seaton's and Stonewall's claims to National Indemnity Company ("NICO"), a reinsurer whose strategic objections were at odds with Seaton's and Stonewall's interests.

2. While the Administration Agreements were in effect, Cavell and Randall periodically represented to Seaton and Stonewall (collectively, the "Companies") that Cavell was zealously safeguarding the Companies' interests and faithfully fulfilling Cavell's fiduciary duties, as well as its duty of undivided loyalty. Based, in part, upon these representations, Seaton and Stonewall each agreed in 2004 to amend the Administration Agreements between them and Cavell (respectively, the "Seaton Administration Agreement" and the "Stonewall Administration Agreement") and to extend the period during which Cavell would act as run-off manager.

3. Until late 2005, Seaton and Stonewall relied upon Cavell's and Randall's representations and believed that Cavell was discharging its duties faithfully and professionally. In late 2005, Seaton and Stonewall discovered that Cavell's and Randall's periodic representations during the term of the Administration Agreements, as well as those that preceded the Administration Agreements' initial and renewal

negotiations, were false and that no later than August 2001, when Cavell and NICO entered into a so-called "Collaboration Agreement," Cavell wholly abdicated its fiduciary duties and responsibilities and delegated to NICO unfettered discretion to handle the Companies' claims and to collect reinsurance recoveries on the Companies' behalf.

4. Upon discovery of the import of the Collaboration Agreement and the falsity of Cavell's and Randall's representations, Seaton and Stonewall terminated the Seaton and Stonewall Administration Agreements and Cavell's services as run-off manager. Here, Seaton and Stonewall are seeking to recover damages for Cavell's and Randall's fraud, including a return of the more than $27 million paid to Cavell as fees under the Administration Agreements.

## II. The Parties

5. Seaton, formerly known as Unigard Security Insurance Company, is an insurance company organized and existing under the laws of the State of Rhode Island, with its principal place of business located in Warwick, Rhode Island.

6. Stonewall is an insurance company organized and existing under the laws of the State of Rhode Island, with its principal place of business located in Warwick, Rhode Island.

7. Cavell, formerly known as Ken Randall America, Inc. and, earlier still, as Eastgate, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Cambridge, Massachusetts. Cavell was initially owned by Eastgate Group Ltd. (the "Eastgate Group") and is now owned by the Randall & Quilter organization.

8. Ken Randall is a natural person who, upon information and belief, is a citizen of the United Kingdom.

**III. Jurisdiction and Venue**

9. Jurisdiction is based upon 28 U.S.C. § 1332(a). The citizenship of the parties is diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10. Venue is based upon 28 U.S.C. § 1391. Defendants are subject to service in this district. Further, in the Seaton Administration Agreement, Seaton and Cavell agreed that any action between them could be brought in the United States District Court for the Southern District of New York.

**IV. Factual Background**

**A. The Formation of Dukes Place**

11. In mid June 1996, Randall, the President of the Eastgate Group had discussions with Alfred Eckert III and Robert Hamwee of Greenwich Street Capital Partners Inc. ("GSC"), concerning the formation of a vehicle to acquire solvent insurance and reinsurance companies which had ceased, or were about to cease, underwriting new business. The Eastgate Group, through Randall, represented itself in those discussions to be a market leader in the provision of run-off services, including claim administration.

12. The discussions between Randall on the one hand and Eckert and Hamwee on the other proceeded through the summer of 1996 and came to fruition in September 1996.

13. On September 9, 1996, GSC issued a press release in which it announced that it had formed Dukes Place Holdings L.P. ("Dukes Place") as "an investment

partnership to acquire solvent insurance and reinsurance companies which have ceased, or are about to cease, underwriting new business." The press release also stated that Dukes Place had contracted its management to the Eastgate Group. The Eastgate Group requested and received, as part of this management structure, the exclusive right to provide claim administration and other run-off services to all companies acquired by Dukes Place.

