**RANDALL & QUILTER INVESTMENT HOLDINGS LIMITED**
9-13 Fenchurch Buildings London EC3M 5HR
Tel: +44 (0)20 7481 1010 Fax: +44 (0)20 7481 8409
email: firstname.lastname@cavell.co.uk

26 May 2006

Ms Amy Daubert
Pennsylvania Insurance Department
Office of Corporate and Financial Regulation
1326 Strawberry Square
Harrisburg
PA 17120
USA

**BY EMAIL AND BY COURIER**

Dear Ms Daubert

**RE: APPLICATION FOR APPROVAL OF THE ACQUISITION OF CONTROL OF ACE AMERICAN REINSURANCE COMPANY ("AARE") BY RANDALL & QUILTER INVESTMENT HOLDINGS LIMITED ("WE" OR "R&Q") – LETTER FROM HANGLEY ARONCHICK SEGAL & PUDLIN DATED 19 MAY 2006**

We refer to the letter addressed to you dated 19 May 2006 from Hangley Aronchick Segal & Pudlin ("HASP") which seeks to place on the public record a copy set of emails apparently sent anonymously last year to the Rhode Island Department of Insurance and then passed to HASP, again anonymously but in circumstances which are still unclear to us. As you know, HASP represents a number of ACE's competitors who object to our proposed acquisition of the Brandywine companies.

We write, first, to request that the HASP letter, its enclosures and this response are all excluded from the public record. We set out immediately below the reasons why we make this request. We also in this letter respond to the substantive points made by HASP and, as far as we are able, by the author of the anonymous emails; and, finally, we explain why the Department should not succumb to this last ditch attempt to derail the AARe application process.

## 1. REQUEST FOR CONFIDENTIALITY

1.1 The anonymous emails make a series of extraordinary allegations against a number of parties, including but not limited to Cavell USA Inc ("Cavell"). They appear to emanate from a person or persons sufficiently familiar with Cavell's office in Boston to know the names of certain members of Cavell's staff and to have knowledge of some of the claims being handled there. We conclude that the author of the anonymous emails probably is – or was – a disaffected junior employee. (We say "junior" because the author makes a range of egregious factual errors and demonstrates a lack of understanding of the reserving process in which the individual claims are handled).

1.2 The allegations are untrue and are highly damaging to a number of parties including Cavell, NICO, Seaton, Stonewall, Dukes Place and various named and unnamed individuals. If published by the Department, they could cause irreparable and preventable commercial and reputational harm to all these persons, most of whom are not party to the AARe application.

1.3 The anonymous emails also contain a significant amount of confidential, commercially sensitive and proprietary information concerning individual claims and other matters, many of which are already subject to litigation. Such information belongs variously to Seaton, Stonewall and other third parties who are not represented and play no part in the AARe application but who would inevitably suffer significant harm if the information were to be made public by the Department.

1.4 Whether or not the author of the anonymous emails was entitled to share his opinions with the Rhode Island Department of Insurance (on which we are not yet in a position to express a view) it is clear that the route by which the anonymous emails came into the hands of HASP must have involved at the very least a breach of confidence and possibly also the commission of other civil or criminal offences. We note that HASP itself – no doubt after due consideration - is unwilling to support or take responsibility for the anonymous allegations that it wishes to place in the public domain ("we received these documents anonymously and we cannot determine their source, or vouch for their authenticity or for the accuracy of the claims made in them").

1.5 The anonymous allegations, if true, would raise serious questions about our competence and our integrity. We understand, therefore, that even though the principles of natural justice would ordinarily entitle us to know the identity of our accusers, the Department has no choice but to investigate the anonymous allegations to satisfy itself that they have no substance. We submit, however, that the Department is well able to fulfil its statutory responsibilities without placing this correspondence on the public record and that, balancing the harm to third parties as well as to Cavell against the obvious desire of HASP and its clients to frustrate the AARe application without regard to the rights of third parties, the proper course of action would be to afford confidentiality to the correspondence as a whole.