14. During the discussions in the summer of 1996 that preceded the formation of Dukes Place and that preceded Dukes Place's retention of the Eastgate Group as run-off manager, Randall represented to Eckert and Hamwee that the Eastgate Group's run-off operations would exercise independence in their role as claims administrator for any insurance entity acquired by Dukes Place and, at all times, would safeguard such entity's economic and other interests. Based upon Randall's representations, it was GSC's and Dukes Place's understanding that the Eastgate Group would identify suitable companies for acquisition by Dukes Place, assist Dukes Place in negotiating a purchase and, thereafter on behalf of any acquired company work toward reducing liabilities in the shortest timeframe in order to maximize the value of the Dukes Place investment.

15. The Eastgate Group, through Randall, represented in the weeks leading up to Dukes Place's formation both that the Eastgate Group and its various affiliates had the expertise to provide claims administration and that they alone would provide those services to any entity acquired by Dukes Place.

**B. The Sale of Seaton and the Negotiation of the Seaton Covers**

16. In or about 1996, John Hancock Property & Casualty Holding Company ("John Hancock"), the then owner of Seaton, concluded that Seaton would no longer

write any new business and, going forward, would run-off its existing obligations to policyholders and cedents. Ever since, Seaton has remained in run-off.

17. In or about 1997, John Hancock decided to sell its interest in Seaton. In November 1998, it and Dukes Place Holdings, L.P. ("Dukes Place") entered into a Stock Purchase Agreement pursuant to which Dukes Place agreed to purchase, and John Hancock agreed to sell, all of the issued and outstanding shares of Seaton.

18. In connection with the acquisition of Seaton, Seaton purchased two finite reinsurance contracts (the "Seaton Covers") from NICO, an insurer in the Berkshire Hathaway group of insurance companies. Under the Seaton Covers, NICO agreed to reinsure Seaton's liabilities up to an aggregate limit of $343 million in exchange for a premium (paid by Seaton) of $192 million. This premium represented a substantial portion of Seaton's assets. (The limit of the Seaton Covers was later increased to $350 million.)

19. The control of Seaton's claims was a significant issue during the negotiation of the Seaton Covers. NICO sought to obtain control over the handling of Seaton's claims but was unable to do so. Seaton, as well as Dukes Place, insisted that Seaton retain control.

20. The Seaton Covers were subject to regulatory review and approval. Regulatory approval was an express condition precedent to the Covers' effectiveness. One topic of regulatory concern was claims control. The regulators wanted to ensure that under the Seaton Covers, Seaton retained control over the handling of its claims.

21. Under the Seaton Covers, Seaton retained responsibility for handling claims made against its insurance policies and reinsurance contracts. The Seaton Covers

authorized Seaton, which, following the sale, would no longer have any staff of its own, to use a third-party claims administrator to provide claim administration.

**C. Cavell is Appointed Seaton's Run-Off Manager**

22. Effective March 31, 1999, Seaton through Dukes Place and consistent with the arrangement previously negotiated by Eckert and Randall – retained Cavell to provide comprehensive run-off management services to Seaton. Under the Seaton Administration Agreement, which set forth the services Cavell agreed to provide to Seaton, Cavell was entitled to a substantial annual fee, ranging from $2.75 million for the year ending March 31, 2000 to $2.55 million for the year ending March 31, 2004. In January 2004, Seaton and Cavell amended the Seaton Administration Agreement to provide additional annual, multi-million dollar fees for Cavell – for the years ending March 31, 2005, March 31, 2006, March 31, 2007 and March 31, 2008. (During the term of the Seaton Administration Agreement, Seaton paid Cavell more than $16 million in fees.)

23. Under the Seaton Administration Agreement, Seaton entrusted Cavell to manage virtually all of Seaton's affairs, including claims administration, reinsurance collections, accounting and other services. The Seaton Administration Agreement required Cavell to perform its services "with reasonable care and skill in a professional and efficient manner." (A copy of the Seaton Administration Agreement, as amended, is attached hereto as Exhibit 1 and incorporated herein by reference.) This requirement memorialized an undertaking previously given by Randall, on behalf of the Eastgate Group and its various affiliates to Eckert and Hamwee. The Seaton Administration Agreement also required the Eastgate Group and its affiliated companies to manage and settle Seaton's claims "with the objective of their settlement at the lowest cost of

indemnity in the shortest timeframe." The Eastgate Group committed to this undertaking at the outset of negotiations, as reflected in an October 1997 draft "Heads of Terms" prepared by the Eastgate Group and provided to Hamwee of GSC.