1.6 If, notwithstanding the above, the Department concludes that it is necessary to place the HASP letter on the public record, then we would request that this response be placed on the public record simultaneously. We submit that, due to the irreparable and unjustified harm described above, the anonymous emails should in no event be made part of the public record. If the Department wishes to place the anonymous emails themselves on the public record, then we believe that it ought first to consult with those third parties so that they also may have the opportunity to make their views known. For this reason, we have copied this letter, the HASP letter and its attachments to NICO and to Dukes Place (for itself and on behalf of Seaton and Stonewall).

## 2. THE ANONYMOUS ALLEGATIONS

2.1 The anonymous allegations focus primarily on a series of individual claims handled in Cavell's Boston office which the author contends to have been dealt with improperly. There are also a number of wild assertions, not backed up by any evidence, which masquerade as statements of fact. An example would be the suggestion that "Cavell is one of the tools used by Berkshire to falsify financial records and defraud policyholders and Insurance Commissioners".

2.2 For the reasons set out in Section 1 of this letter, we believe that it would be inappropriate for us to set out here a detailed response identifying the individual claims, since to do so would compound the harm to third parties not involved in the AARe application.

2.3 We set out in Section 3 of this letter why we believe that it is in any event unnecessary for the Department to conduct its own review of individual claims. Rather, we summarise below the nature of the allegations which have been made anonymously so that we may in Section 3, on a generic basis and without causing further harm to any third parties, demonstrate that the anonymous allegations are untrue and appear to have been made with malicious intent.

2.4 We begin by explaining a little of the background. Seaton and Stonewall were acquired by Dukes Place in 1999 and 2000 respectively. At the time of each acquisition, Seaton and Stonewall purchased retroactive loss portfolio reinsurances from NICO whereby each company's insurance obligations were reinsured by NICO "from the ground up" in consideration of a premium that reflected the totality of that company's reserves. The reason for the purchase of such cover was to protect the company in question against (a) future asbestos and environmental deterioration and (b) the possibility of non-recovery of ceded reinsurance. The NICO reinsurance agreements were subject to regulatory scrutiny and approval as part of the process for approving the Seaton and Stonewall acquisitions.

2.5 The terms of the NICO reinsurance agreements of Seaton and Stonewall were similar to wordings used in a number of other substantial reinsurance agreements written by NICO in which Seaton and Stonewall had no involvement at all. A key term of each reinsurance agreement was that NICO was entitled to "associate" in the handling of each company's claims.

2.6 Cavell was appointed manager of both Seaton and Stonewall from the point of acquisition by Dukes Place as part of a wider commercial arrangement between the parties. In 2001, Cavell delegated to NICO certain claims handling functions in respect of Seaton and Stonewall pursuant to the Collaboration Agreement, which is discussed further below. During the course of 2005, Dukes Place advised that it would be looking to exit its insurance investments because the Dukes Place fund had reached its natural maturity. We understand that Seaton and Stonewall along with other insurance investments made by Dukes Place are in the course of being sold. We reached agreement with Dukes Place earlier this year on the terms on which we would cease to manage Seaton and Stonewall with effect from 31 March 2006 (but Cavell continues to provide some services in respect of Seaton and Stonewall in order to ensure a smooth transition). Acting in response to your requirements, we have on a confidential basis provided information (which might otherwise have been confidential to others) inter alia concerning the circumstances which culminated in our ceasing to be the run-off manager of Seaton and Stonewall.

2.7 The anonymous allegations appear to fall into the following categories of complaint:

2.7.1 That the NICO retroactive reinsurances are loans rather than policies of insurance;

2.7.2 That control of claims for Seaton and Stonewall (and Transport) has been ceded to NICO:

2.7.3 That claims have been paid – or payments withheld – in both cases improperly so as to improve the cash flow of NICO and in one case as a "sweetener" to induce a separate payment to another NICO client;

2.7.4 That the reserves of Seaton and Stonewall have been understated for a range of alleged improper purposes, notably to inflate the surplus so as to enable Dukes Place as owner of the two companies to extract a dividend to which it is not properly entitled or to delay an inevitable insolvency of one or both companies pending determination of the AARe application. Separately, it is implied that the decision of the two companies not to establish a significant ULAE reserve is also evidence of deliberate under-reserving;

2.7.5 That "figures" or "numbers" (it is not always clear from the emails whether the reference is to reserving, financial reporting or statutory reporting) have been manipulated by named individuals at Cavell and/or NICO to improve NICO's cash flow (see above) and/or for personal financial gain;

2.7.6 That the financial statements for Seaton and Stonewall do not properly reflect their assets and liabilities;

2.7.7 That the NICO representative at Cavell's office has breached settlement agreements and failed to pay legal fees when properly due, again for reasons of cash flow; and

2.7.8 That the reason for redomesticating "the three companies" (by which we think is meant Seaton, Stonewall and Transport) to Rhode Island was to enable Dukes Place to take advantage of Rhode Island's "schemes of insolvency" (by which we think is meant the Rhode Island legislation for *solvent* schemes of arrangement) and then "walk away from any remaining liability".