24. Seaton would not have retained Cavell as its run-off manager but for the representations earlier made by Randall and the Eastgate Group to Eckert and Hamwee. In particular, Seaton, which had been acquired by Dukes Place, relied, when retaining Cavell, among other representations, upon Randall's and the Eastgate Group's commitments to: (i) zealously safeguard the interests of any entity acquired by Dukes Place; (ii) exercise independence when evaluating and administrating claims; and (iii) run-off the Company's liabilities at the lowest cost of indemnity in the shortest timeframe possible.

25. In early 1999, in connection with negotiating the Seaton Administration Agreement, Cavell and Randall represented to Seaton – as later reflected in the Seaton Administration Agreement itself – that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." This representation is also reflected in the drafts of the Administration Agreement prepared by Cavell.

26. As discussed more fully below, both prior and subsequent to the execution of the Seaton Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Seaton that they intended to cede and did in fact cede control of the administration of Seaton's claims to NICO, a company whose strategic objectives were at odds with Seaton's. NICO's interests, unlike Seaton's, were advanced by the payment of liabilities over a prolonged period of time, rather than in a short timeframe.

27. As a result of the Seaton Administration Agreement, Cavell became Seaton's agent and, in this capacity, owed Seaton fiduciary duties, including but not limited to, duties of complete candor, undivided loyalty and full disclosure.

28. Upon information and belief, prior to the time Cavell entered into the Seaton Administration Agreement, Cavell and Randall had determined that Cavell would cede claims control to NICO, by transferring to NICO all of Cavell's responsibilities for claim services under the Seaton Administration Agreement. Cavell and Randall never informed Seaton that Cavell intended to cede claims control to NICO. Had Cavell or Randall done so, Seaton would not have entered into the Seaton Administration Agreement.

29. Shortly after the Seaton Administration Agreement was signed, Cavell and NICO made an oral pre-funding agreement, the effect of which was to cede control of claims to NICO. Cavell failed to disclose to – and, upon information and belief, actively concealed from – Seaton the existence of this oral agreement, which came to Seaton's attention only this past summer. Had Cavell or Randall disclosed the oral pre-funding agreement and Cavell's concomitant cession of claims control to NICO in 1999, when the pre-funding agreement was made, or at anytime thereafter, Seaton would have immediately terminated the Seaton Administration Agreement.

**D. The Sale of Stonewall and the Negotiation of the Stonewall Cover**

30. In or about 1990, Great American Insurance Group Inc. ("Great American"), the then owner of Stonewall, concluded that Stonewall would no longer write any new business and, going forward, would run-off its exiting obligations to policyholders and cedents. Ever since, Stonewall has remained in run-off.

31. In or about 1999, Great American decided to sell its interest in Stonewall. In May 1999, it and Dukes Place entered into a Stock Purchase Agreement pursuant to which Dukes Place agreed to purchase, and Great American agreed to sell, all of the issued and outstanding shares of Stonewall.

32. In connection with the acquisition of Stonewall, Stonewall purchased a finite reinsurance contract (the "Stonewall Cover") from NICO. Under the Stonewall Cover, NICO agreed to reinsure Stonewall's liabilities up to an aggregate limit of $240 million in exchange for a premium (paid by Stonewall) of $126 million. This premium represented a substantial portion of Stonewall's assets.

33. The Seaton Covers served as the template for the Stonewall Cover, thus streamlining negotiations.

34. The Stonewall Cover, like the Seaton Covers, vested claims control in Stonewall and bound NICO to Stonewall's reasonable, good faith disposition of claims.