## 3. R&Q'S RESPONSE

3.1 The anonymous emails were addressed to the Chief Insurance Examiner of the Rhode Island Department. It appears that we have not been provided with a complete set of this correspondence, but we can see that the emails provided by HASP are dated between May and October 2005. As you are aware, the Rhode Island Department, assisted by independent actuaries Mercer Oliver Wyman ("Mercer"), conducted Examinations of Seaton and Stonewall during the latter part of 2005.

3.2 Ms Hoelsken of Cavell was until recently an officer of both companies and in that capacity was provided with copies of the actuarial reports on Seaton and Stonewall prepared by Mercer and dated 30 March 2006 and, by letters dated 1 May 2006, was provided with copies of the "final version" of the Reports of the Examinations of Seaton and Stonewall prepared by the Rhode Island Department. As required by you, and on a confidential basis, we have already furnished you with copies of all these documents. We understand that the Examination Reports will, if adopted by the Director of the Rhode Island Department of Business Regulation, in due course become part of the public record in Rhode Island but that the Mercer Reports, which contain specific claims and reserving information, will remain confidential.

3.3 Regarding the course of the inquiry, the Rhode Island Department was the initial recipient of the anonymous allegations and it has conducted the Examinations discussed herein of Seaton and Stonewall. Cavell would be unable to furnish the information necessary for further inquiry by the Pennsylvania Department, even if so required, because it has ceased to be the run-off manager of Seaton and Stonewall and therefore no longer has access to the information in question. It appears to us that the Pennsylvania Department is entitled to rely on the inquiries conducted by the

Rhode Island Department and thus it seems to us that the appropriate avenue of inquiry for the Pennsylvania Department regarding the anonymous allegations would be to rely on the investigations already conducted by the Rhode Island Department.

3.4 It is clear that the extensive inquiries conducted by the Rhode Island Department and their advisers in the course of the recent Examinations of Seaton and Stonewall were informed by the anonymous allegations. The Examinations involved a detailed review of numerous claims, including but not limited to those the subject of the anonymous allegations. We note that at no time, either during the Examinations or otherwise, has the Rhode Island Department or any of its advisers ever put to us any of the anonymous allegations and we were made aware of them only when you provided us with a copy of HASP's letter of 19 May 2006. Even more significantly, there is no mention of the anonymous allegations in either the Examination Reports or the Mercer Reports and the conclusions reached by Mercers and the Rhode Island Department (to which we refer in more detail below) are entirely inconsistent with the anonymous allegations. We now turn to respond to the allegations themselves.

*The NICO retroactive reinsurances are loans rather than policies of insurance*

3.5 Mercer reviewed all of NICO's retroactive insurance contracts for Seaton and Stonewall and concluded that they satisfied the two risk transfer requirements for reinsurance contracts under SSAP 62 (namely, that NICO assumed significant risk under the reinsured portions of the underlying contracts and that it was reasonably possible that NICO might realise a significant loss under the contracts) and that the contracts were "appropriately accounted for as retroactive reinsurance". [Mercer Reports on Seaton at pp.20-22 and on Stonewall at pp.17-18].

*Control of claims for Seaton and Stonewall (and Transport) has been ceded to NICO*

3.6 Dealing first with Transport, the remark is entirely without foundation. Transport handles its own claims, administered from an office in Cumberland, Rhode Island, and employs its own staff to do so. Cavell undertakes a degree of oversight but it is not the manager of Transport's claims. NICO is Transport's reinsurer (and as such has the "right to associate" in claims as well as the right to approve payments in excess of $150,000) but it has no role to play in Transport's claims handling operations. Transport does not come within the terms of the Collaboration Agreement between Cavell and NICO which is discussed further below. (In passing, we comment that this is a typical example of the muddled thinking behind many of the anonymous allegations. The author confuses companies, roles and even claims themselves. He fails to distinguish between the various parties he accuses so indiscriminately of impropriety, falsely ascribes actions to one which could only be of benefit to another, and misconstrues the relationships between them).