35. At no time prior to the inception of the Stonewall Cover did Cavell, Randall, NICO or, for that matter, any one disclose to Stonewall (or Dukes Place) or any insurance regulator the oral, pre-funding side agreement that Randall and NICO had negotiated concerning Seaton and that would be applied prospectively by Cavell to Stonewall.

36. Under the Stonewall Cover, Stonewall retained responsibility for handling claims made against its insurance policies and reinsurance contracts. The Stonewall Cover authorized Stonewall, which, following its sale, would no longer have any staff of its own, to use a third-party claims administrator to provide claim administration.

**E. Cavell is Appointed Stonewall's Run-Off Manager**

37. Effective September 30, 2000, Stonewall – through Dukes Place and consistent with the agreement previously negotiated by Eckert and Randall – retained Cavell to provide comprehensive run-off management services to it. Under the Stonewall Administration Agreement, which set forth the services Cavell agreed to provide to Stonewall, Cavell was entitled to a substantial annual fee, ranging from $2.3 million for the year ending September 30, 2001 to $1.65 million for the year ending September 30, 2005. In January 2004, Stonewall and Cavell amended the Stonewall Administration Agreement to provide additional annual, multi-million dollar fees for Cavell – for the years or partial year ending December 31, 2005, December 31, 2006, December 31, 2007 and December 31, 2008. (During the term of the Stonewall Administration Agreement, Stonewall paid Cavell more than $11 million in fees.)

38. Under the Stonewall Administration Agreement, Stonewall entrusted Cavell to manage virtually all of Stonewall's affairs, including claims administration, reinsurance collections, accounting and other services. The Stonewall Administration Agreement required Cavell to perform its services "with reasonable care and skill in a professional and efficient manner." (A copy of the Stonewall Administration Agreement, as amended, is attached hereto as Exhibit 2 and incorporated herein by reference.) This requirement memorialized an undertaking previously given by Randall, on behalf of the Eastgate Group Ltd. and its various affiliates to Eckert and Hamwee.

39. Stonewall would not have retained Cavell as its run-off manager but for the representations earlier made by Randall and the Eastgate Group to Eckert and Hamwee. In particular, Stonewall, which had been acquired by Dukes Place, relied, when retaining Cavell, upon Randall's and the Eastgate Group's commitments to:

(i) zealously safeguard the interest of any entity acquired by Dukes Place; (ii) exercise independence when evaluating and administrating claims; and (iii) run-off the Company's liabilities at the lowest cost of indemnity in the shortest timeframe.

40. In early 1999, in connection with negotiating the Stonewall Administration Agreement, Cavell and Randall represented to Stonewall – as later reflected in the Stonewall Administration Agreement itself – that Cavell would "at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith." This representation is also reflected in the drafts of the Administration Agreement prepared by Cavell.

41. As discussed more fully below, both prior and subsequent to the execution of the Stonewall Administration Agreement, Cavell and Randall fraudulently failed to disclose to and concealed from Stonewall that they intended to cede and in fact had agreed to cede control of the administration of Stonewall's claims to NICO.

42. As a result of the Stonewall Administration Agreement, Cavell became Stonewall's agent and, in this capacity, owed Stonewall fiduciary duties, including but not limited to, duties of complete candor, undivided loyalty and full disclosure.

43. Upon information and belief, prior to the time Cavell entered into the Stonewall Administration Agreement, Cavell and Randall, had determined that Cavell would cede claims control to NICO, by transferring to NICO all of Cavell's responsibilities for the performance of claim services under the Stonewall Administration Agreement. Cavell and Randall never informed Stonewall that Cavell intended to cede claims control to NICO. Had Cavell or Randall done so, Stonewall would not have entered into the Stonewall Administration Agreement.

44. Several months before the Stonewall Administration Agreement was signed, Cavell and NICO made an oral pre-funding agreement, the effect of which was to transfer control over Stonewall's claims to NICO upon the sale of Stonewall to Dukes Place. Cavell failed to disclose to – and, upon information and belief, actively concealed from – Stonewall (and Dukes Place) the existence of this oral agreement, which came to Stonewall's attention only this past summer. Had Cavell or Randall disclosed the oral pre-funding agreement and Cavell's concomitant intention to transfer claims control to NICO in 2000, when the Stonewall Administration Agreement was being negotiated, Stonewall would not have agreed to the Stonewall Administration Agreement.