3.7 As far as concerns Seaton and Stonewall, we imagine that the allegation is directed at the operation of the Collaboration Agreement between NICO and Cavell, a copy of which we have already provided to you. As noted above, Cavell (then known as "Eastgate Inc.") was appointed the run-off manager for each of Seaton and Stonewall as part of the acquisition by Dukes Place. The management agreements with the two companies (which were approved by the relevant Insurance Department at the time of each aqcuisition) specifically authorised Cavell to "delegate to any person such functions as it deems necessary for the performance of its obligations". In accordance with that authority, Cavell (then known as "Ken Randall America Inc.") delegated to NICO (which in any event had a right under its retroactive reinsurance

contracts to associate in claims and to approve any payments in excess of an agreed amount) "responsibility for the management of claims in respect of Seaton and Stonewall" [Collaboration Agreement, Clause 3.1].

3.8 It is beyond doubt that NICO is the world's pre-eminent participant in the non-life run-off arena. Self-evidently, therefore, Cavell's knowledge and expertise were enhanced by its association with NICO via the Collaboration Agreement. The benefit to Seaton and Stonewall of these arrangements was that they thereby secured continuity of knowledge and processes through retention of Cavell staff familiar with these portfolios and at the same time gained access to the vast body of market knowledge which NICO was willing to make available to inform Seaton and Stonewall's claims handling process. They were also able to participate in the sharing with other NICO clients of legal costs which they would otherwise have had to meet in full. The benefit to Cavell of these arrangements was that, at an early stage in its development, the costs associated with building a significant US infrastructure were met by NICO. In operational terms, Cavell's claims handling staff were allocated to work at the direction of and according to the instructions of NICO and the costs of employing them were reimbursed to Cavell by NICO.

3.9 The Collaboration Agreement was intended to reflect what in the UK is known as "secondment" whereby an employee of one entity can be allocated, on a full- or a part-time basis, to work for another. The employer remains responsible for the administrative side of the employment but the entity to which (s)he is seconded takes responsibility for the actions or omissions of the employee when acting according to its instructions. It is fair to say that the US employees of Cavell have at times found it difficult to grasp the legal implications of this arrangement and it may be this which prompted the author of the anonymous emails to complain that "staff are advised that they are Cavell employees". The fact is that they *are* Cavell employees. Indeed, they are also employees of ADP Total Source Inc., a company which provides the benefits associated with employment by Cavell, but the author did not think that worthy of mention.

3.10 Cavell of course remained responsible to Seaton and Stonewall respectively for the services required to be performed under the Seaton and Stonewall management agreements, including those delegated to NICO. I personally visited the Boston office on a frequent basis and held meetings to discuss specific claims and ceded reinsurance issues with relevant staff and with NICO. This practice was later varied when I was advised by the President of Seaton and Stonewall that he would henceforward undertake regular on-site reviews.

3.11 It may be that, again, the author of the anonymous emails is confused - this time as to the NICO-Cavell relationship as regards Seaton and Stonewall on the one hand and as regards other NICO clients on the other hand. The Collaboration Agreement separately covers the provision by Cavell to NICO of services in respect of NICO's responsibilities to these other clients. The distinction is important because, in relation to NICO's other clients, Cavell has no direct relationship and therefore has no role to play in supervising NICO's actions.

*Claims have been paid – or payments withheld – in both cases improperly so as to improve the cash flow of NICO and in one case as a "sweetener" to induce a separate payment to another NICO client*

3.12 The author of the anonymous allegations makes a series of charges centring on a range of individual claims in which he asserts that NICO (by implication with Cavell's collusion) has authorised payments or withheld funds (including, for example, by prematurely closing cases) for an improper purpose.