**F. Cavell Enters Into a Collaboration Agreement with NICO**

45. In or about June 2001, Cavell and NICO negotiated a contract entitled "Collaboration Agreement." Under this contract, which took effect on August 8, 2001, Cavell subdelegated to NICO all of the claims handling and reinsurance collection responsibilities Cavell was retained to perform pursuant to the Seaton and Stonewall Administration Agreements. The practical effect of the Collaboration Agreement was to substitute NICO in place of Cavell as the provider of claim and reinsurance collection services.

46. Neither Seaton nor Stonewall were privy to the negotiations that led up to the Collaboration Agreement; nor were Seaton and Stonewall a party to the contract itself. Seaton and Stonewall were not asked to consent and did not consent to Cavell's wholesale abdication of its claims and reinsurance collection responsibilities. If Seaton or Stonewall had been asked to consent, neither Company would not have done so and,

instead, each Company would have terminated its Administration Agreement with Cavell.

47. The Collaboration Agreement (a copy of which, as amended, is attached as Exhibit 3 and incorporated herein by reference) provides, in part: "For the avoidance of doubt, NIC[O] retains all authorities to supervise and control claims handling and reinsurance collections;" "[Cavell] authorizes and requires NIC[O] to direct the Claims Handling Staff in the performance of their duties;" and "the salary and bonus of all Claims Handling Staff shall be set by NIC[O]."

48. The Collaboration Agreement solidified NICO's control over claims and insured that Seaton's and Stonewall's objective to complete an orderly and speedy run-off, extinguishing liabilities as promptly as possible, would be subjugated – and subordinate – to NICO's competing interest in deferring claim payments for as long as possible. Seaton's and Stonewall's goal to settle their liabilities "at the lowest cost of indemnity in the shortest timeframe" was thwarted.

49. Following the Collaboration Agreement's effective date, Cavell employees reported to NICO and took instructions directly from NICO, which not only set their salaries and determined their bonuses but paid both as well.

50. Following the Collaboration Agreement's effective date, NICO reimbursed Cavell for 100% of the salaries and employment-related benefits of those Cavell employees who handled Seaton and Stonewall claims. NICO also paid a substantial portion of Cavell's overhead (for example, office rent and supplies).

51. Stonewall and Seaton, which were unaware of the terms of the Collaboration Agreement, continued to pay Cavell pursuant to the Administration Agreements. These payments totaled $4-5 million per year during the time that the

Collaboration Agreement was in effect. In other words, while the Collaboration Agreement was in force, Cavell and Randall were paid twice – once by Stonewall and Seaton and once by NICO – to perform the same claims handling services. This arrangement resulted in a substantial windfall for Cavell which was now being paid by NICO to perform services that the Companies had already paid Cavell to carry out.

52. In January 2002, Cavell negotiated an agreement with Stonewall "for the collection of reinsurance debt" without ever telling Stonewall that NICO had assumed responsibility for overseeing collection efforts from reinsurers.

**G. The Renegotiation of the Administration Agreements**

53. The Administration Agreements, as originally written, set forth Cavell's compensation for a period of five years. In January 2004, as the fifth anniversary of the Seaton Administration Agreement approached, Cavell on the one hand and Seaton and Stonewall on the other entered into negotiations to set compensation for years six and onward.

54. In connection with those discussions, the Administration Agreements were amended in writing (the "Amendments"). Randall negotiated the Amendments. At no time during those negotiations did Randall or Cavell inform Seaton or Stonewall that control over claim handling had been transferred to NICO and that all claims handling and reinsurance collections were performed under "the supervision, direction and control" of NICO. To the contrary then, as it had done for years, Cavell and Randall continued to misrepresent the services that Cavell actually was providing to Seaton and Stonewall.

55. Like the Administration Agreements, the Amendments specifically tie Cavell's renumeration to its "providing [specified] services" to the Companies, including, in particular, claims administration and collection of reinsurance.