3.13 It is of course difficult to refute such allegations in a public arena without identifying the individual claims and without recourse to files and other information to which we no longer have access. In the short time since receiving a copy of the anonymous emails, however, we have made enquiries of Cavell staff and of NICO about the claims in question and have received satisfactory explanations in all cases. I was particularly interested to learn that claims are identified in the anonymous emails which do not even relate to either Seaton or Stonewall. Such muddled and confused thinking seems to be representative of the emails as a whole.

3.14 Regarding the allegation that a payment was made by Stonewall in order to induce a payment to be made to another NICO client, I understand the situation to be that the claims in respect of which Stonewall was required to pay were previously agreed claims and there was no dispute about Stonewall's liability. Stonewall had earlier attempted to withhold payment on the ground that other monies were owing and more would become due to Stonewall by that same UK entity. The UK entity threatened to commence proceedings in the UK to recover the amount undoubtedly owed. In view of Stonewall's potential exposure to UK interest and attorney costs (which were thought to be considerable), the President of Stonewall specifically agreed to the payment of the money due to the UK entity.

*The reserves of Seaton and Stonewall have been understated for a range of alleged purposes, notably to inflate the surplus so as to enable Dukes Place as owner of the two companies to extract a dividend to which it is not properly entitled or to delay an inevitable insolvency of one or both companies pending determination of the AARe application. Separately, it is implied that the decision of the two companies not to establish a significant ULAE reserve is also evidence of under-reserving*

3.15 The author of the anonymous emails clearly fails to understand the reserving process adopted by Seaton and Stonewall prior to 31 March 2006 (when Cavell ceased to be the run-off manager) and, again, confuses, the interests of and the roles undertaken by the various parties involved. We therefore set out a brief summary of the process in question.

- The primary role of the run-off manager is to apply its expertise in the settlement of claims and the collection of ceded reinsurance, always recognising the insurer's obligations to meet valid policyholder claims as they fall due for payment. Experience gained over the years is applied to ensure efficient and effective case management. Knowledge of market issues, trends and particular assureds informs that process;

- The run-off manager can also provide valuable support to the insurer by using its knowledge and expertise in relation to setting case reserves but the run-off manager cannot be held responsible for the claims themselves since these are simply the legacy of the business written (often decades ago) and developing case law;

- Whilst Cavell (and NICO) had significant input by way of recommending appropriate levels of individual case reserves, it is important to realise that overall reserving decisions (that is, as to the reserves to be carried for IBNR and IBNER in addition to the individual case reserves) were made by Seaton and Stonewall, not by NICO and certainly not by Cavell. Cavell provided quarterly written reports to the Boards of Seaton and Stonewall containing financial information and a detailed commentary on all material movements and contentious claims. The President of Seaton and Stonewall, or on occasion his deputy, conducted his own independent on-site reviews at Cavell's Boston office, with unfettered access to all staff, all files and also to NICO, and he also consulted independent actuarial and other professional advisers;

- When reserving for asbestos and environmental losses, all insurers are required to make judgments in projecting likely future claims development over potentially decades into the future;

- The reserving process (not just in respect of Seaton and Stonewall but commonly throughout the insurance industry) involves not only a subjective judgment about the likely prospects of individual cases but also a further judgment about IBNR and IBNER. Moreover, any judgment about an individual case must address not only the merits of the claims itself but also an assessment of issues of more general concern. A striking example would be the implications of claims arising under so-called "pre-packaged bankruptcies". We note in passing that the author of the anonymous emails clearly sees the position only from the perspective of individual case reserves. The absence of an understanding of the wider context is a further indication that the author is – or was – a junior employee without the knowledge or experience to perceive the other relevant issues;

- It is important that the reserving process adopted by any insurance company is both robust and open. We believe that the processes adopted in respect of Seaton and Stonewall, far from being properly subject to criticism, were in fact more robust and open than is normal in the run-off arena;

- As already noted, the author of the anonymous emails fails to identify correctly or distinguish between the different – and by no means identical – interests involved in the Seaton and Stonewall reserving process. In other situations, an insurance company would make its reserving decisions based - only - on its own experience in the field, subject to scrutiny by independent actuaries, auditors and regulators. In making their reserving decisions, Seaton and Stonewall benefited from two additional – and as noted above, substantial – pools of expertise – those of Cavell and of NICO. Seaton and Stonewall were thus able to draw on a huge body of general market knowledge acquired over years of dealing with portfolios similar to their own. Seaton and Stonewall could also draw on external market commentary such as the benchmarking on reserving levels prepared by A. M. Best;

- During the course of 2005, Seaton began to experience significant developments in a relatively small number of claims. In response, the President of Seaton conducted an in-depth review of these individual cases and the results of this review were discussed in detail by the Board of Seaton before final reserving decisions were made.