56. In quarterly statements prepared by Cavell for Seaton (beginning in June 1999 and continuing through March 2004, and later), Cavell regularly stated that claim determinations were agreed upon by it prior to review by NICO. Seaton now knows that, in truth, no claim determinations were made by Cavell until NICO had reviewed the claim and approved settlement. In many quarterly reports, in 2002 and later, Cavell referred to "scheduled visits by NIC[O]" when, in fact, as Seaton now knows, there were no such visits as NICO was ever present and controlled Cavell's claim staff on a day-to-day basis. These false representations pertaining to Seaton also affected Stonewall as the same individuals at GSC who monitored Dukes Place's investment in Seaton also monitored Dukes Place's investment in Stonewall.

57. Beginning in March 1999 for Seaton and in September 2000 for Stonewall, Cavell prepared quarterly, regulatory filings for Seaton and Stonewall. In those reports, Cavell stated in an interrogatory response that there had not "been any significant changes regarding the terms of [any management] agreement or principals involved." In truth, a material change had occurred when Cavell transferred control over claims to NICO, first in connection with the oral prefunding agreement and still later pursuant to the Collaboration Agreement. Cavell's misrepresentations in this regard were part of a practice by it and Randall to portray the false impression that Cavell was performing consistent with (i) commitments undertaken by it in the Administration Agreements and (ii) the representations made to Eckert and Hamwee at the outset, namely that Cavell would exercise independence in conducting Seaton's and

Stonewall's run-offs, would at all times act in Seaton's and Stonewall's interests and would run-off each Company's liabilities at the lowest cost of indemnity in the shortest timeframe possible.

58. Randall's and Cavell's failure to disclose the change in control over claims handling materially misled Seaton and Stonewall, each of which continued to believe that Cavell handled claims and was safeguarding its interests.

59. If Randall or Cavell had made full and adequate disclosure of either the oral pre-funding agreement or the Collaboration Agreement during the time the Amendments were being negotiated, the Companies would not have agreed to the Amendments and, instead, would have immediately terminated the Administration Agreements.

**H. Seaton's and Stonewall's Termination of the Administration Agreements**

60. Upon entering into the Administration Agreements with Cavell, Seaton and Stonewall each reasonably believed and expected that Cavell, Seaton's and Stonewall's fiduciary, would zealously represent Seaton's and Stonewall's interests and faithfully handle Seaton's and Stonewall's claims and reinsurance collections. Indeed, on several occasions in 1999 and 2000, Randall represented to Eckert that Cavell was doing just that. These representations were made by Randall in discussions that preceded or followed the Board meetings of the Eastgate Group attended by Eckert. Randall would typically remark – at times, in response to Eckert's inquiries – that GSC's investments through Dukes Place were on track and proceeding as originally planned, e.g., with Cavell handling claims, exercising its independence in an effort to maximize value by settling claims at the lowest cost of indemnity in the shortest timeframe.

61. Seaton and Stonewall paid substantial fees, more than $16 million and $11 million, respectively, to Cavell for Cavell to provide management services.

62. Cavell and Randall knew that NICO's interests would be and often were completely adverse to Seaton's and Stonewall's interests. Nonetheless, Cavell and Randall entered into the oral pre-funding agreement and, thereafter, the Collaboration Agreement, allowing NICO to take control over Seaton's and Stonewall's claims handling and reinsurance collections, all the while falsely portraying to Seaton and Stonewall that Cavell remained steadfast in protecting Seaton's and Stonewall's interests.

63. As a result of discovering aspects of Cavell's fraudulent misconduct in November 2005, Seaton and Stonewall notified Cavell in January 2006 that Seaton and Stonewall were terminating Cavell's services.

64. On or about February 17, 2006, Dukes Place (for itself and on behalf of its partners, shareholders, directors, officers, subsidiaries, associated companies and affiliates, including, but not limited to, Seaton and Stonewall) and Randall & Quilter Investment Holdings Limited (for itself and on behalf of its partners, shareholders, directors, officers, subsidiaries, associated companies and affiliates, including, but not limited to, Cavell) terminated the Administration Agreements by executing a document titled the Term Sheet ("Term Sheet").