3.16 We are all, it now transpires, fortunate that the anonymous allegations were made known to the Rhode Island Department prior to the Examinations of Seaton and Stonewall. The Department was thus able to instruct Mercer to inquire into the substance of the allegations. Mercer confirm that they were asked to "perform a claim review (based on a sample of [Mercer's] choosing) and provide insight into the company's reserving practice". [Mercer Reports at p.1]. We can confirm that Mercer examined numerous individual claims files, including claims mentioned by the author of the anonymous allegations and they asked searching questions, some of which puzzled us at the time but which we can now well understand. Moreover, Mercer's Reports commented specifically on a number of the claims to which the anonymous emails referred.

3.17 The run-off manager must be diligent and realistic in recommending the level of individual case reserves. In the case of claims relating to asbestos and environmental losses, there is inevitably a high degree of subjective judgment and the individual case reserves are subject to uncertainties. In our experience, actuarial reports such as Mercer's always contain well-accepted qualifications as to such uncertainties. We believe, however, that the conclusions reported by the Rhode Island Department utterly refute the anonymous allegations as to deliberate under-reserving in the case of Seaton and Stonewall.

3.18 The Rhode Island Department stated as follows in the case of Seaton:

"The major focus of Mercer's review of Seaton's carried December 31, 2004 reserves involved checking the reasonableness of the actuarial report prepared by Seaton's independent actuary, Ernst & Young. Mercer reviewed the E&Y calculations for accuracy, estimation methods and the judgmental selection of ultimate values. In addition, Mercer performed an on-site individual claim review."

3.19 Mercer concluded that Seaton's net carried loss reserves were deficient but that "all of the net deficiency (excluding ULAE) which is not covered by the [NICO retroactive reinsurance] as estimated by Mercer should be offset by retroactive reinsurance recoverables and should therefore not impact Seaton's surplus as of December 31, 2004". [Mercer Report at p.3]. Moreover, Mercer's review was undertaken in the second half of 2005, by which time, as is acknowledged in the Mercer Report [p.4], the Board of Seaton had itself concluded that further reserve increases were required.

3.20 In the case of Stonewall, Mercer stated as follows:

"We find the direct and assumed loss and LAE reserves carried by Stonewall as of December 31, 2004 to be a reasonable provision for the direct and assumed unpaid loss and loss expense obligations of Stonewall as of December 31, 2004. We find the net loss and LAE reserves carried by Stonewall as of December 31, 2004 to be a reasonable provision for the net unpaid loss and loss expense obligations of Stonewall as of December 31, 2004."

3.21 Mercer also applied external benchmarks to the asbestos and environmental reserves carried by each company. In the case of Seaton, Mercer stated as follows:

"The five year survival ratio (10.4) of Seaton's carried reserves is below the recommended industry standard of 12.0 (as published by A. M. Best) but above the current insurance industry average of 8.7. It should be noted that the above gross ratios include the [ ... ] business which is 100% ceded ... If this business were removed from the gross data ... (based on information provided by Cavell) the total 1 year, 3 year and 5 year survival ratios would be 21.2, 10.8 and 12.5 respectively, and as a result, the 5 year survival ratio would be above the industry recommended standard of 12.0." [Mercer Report at p.17].

3.22 In the case of Stonewall, Mercer stated as follows:

"The survival ratio of Stonewall's carried reserves is well above the recommended industry standard of 12.0 (as published by A. M. Best) and well above the current insurance industry average of 8.7." [Mercer Report at p. 13].