65. The Term Sheet (a copy of which is attached hereto as Exhibit 4 and incorporated herein by reference) called for: (i) the orderly termination of the contractual and other commercial relationships between Seaton and Stonewall on the one hand and Cavell on the other effective March 31, 2006; and (ii) Cavell's orderly handover of run-off management to the Companies and/or their designated

representative(s). The Term Sheet also released certain claims by Seaton and Stonewall against Cavell, but expressly preserved the Companies' right to pursue claims sounding in fraud.

**FIRST COUNT**
**(Cavell's and Randall's Fraud Upon Seaton)**

66. Plaintiffs repeat and reallege paragraphs 1 to 65 as if set forth here at length.

67. Both prior and subsequent to the execution of the Seaton Administration Agreement, the Eastgate Group and Randall falsely represented to Seaton that Cavell would perform claims handling services during the term of the Seaton Administration Agreement and zealously protect Seaton's interests. In addition, the Eastgate Group and Randall represented prior to inception of the Administration Agreements that it and its affiliates would seek to run-off the Companies' liabilities at the cost of indemnity in the shortest timeframe. All along (or, at the very latest, shortly after the inception of the Seaton Administration Agreement), Cavell and Randall intended to cede and, in fact, did cede claims control to NICO, an entity whose business interests in prolonging the payout of claims conflicted with Seaton's leaving Seaton vulnerable to having its claims handled in a less than optimum manner.

68. Cavell and Randall failed to disclose and, upon information and belief, actively concealed from Seaton both their intention to cede claims control to NICO and the fact that they had done so.

69. Through their words and conduct, Cavell and Randall intentionally misrepresented to Seaton that Cavell was acting in good faith and in furtherance of Seaton's best interests. For more than five years prior to discovery, Cavell and Randall fraudulently subverted Seaton's rights to NICO's and other NICO-reinsured companies' interests.

70. Cavell and Randall had a duty to disclose the fact that they had ceded claims control to NICO but each failed to make such disclosure in order to further their own interests, including keeping the Seaton Administration Agreement in force and, still later, extending its term.

71. Cavell's and Randall's misrepresentations and nondisclosures were intentional, material and knowingly false; likewise, Cavell's and Randall's concealments of material facts were intentional and deliberate; Cavell and Randall understood or reasonably should have known that Seaton would rely upon, and that Seaton had relied upon, the accuracy and completeness of the representations made to it. Seaton reasonably and justifiably relied on Cavell's and Randall's representations, and has been damaged thereby – in an amount to be proven at trial.

72. Cavell's and Randall's nondisclosures and concealments were intentional and material and Cavell and Randall intended its nondisclosures and concealments to induce Seaton's reliance thereon. Cavell and Randall knew or reasonably should have known that Seaton would so rely. Seaton reasonably and justifiably relied that Cavell and Randall would disclose the concealed and non-disclosed information and has been damaged thereby – in an amount to be proven at trial.

73. Seaton's damages include paying Cavell more than $16 million to perform services that either were not performed or were performed in a manner never contemplated by Seaton. Seaton's damages also include the diminished value of the company which, had it been run-off properly, would today be worth $65 million (or more). Instead, Seaton, is virtually valueless.

**SECOND COUNT**
**(Cavell's and Randall's Fraud Upon Stonewall)**

74. Plaintiffs repeat and reallege paragraphs 1 to 65 as if set forth here at length.

75. Both prior and subsequent to the execution of the Stonewall Administration Agreement, Cavell and Randall falsely represented to Stonewall that Cavell would perform claims handling services during the term of the Stonewall Administration Agreement and zealously protect Stonewall's interests. All along Cavell and Randall intended to cede and upon execution of the Stonewall Administration Agreement did cede claims control to NICO, an entity whose interests conflicted with Stonewall's leaving Stonewall vulnerable to having its claims handled in a less than optimum manner.