3.23 The author of the anonymous emails states that "no specific reserves have been posted [by Stonewall] for ULAE, which is a major portion of Stonewall's liability" and he thereby again implies that reserves have been understated. Mercer noted that neither Seaton nor Stonewall carried substantial provision for ULAE, but acknowledged that this was on the basis that annual investment income for each company more than offsets annual costs, including Cavell's fees. In fact, this basis of reserving for ULAE had been accepted by the Insurance Departments of Washington and Ohio at the time of the acquisitions and it was not criticised by Rhode Island (nor by Mercer which advised Rhode Island at the time) upon redomestication of the two companies. Mercer also confirm [p. 15] that they do not disagree that future investment income will more than offset future expenses but they nevertheless opine that a higher ULAE provision should be carried in each case. Accordingly, we understand that the Boards of Seaton and Stonewall have increased their ULAE reserves as at December 31, 2005.

3.24 In relation to the specific allegation that Seaton's reserves have been understated by "management" (whomever that means) in order to stave off an insolvency pending determination of the AARe application, we point out again that Seaton's reserves are determined by the Board of Seaton, and Seaton has no conceivable interest in the outcome of the AARe application. In the case of the allegation that a named member of Cavell's senior management team posted a reserve that was 10% of the recommended amount in order to produce an inflated surplus and thus enable Dukes Place to extract a dividend to which it was not entitled, we point out that the claim in question was reviewed by Mercer in some detail. The named Cavell employee had no authority in this regard and in any event had no reason to facilitate any improper action on the part of the owners of Seaton.

3.25 Finally, I would like to add a personal observation concerning the allegation of deliberate under-reserving. It is my experience over many years, borne out by published market statistics, that NICO is at the conservative end of the reserving spectrum. To suggest that NICO would have colluded in an exercise of deliberate under-reserving in the case of Seaton and Stonewall is ludicrous, particularly in light of its standing in the market and acknowledged reserving track record.

*The "figures" or "numbers" [it is not always clear from the emails whether the reference is to reserving, financial reporting or statutory reporting] have been manipulated by named individuals at Cavell and/or NICO to improve NICO's cash flow [see above] and/or for personal financial gain*

3.26 We hope that it will now be clear that the various claims and reserving processes were subject to sophisticated system of checks and balances involving entities and persons other than NICO, some with competing commercial objectives. Decisions on reserving were made by the Boards of Seaton and Stonewall respectively. The preparation of financial and statutory reports was the responsibility of Cavell, not NICO, and there was no personal financial or other benefit to Cavell staff in NICO's cash flow position.

3.27 We note more generally that Mercer made the following observations with regard to their review of claims files for both Seaton and Stonewall:

"We found each of the files detailed below [namely a selection of individual claims upon which Mercer commented in detail in their Reports] to be in good order (from an organizational standpoint) and to have undergone the analysis of a claim adjuster experienced in dealing with complex claims. Many of the files we reviewed contained detailed modeling of [Seaton's] [Stonewall's] exposure with various possible outcomes (ie best case, worst case etc)." [Mercer Reports at p. 26 and 22 respectively]

*The financial statements for Seaton and Stonewall do not properly reflect their assets and liabilities*

3.28 To the extent that this is a comment on insurance assets and liabilities, we repeat our observations as to the processes involved for establishing reserves and as to the outcome of the recent Examinations by the Rhode Island Department. To the extent that this is a comment on non-insurance assets and liabilities, we observe that these are the subject of independent audit.

*The NICO representative at Cavell's office has breached settlement agreements and failed to pay legal fees when properly due, again for reasons of cash flow*

3.29 To an extent this is a repetition of earlier complaints about withholding payments and we repeat our earlier comments. In the case of specific allegations, we have asked for and received explanations from NICO and we are satisfied that the allegations are unfounded.

*The reason for redomesticating "the three companies" (by which we think is meant Seaton, Stonewall and Transport) to Rhode Island is to enable Dukes Place to take advantage of Rhode Island's "schemes of insolvency" (by which we think is meant the Rhode Island legislation for solvent schemes of arrangement) and then "walk away from any remaining liability".*

3.30 This is a rather puzzling accusation. As far as concerns the attractions of Rhode Island as a home for insurers in run-off, you will recall that HASP itself has repeatedly – and without justification – alleged that Seaton and Stonewall were redomesticated in order to take advantage of Rhode Island's solvent scheme legislation and has suggested that we plan a similar strategy in relation to AARe. (We are not aware that Rhode Island deals differently from any other US state when it comes to insolvency, so we assume that the author of the anonymous emails is yet again confused about the point he is trying to make). We repeat the response we gave to HASP's original assertions: that Seaton and Stonewall were redomesticated at the request of their previous regulators, that Rhode Island conducted extensive inquiries before accepting the companies in question and that neither of them is in any event a suitable subject for a solvent scheme of arrangement because of the reinsurance

assets on which they both rely. We have already given very specific assurances as to our intentions in respect of AARe, which do not include a redomestication to Rhode Island.