76. Cavell and Randall failed to disclose and, upon information and belief, actively concealed from Stonewall both their intention to cede claims control to NICO and the fact that they had done so.

77. Through their words and conduct, Cavell and Randall intentionally misrepresented to Stonewall that Cavell was acting in good faith and in furtherance of Stonewall's best interests. For more than five years prior to discovery, Cavell and Randall fraudulently subverted Stonewall's rights to NICO's and other NICO-reinsured companies' interests.

78. Cavell and Randall had a duty to disclose the fact that they had ceded claims control to NICO but each failed to make such disclosure in order to further their own interests, including keeping the Stonewall Administration Agreement in force and, still later, extending its term.

79. Cavell's and Randall's misrepresentations and nondisclosures were intentional, material and knowingly false; likewise, Cavell's and Randall's concealments

of material fact were intentional and deliberate; Cavell and Randall understood or reasonably should have known that Stonewall would rely upon, and that Stonewall had relied upon, the accuracy and completeness of the representations made to it. Stonewall reasonably and justifiably relied on Cavell's and Randall's representations, and has been damaged thereby – in an amount to be proven at trial.

80. Cavell's and Randall's nondisclosures and concealments were intentional and material and Cavell and Randall intended its nondisclosures and concealments to induce Stonewall's reliance thereon. Cavell and Randall knew or reasonably should have known that Stonewall would so rely. Stonewall reasonably and justifiably relied that Cavell and Randall would disclose the concealed and non-disclosed information and has been damaged thereby – in an amount to be proven at trial.

81. Stonewall's damages include paying Cavell $11 million to perform services that either were not performed or were performed in a manner never contemplated by Stonewall. Stonewall's damages also include the diminished value of the company which, had it been run-off properly, would be worth more today than its current value.

**THIRD COUNT**
**(Violations of M.G.L. c. 93A)**

82. Plaintiffs repeat and reallege paragraphs 1 to 65 as if set forth here at length.

83. Cavell's and Randall's concealment of and failure to disclose material information to Seaton and Stonewall that Cavell and Randall were obligated to disclose to the Companies and Cavell's and Randall's material misrepresentations to Seaton and Stonewall through Cavell's and Randall's words and conduct occurred largely within Massachusetts and comprise unfair and deceptive acts and practices in the conduct of a

trade or commerce in violation of Massachusetts General Laws (M.G.L.) c. 93A. Cavell's and Randall's unfair and deceptive acts and practices include their fraudulent concealment and nondisclosure to Seaton and Stonewall of the oral pre-funding agreement and, still later, the Collaboration Agreement, each of which wrested claims control from Seaton and Stonewall without Seaton's and Stonewall's knowledge or consent and gave control to NICO.

84. Seaton and Stonewall, which engage in commerce, suffered damages as a consequence of Cavell's and Randall's unfair and deceptive acts and practices.

85. Cavell's violations of M.G.L. c. 93A and the rules and regulations issued thereunder caused damage to Seaton and Stonewall in an amount to be proven at trial, entitling the Companies to treble damages, attorneys' fees, costs and expenses.

WHEREFORE, plaintiffs, Seaton Insurance Company and Stonewall Insurance Company, respectfully request that judgment be entered against defendants, jointly and severally, and in plaintiffs' favor awarding plaintiffs compensatory damages in an amount to be proven at trial which, then, would be trebled pursuant to M.G.L. c. 93A and its associated rules and regulations, together with punitive damages of $75 million, interest and such other and further relief as to the Court seems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure.

DATED: December 28, 2007

CADWALADER, WICKERSHAM & TAFT LLP

By: ______________________
John F. Finnegan (JFF-3336)
Attorneys for SEATON INSURANCE COMPANY
and STONEWALL INSURANCE COMPANY

Of Counsel:

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 28th day of December 2007, I caused a copy of the foregoing First Amended Complaint to be sent by hand and electronic mail to the following:

Ira Greenberg, Esq.
Vincent J. Vitkowsky, Esq.
Robert W. DiUbaldo, Esq.
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022

John F. Finnegan