3.31 Transport is of course domiciled in Ohio, not Rhode Island, although the Ohio Department has indicated that it would wish us to take the company elsewhere. Since the administration of Transport is already conducted from our office in Cumberland, Rhode Island may well be an appropriate jurisdiction for Transport to be domiciled in, but that will depend on the best interests of Transport at the time (and no decision has yet been taken) as well as on the approval of both Ohio and Rhode Island.

3.32 Finally, we would like to respond to the suggestions made directly by HASP in their letter of 19 May 2006. First, they imply that we were somehow remiss in not disclosing in the revised Form A filed with the Department on 26 January 2006 that we had been replaced as run-off manager of Seaton and Stonewall on 18 January 2006. As the Department is already aware, in late February 2006, we reached agreement with Dukes Place on the basis on which we would cease to act as run-off manager of the two companies. We did not cease so to act until 31 March 2006. We were not aware until recently that Castlewood US Inc claims to have been appointed with effect from 18 January 2006 and we have asked Dukes Place to clarify the position.

3.33 HASP also state that we have "relied on the management of Seaton and Stonewall as evidence of [our] fitness to manage" AARe. You will, in recalling the actual sequence of events, no doubt see the irony here. HASP originally said that we were "heretofore unknown parties" and suggested that we lacked the requisite experience of portfolios similar to AARe's. At the Department's suggestion, we provided further information about our role as manager of Seaton and Stonewall in order, simply, to illustrate that we had experience of US companies with portfolios of asbestos and environmental liabilities. We have recently ceased to act as manager of Seaton and Stonewall in circumstances which we have fully explained to the Department and which cast no shadow at all over our qualifications to manage AARe. There have, inevitably, been movements in the reserves of Seaton and Stonewall in the lengthy period during which the AARe application has been outstanding but none of these movements has any bearing on the question of our suitability to manage AARe. For HASP now to suggest, on the basis of a set of anonymous and false allegations, that matters which have been thoroughly reviewed by a fellow Insurance Department and their independent professional advisers, somehow "may provide some light on [our] track record as a run-off manager" is quite simply obscene.

## 4. SUMMARY AND CONCLUSIONS

4.1 We respectfully urge the Department not to succumb to this last ditch attempt to derail the application process. The allegations, made anonymously and passed to HASP anonymously, are untrue and malicious in intent. The timing of their disclosure is a dirty tricks campaign clearly calculated to impede the proper processes of the Department and we hope that you will treat the anonymous allegations, and those who made them, with the contempt that they deserve. For the reasons set out in Section 1 above, we believe that it would not be appropriate for the Department to place any of the HASP letter, the anonymous emails or this letter on the public record. If the Department takes a different view, we urge (a) that the HASP letter only be placed in the public record if also accompanied by our own

response as set out in this letter and (b) that the anonymous emails in any event be kept confidential because of the harm that disclosure will cause, not only to Cavell but also to third parties not involved in the AARe application.

4.2 We believe that the appropriate avenue of inquiry for the Department regarding the anonymous allegations would be to rely on the conclusions of the Rhode Island Department as set out in this letter (confirmed, of necessity on a confidential basis, in the copy documents which we have furnished to the Department).

4.3 We believe that the responses set out in this letter comprehensively refute the anonymous allegations – indeed, we believe they demonstrate yet again our credentials. We hope that the Department will continue to move as expeditiously as possible to make its decision in respect of the AARe application. We feel very strongly that to allow any further delay, more than a year after the application process began, on the basis of anonymous allegations the disclosure of which was so obviously timed to disrupt the Department's due process and which are in any event comprehensively discredited, is inherently unfair both to ourselves and to ACE.

Please feel free to contact me, or Mr Alberts or Mr Winckler at Lovells if there is any matter on which we can be of further assistance.

Yours sincerely

**KEN RANDALL**