**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

SEATON INSURANCE COMPANY, f/k/a UNIGARD MUTUAL INSURANCE COMPANY,

Plaintiff,

v.

ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY,

Defendant.

Civil Action No.: 07-332-S

# PLAINTIFF SEATON INSURANCE COMPANY'S MEMORANDUM OF LAW IN REPLY TO DEFENDANT ILLINOIS UNION INSURANCE COMPANY'S OPPOSITION TO MOTION TO DISQUALIFY COUNSEL

## INTRODUCTION

Plaintiff Seaton Insurance Company, f/k/a Unigard Mutual Insurance Company ("Seaton"), submits this Memorandum of Law in reply to the Opposition to Motion to Disqualify Counsel of Defendant Illinois Union Insurance Company f/k/a GATX Insurance Company ("Illinois Union") filed on February 4, 2008.[1] As set forth below, and as demonstrated in Seaton's Memorandum of Law in Support of its Motion to Disqualify [PACER No. 26]; the accompanying Supplemental Affidavit of Joseph P. Follis dated February 19, 2008 ("Supp. Follis Aff."); and the Affidavit of Thomas M. Ryan dated February 15, 2008 ("Ryan Aff.") submitted herewith, the Crowell & Moring law firm ("C&M") is precluded from representing Illinois Union in this case. C&M ***currently represents*** Seaton in other cases and has done so in

[1] Seaton notes that if the Court were to deny Illinois Union's pending motions to admit Attorneys Devery and Kalish *pro hac vice* [PACER Nos. 13, 14], which is well within the Court's discretion, the issue of disqualification based on Crowell & Moring's conflict of interest becomes moot. Since, as of this time, these attorneys have never been "qualified" to represent Illinois Union in this Court, there would be no need to enter an order "disqualifying" them.

the past, and ***Seaton has not waived the conflict of interest*** inherent in C&M's proposed representation of Illinois Union in this matter.

Notwithstanding the mountain of paper submitted with Illinois Union's opposition, what is most noticeable is what is glaringly absent from its papers:

- Proof that anyone from Seaton, or acting on behalf of Seaton, executed a blanket waiver of all future conflicts involving the ACE Companies in all cases and for all time;
- Proof that anyone in 2003 was capable of giving such "informed consent" to a blanket waiver of conflicts that would apply to all claims for all time;
- Any mention of the fact that, as of October 2006, Crowell & Moring was on clear notice that Seaton did not consent to dual representation in an adverse situation and did not expect its law firm to be suing it in future cases; and
- Any mention of the fact that, after being put on notice in October 2006 that Seaton would not consent to any such dual representation, C&M did absolutely nothing to attempt to negotiate a conflicts waiver with Seaton.

Illinois Union erroneously characterizes and relies upon a June 30, 2003 letter from C&M addressed to Randall America, an entity entirely unrelated to Seaton, as a purported "blanket" waiver by Seaton of all conflicts of interest in whatever context and for all time. Illinois Union's argument is not credible. At best, C&M's characterization of the letter can only be viewed as attempting to construct an elaborate game of "gotcha" that is antithetical to the letter and spirit of the applicable rules of professional conduct.[2] The clear context of the letter is the setting of rates for calendar year 2003. Buried in the letter is an isolated paragraph relating to conflict issues. As explained in the Ryan Affidavit, C&M's June 30, 2003 letter was ***not*** a waiver of conflicts of

---

[2] It is entirely unnecessary for the Court to engage in an elaborate multi-state analysis of the ethical rules. The simple fact is that attorneys who are not members of the Rhode Island bar are seeking the indulgence of the Court to practice here and must therefore abide by this state's rules of professional conduct. In any event, as the ABA's Opinion on this very subject makes clear [Ex. A hereto], the notion that any purported waiver of conflicts must be clearly spelled out and based upon informed consent is a cornerstone of the ethics rules in every state.

interest that would be effective for all time in all claims situations. To the extent that the letter can be regarded as any type of mutual "understanding" at all, it would not apply to the situation at hand. When Mr. Ryan received the letter from Mr. Hendler, it was Mr. Ryan's understanding that any agreement regarding conflicts would be limited in time and only apply to conflicts in cases involving multiple insurer defendants who are sued together in the same case and who are not known to have adverse interests. Mr. Ryan never had any understanding that any such "waiver" involving the ACE Companies would extend to situations of a direct conflict of interest (such as is present here), much less extend to all future claims for all time.

There is nothing in the literal language of the June 30, 2003 letter which can now be read as a binding agreement by Seaton to waive all conflicts for all time in all cases without regard to the facts and circumstances of any particular claim. Indeed, such a construction of the letter would be directly contrary to the Rhode Island Rules of Professional Conduct and the leading ABA Opinion on the issue of advance waivers. It is impossible for Randall America to have even understood what it was purportedly "waiving" on behalf of Seaton and all of the other companies for which it handled claims at the time of the letter if the letter is read as broadly as C&M now argues.

Moreover, the June 30, 2003 letter cannot be irrevocable and binding upon Seaton for all claims until the end of time. Without Seaton's informed consent to the proposed representation by C&M here, there is no basis under the applicable Rhode Island Rules of Professional Conduct for the Court to permit C&M to appear in this matter for Illinois Union, and the Court should rule that C&M is disqualified from the representation. The Rhode Island Rules of Professional Conduct do not allow simultaneous representation by C&M of Seaton and a party who is adverse to Seaton's interests when Seaton has not consented to, and in fact repeatedly objected to, the dual representation.

## SUPPLEMENTAL STATEMENT OF FACTS

The facts relating to this case are set forth in detail in Seaton's Memorandum of Law in Support of its Motion to Disqualify Jennifer R. Devery, Esq. and Paul W. Kalish, Esq. of Crowell & Moring LLP [PACER No. 26], the Affidavit of Joseph P. Follis in support thereof dated January 17, 2007 [PACER No. 25] ("Follis Aff."), the Affidavit of Thomas M. Ryan dated February 15, 2008 ("Ryan Aff.") and the Supplemental Affidavit of Joseph P. Follis dated February 19, 2008 submitted herewith ("Supp. Follis Aff."), all of which Seaton incorporates by reference. Seaton notes below certain facts that are particularly relevant in order to reply to the alleged "facts" raised by Illinois Union in its opposition of February 4, 2008.

### The June 2003 Letter

Seaton has not and does not agree to waive any conflict of interest involving C&M and continues to oppose any attempt by C&M to represent Illinois Union in this lawsuit. [Follis Aff., ¶3; Supp. Follis Aff., ¶¶12, 14; Ryan Aff., ¶3]. Seaton's objections to the dual representation were made known to C&M ***in October 2006***, long before this action was filed. [Supp. Follis Aff., ¶8]. The crux of Illinois Union's argument is that a June 30, 2003 letter from C&M to Thomas M. Ryan of Randall America[3] should be read as a blanket waiver of all conflicts of interest for all Randall America clients, including Seaton, for all time. [Opposition Br. at 5]. At the time of the June 30, 2003 letter, Mr. Ryan was an employee of National Indemnity Company, where he had certain responsibilities for claims that were administered by Randall America. [Ryan Aff., ¶2]. At the same time, Randall America had been acting as a third-party administrator for Seaton pursuant to an Agreement Relating to Administration of Run-Off Business (the "Run-Off Agreement"). [Follis Aff., ¶3; Supp. Follis Aff., ¶4]. Seaton terminated the Run-Off Agreement

[3] Mr. Ryan is not and never has been an employee of Randall America [Ryan Aff., ¶¶1, 2], nor has Mr. Ryan ever been an employee of Seaton. [Follis Aff., ¶9].

and its relationship with Randall America as of March 31, 2006. [Follis Aff., ¶8; Supp. Follis Aff., ¶6].

Illinois Union argues that the June 30, 2003 letter reiterated and memorialized the advance conflict waiver given by Mr. Ryan on behalf of Seaton (and other companies for which Randall America administered claims). [Opposition Br. at 5]. However, Mr. Ryan never agreed to a general or "blanket" waiver of future conflicts of interest on behalf of Seaton (or any other company for which Randall America was acting as claims manager) with respect to matters involving the ACE Companies. [Ryan Aff., ¶3]. In fact, Mr. Ryan was never even asked by Mr. Hendler, Mr. Plevin or any other partner at C&M to enter into a general or "blanket" waiver of future conflicts of interest on behalf of Seaton (or any other company for which Randall America was acting as claims manager) with respect to matters involving the ACE Companies. In addition to ***not*** being a general or "blanket" waiver, the June 30, 2003 letter was also not a waiver for future conflicts that would be effective for all time. [Ryan Aff., ¶5]. Mr. Ryan was never asked by Mr. Hendler, Mr. Plevin or any other partner at C&M to agree to enter into an agreement to waive future conflicts that would be effective for all time. [Ryan Aff., ¶6].

Mr. Ryan's Affidavit makes it clear that the June 30, 2003 letter was very limited in scope. The letter is not a blanket waiver of conflicts in all matters where the interests of the ACE Companies and the interests of Seaton (or other companies for which Randall America was acting as claims manager) were actually adverse. [Ryan Aff., ¶¶3, 11]. Instead, the only understanding contemplated by the letter involved the common situation where the ACE Companies and insurers for which Randall America was acting as claims administrator were named as defendants in a complex insurance coverage case and ***where the interests of the insurers in defeating or limiting coverage would generally be aligned***. [Ryan Aff., ¶¶9, 10]. In the context of such suits, Mr. Ryan understood that the mere theoretical "possibility" that the

ACE Companies and one or more of the companies represented by Randall America could be adverse on some coverage issue would not be used by the companies for which Randall America was handling claims as a means to automatically preclude C&M from undertaking the representation of the ACE Companies. [Ryan Aff., ¶9]. Any attempt by C&M to expand the scope of the understanding reflected in the letter is totally at odds with both the specific language contained in the letter and Mr. Ryan's contemporaneous understanding.

**The Subsequent Arbitrations**

In August and September 2006, C&M, on behalf of certain ACE Companies,[4] issued arbitration demands for two separate claims against Seaton, both of which are unrelated to the claims in this litigation. [Supp. Follis Aff., ¶7]. No arbitration panel was selected in either matter as the parties attempted to reach a settlement, and both arbitrations were stayed until November 2007. [*Id.*]. Upon learning of C&M's representation of parties adverse to Seaton in the 2006 arbitrations, Joseph P. Follis, Vice President of Seaton, contacted C&M and ***explicitly objected*** to the representation. [Supp. Follis Aff., ¶8]. On October 3, 2006, Mr. Follis sent an e-mail message to Clifford B. Hendler of C&M stating that "***today (and going forward), Seaton is not expecting to be sued by firms that represent us.***" [*Id.*; Exh. C to Hendler Decl. (emphasis added)]. Thus, C&M was clearly on notice as of October 2006 that Seaton did not expect its lawyers to sue Seaton or otherwise be directly adverse to Seaton on behalf of the ACE Companies. [Supp. Follis Aff., ¶8]. In response to Seaton's objection to C&M's representation, Mr. Hendler forwarded to Mr. Follis by e-mail a copy of the June 30, 2003 letter. [Supp. Follis Aff., ¶9; Exh. C and Exh. A to Hendler Decl.].

Seaton had not received a copy of the June 30, 2003 letter until October 3, 2006, well after Seaton had terminated its relationship with Randall America. [Supp. Follis Aff., ¶10].

[4] Illinois Union is a part of the ACE Group of Insurance Companies.

Seaton did not sign the June 30, 2003 letter, nor did Seaton agree to waive all conflicts of interest presented by C&M's representation of the ACE Companies in perpetuity. [Supp. Follis Add., ¶11]. Seaton did not receive any consideration from C&M for the purported "blanket" waiver of all conflicts of interest for all time and without regard to the facts and circumstances of any particular claim. [*Id.*]. C&M never attempted to obtain an agreement from Seaton with respect to any future waiver of conflicts of interest involving the ACE Companies, nor did C&M purport to challenge Mr. Follis' clear statement that Seaton did not consent to any such adverse representation. [Supp. Follis Aff., ¶12]. Mr. Follis did not retract his position regarding this issue after receiving the June 2003 letter, nor did C&M ever take any steps to reach an agreement that would clarify the matter of conflicts. Instead, in clear contravention of the ethics rules, C&M continued to engage in an elaborate game of "gotcha" by suggesting (as it does here) that the 2003 letter represents a blanket waiver of all known and unknown conflicts that might arise in cases where the ACE Companies wanted to retain C&M to be adverse to Seaton.

After Seaton clearly objected to C&M's representation of adverse parties in the 2006 arbitrations, C&M did not seek a waiver from Seaton for the conflict of interest. [Follis Aff., ¶11; Supp. Follis Aff., ¶12]. Instead, C&M, on behalf of certain ACE Companies, issued demands for arbitration to Seaton for seven new matters in November 2007. [Supp. Follis Aff., ¶12]. Also in November 2007, the stays on the 2006 arbitrations were lifted as the parties were unable to reach a settlement. [*Id.*]. Then, in December 2007, defendant Illinois Union sought to replace its counsel in this case with C&M. [Follis Aff. ¶11; Supp. Follis Aff., ¶13].[5] Again, C&M never sought Seaton's consent to the proposed representation of Illinois Union in this

[5] Illinois Union attempts to suggest that its selection of the Mound Cotton firm was some type of administrative mistake. Apart from the lack of credibility of such a claim, the fact is that Illinois Union made a decision to replace its counsel who did not have an ethics conflict with one that did. There is no reason for the Court to indulge such a strategy.

matter. [Follis Aff. ¶11; Supp. Follis Aff., ¶12]. Seaton does not agree to waive the conflict of interest presented by C&M's current and prior representation of Seaton and its proposed representation of Illinois Union in this case. [Follis Aff., ¶3; Supp. Follis Aff., ¶14].

Illinois Union inappropriately asserts that some type of waiver that is unbounded with respect to time, case or subject matter is in place and should be enforced here so that its counsel can represent Illinois Union against Seaton, a current client of C&M. The purported "waiver" of conflicts of interest contained in the letter dated June 30, 2003 to Randall America (an entirely unrelated corporation), predates this suit by several years and is ***not*** binding upon Seaton until the end of time. Certainly, there is no basis for the Court to find that this letter, which was not even signed by Seaton, constitutes a wholesale "blanket" waiver of all conflicts for all time—which is precisely the position being taken by Illinois Union here.[6] Seaton was not even aware of the existence of the letter until Mr. Follis expressly objected to C&M's representation of the ACE Companies in October 2006. [Supp. Follis Aff., ¶10].

The context of the June 30, 2003 letter relied upon by Illinois Union makes it clear that Seaton did not waive any present or future conflicts of interest stemming from C&M's dual representation, much less agree to any type of "blanket" waiver that would tie its hands forever with respect to new cases that were not even known to exist in 2003. [*See* Ryan Aff.]. The letter is not a conflict of interest waiver at all, but instead relates to "business matters" which are "the last 'piece of the puzzle'" to confirm the relationship between C&M and Randall America for the

[6] Indeed, under C&M's reading of the June 2003 letter, Randall America was purportedly waiving all conflicts in all cases for all time as to any company whose claims it was handling at the time, not just Seaton. This is borne out by the fact that its oft-repeated quotation from an e-mail sent by Mr. Bendig in June 2006 (after Seaton terminated its contract with Randall America) concerned his involvement in handling claims for OneBeacon (formerly Commercial Union), an insurance company that is entirely unrelated to Seaton.

year 2003. The letter details C&M's rates and staffing plans for cases to be administered by Randall America in 2003—some five years ago. [Ryan Aff., ¶¶7, 8]. At the time, rates and staffing plans were reconsidered on an annual basis, and any agreement by Mr. Ryan to rates and staffing plans in 2003 was never intended to be a binding agreement between C&M and Randall America with respect to the handling of cases that extended beyond 2003. [Ryan Aff., ¶7]. Mr. Ryan did not agree, nor was he ever asked to agree, to waive future conflicts of interest on behalf of Seaton with respect to matters involving the ACE Companies that would be effective for all time. [Ryan Aff., ¶¶5, 6]. To the extent that the letter reflects any type of understanding at the time, it was strictly limited to situations involving large, multi-insurer cases where there could be (at most) a theoretical possibility that the interests of insurers whose claims were being handled by Randall America might diverge from the interests of the ACE Companies. [Ryan Aff., ¶9].

The letter relied upon by Illinois Union is not an irrevocable conflict waiver by Seaton, and there is no language in the letter which provides the Court with a basis to give it such effect. And in any event, any purported "consent" to waive a conflict in a case that did not even exist at the time of the letter has been revoked.

## ARGUMENT IN REPLY

The Rhode Island Rules of Professional Conduct do not allow concurrent representation of parties with adverse interests unless there is informed consent to the dual representation, which has not been given by Seaton. Rule 1.7 of the Rhode Island Rules of Professional Conduct states, in relevant part, that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Rules of Prof'l Conduct, R.1.7(a).[7] A lawyer with a

[7] Pursuant to Local District Court Rule 208, the Rules of Professional Conduct as adopted by the Rhode Island Supreme Court shall be the Standards of Professional Conduct for attorneys appearing and/or practicing before this Court, including those seeking admission *pro hac vice*. *See also Obert v. Republic Western Ins. Co.*, 190 F. Supp. 2d 279, 297-98 (D.R.I. 2002);

concurrent conflict of interest may represent a client ***only*** if "each affected client gives informed consent, confirmed in writing." Rules of Prof'l Conduct, R.1.7(b). Informed consent expressly requires that each affected client have a reasonable opportunity to consider the risks and alternatives to the proposed concurrent representation. Rules of Prof'l Conduct R.1.7, cmt. 17, 19. Even if informed consent is given by a client to dual representation, the client is not forever bound by that consent and may revoke it at any time. There is no basis for the Court to find that any of these requirements have been met and, accordingly, C&M cannot be permitted to represent the ACE Companies in this action.

## I. THE JUNE 30, 2003 LETTER FROM C&M TO RANDALL AMERICA CANNOT BE DEEMED A BLANKET WAIVER OF ALL CONFLICTS OF INTEREST UNTIL THE END OF TIME

Illinois Union's opposition papers fail to refute the central legal principles that require the Court to bar C&M's representation of it here. It is a fundamental rule that courts are critical of "blanket" future conflict waivers and loathe to give them effect. *Univ. of Rochester v. G.D. Searle & Co., Inc.*, Civ. No. 00-6161, 2000 U.S. Dist. LEXIS 19030, at *32 (W.D.N.Y. Dec. 11, 2000); *see also Fla. Ins. Guaranty Ass'n, Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255 (S.D. Fla. 1990) (striking down an advance waiver for insufficient consultation or full disclosure); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 227-29 (7th Cir. 1978)(a document intended to grant standing consent must identify the possibility of future conflicts and the circumstances under which adverse representation would be undertaken); Restatement (Third) of Law Governing Lawyers §202, cmt. d (1990)(courts have refused to infer from a general, prior consent that a client was consenting to later, conflicted representation). Even with advance consent, if circumstances develop that change the nature of the concurrent representation so that

---

*Haffenreffer v. Coleman*, Civ. No. 06-299T, 2007 U.S. Dist. LEXIS 75432, at *5-6, n.1 (D.R.I. Oct. 10, 2007).

a conflict of interest arises, the consent may be ineffective. *See* Rules of Prof'l Conduct R.1.7, cmt. 21. And, of course, consent may always be revoked.

### A. Illinois Union's Interpretation of the June 30, 2003 Letter is Far Too Broad

The June 30, 2003 letter cannot and should not be read as an irrevocable waiver by all of Randall America's clients of all possible conflicts of interest for all time, without regard to the facts and circumstances of a particular claim. The waiver language that Illinois Union relies upon is buried at the end of a letter from C&M about its billing rates and staffing arrangements for cases administered by Randall America for the year 2003 only. [Ryan Aff., ¶¶7, 8]. No clear waiver on the part of Seaton (or any other Randall America client) of all conflicts of interest until the end of time is memorialized. The letter is merely intended to "formally renew [C&M's] relationship with Randall America for 2003," and it sets forth the agreements that were reached with respect to rates and staffing issues. [Ryan Aff., ¶¶7, 8].

If the alleged "waiver" is effective at all, which Seaton disputes, it should be read narrowly and as only applying to claims or cases that arose in 2003. [Ryan Aff., ¶7]. C&M has not sought the consent of Seaton to waive any conflicts since the time of the June 30, 2003 letter, even after C&M became aware of Seaton's explicit objection to C&M's dual representation in October 2006. [Supp. Follis Aff., ¶12]. Instead, Illinois Union argues that the June 30, 2003 consent has been consistently "relied upon" by C&M, even in the face of Seaton's clear objection to the dual representation and revocation of any previously given consent. C&M's self-fulfilling "reliance" is hardly reasonable, much less consistent with the ethics rules.

Illinois Union treats the June 30, 2003 letter as a binding contract with Seaton, which can never be terminated or cancelled. The letter is signed only by one of C&M's own partners and ***not*** by any officer or employee of Seaton (or even Randall America). There was no exchange of

consideration between Seaton and C&M for the purported "waiver." [Supp. Follis Aff., ¶11]. There is no evidence that Randall America was represented by counsel in connection with the letter or that C&M made a disclosure of facts that would be sufficient to support a claim of "informed consent." Upon learning of the existence of the letter and C&M's contention that it was a binding, blanket waiver for all time, Seaton ***expressly objected*** to C&M's concurrent representation of an adverse party in other proceedings. [Supp. Follis Aff., ¶8]. Thus, C&M was on notice long before this suit was filed that it would be inappropriate for C&M to appear in the case. Any consent by or on behalf of Seaton to C&M's representation of parties with adverse interests has been withdrawn; permitting the representation of Illinois Union by C&M here would be a clear-cut violation of the Rhode Island Rules of Professional Conduct.

C&M has failed to present any evidence suggesting that Seaton knowingly consented in 2003 to any waiver of a conflict, much less a waiver that would be effective for all time as to all future cases in all jurisdictions and all circumstances. Any discussion between Mr. Ryan and partners at C&M regarding a waiver of conflicts of interest was purely incidental to the consideration of rates and staffing that is the focus of the June 30, 2003 letter. [Ryan Aff., ¶8]. Mr. Ryan never understood that he was being asked to enter into any sort of general waiver of conflicts on behalf of the companies whose claims were then being handled by Randall America, nor did Mr. Ryan ever agree to enter into any such general waiver. [*Id.*].

Instead, the issue that was presented to Mr. Ryan in 2003 by C&M was very different than the circumstance presented here. [Ryan Aff., ¶9]. Mr. Hendler explained to Mr. Ryan that in complex insurance coverage cases such as those for which Randall America retained C&M to serve as counsel, it was common for a large number of insurers to be named as defendants in the

case. [*Id.*].[8] In such instances, the ACE Companies did not want the fact that C&M was representing companies for which Randall America was acting as claims administrator to interfere with their ability to retain C&M as counsel. [*Id.*]. This is the only scenario relating to potential "conflicts" between the ACE Companies and companies for which Randall America was serving as claims administrator that Mr. Ryan ever discussed with Mr. Hendler. [Ryan Aff., ¶10]. When Mr. Ryan received the letter from Mr. Hendler dated June 30, 2003, Mr. Ryan understood the statements on pages 3 and 4 of the letter relating to potential conflicts to be limited to precisely this type of circumstance involving cases brought by a policyholder against multiple insurers. [*Id.*].

Mr. Ryan never had any understanding that C&M (on behalf of the ACE Companies) ever requested that he agree to a blanket waiver of future conflicts in cases where the interests of the ACE Companies and companies for which Randall America was acting as claims administrator were ***actually adverse***, such as the situation presented here. [Ryan Aff., ¶11]. When Mr. Ryan received Mr. Hendler's letter of June 30, 2003, he never understood C&M's statement regarding conflicts as extending to situations such as the one presented here. [*Id.*]. Insofar as Mr. Ryan's Affidavit directly conflicts with the "interpretation" of the letter offered by

---

[8] For example, if a major manufacturer or distributor of asbestos brought a case seeking a declaration that its insurers were obligated to defend or indemnify it for asbestos claims, it would be typical for the policyholder to name as defendants all of the insurers that ever issued policies to the company. [Ryan Aff., ¶9]. In the usual case, the interests of the insurers would generally be aligned. [*Id.*]. However, C&M advised Mr. Ryan that because of the firm's long-standing relationship with the ACE Companies, ACE was concerned that it not be precluded from retaining C&M to represent the ACE Companies in such cases because of the "possibility" that the interests of the ACE Companies could be adverse in some respect to the interests of companies for which Randall America was acting as claims administrator. [*Id.*].

C&M, it is impossible for the Court to conclude that Randall America (on behalf of Seaton) ever gave "informed consent" to a broad waiver of all conflicts in all cases for all time.[9]

Randall America may have engaged C&M in its role as third-party administrator; however, Randall America lacked the authority under the Run-Off Agreement to act as Seaton's agent for the purpose of granting a conflict waiver, particularly one claimed to be of indefinite duration and to apply to all cases whenever and wherever filed and without regard to the nature of the dispute. Moreover, even if Randall America had theoretical "authority" to consent to such a waiver, C&M has not presented any facts suggesting that there were any explicit discussions with Randall America regarding the scope of any such waiver or that C&M was intending to take the position that an alleged "waiver" entered into in connection with the setting of rates in 2003 was a blanket waiver of all conflicts for all time. Indeed, there is no way that Randall America (even if it had the naked authority) could have had sufficient facts regarding all claims that might arise in the future from which any purported "consent" could be considered to be "informed," as expressly required by the applicable ethics rules.

In its Opposition, Illinois Union waxes on about the history of the relationship between C&M and the ACE Companies. C&M ignores the ethical duties that it owes to its other client, Seaton. Illinois Union also mistakenly relies on e-mail exchange with Brian Bendig in June 2006 on behalf of another Randall America client (Commercial Union Insurance Company) pertaining to an entirely unrelated matter not involving Seaton. [*See* Opposition Br., at 7; Plevin Decl. at ¶¶5-10 and Ex. D]. Mr. Bendig's statements on behalf of other Randall America clients are not binding upon Seaton. Moreover, Seaton had ***terminated*** its relationship with Randall

[9] Illinois Union's references to the fact that Seaton and Randall America are parties to litigation in which Seaton has alleged that Randall America engaged in fraudulent conduct is indeed ironic as it simply underscores the fact that Randall America had no authority to enter into any waiver of conflicts at all, much less a purported "blanket" waiver that would tie Seaton's hands for all time, including after it had terminated the contract with Randall America.

America in ***March 2006***, several months prior to the e-mail exchange relied upon by Illinois Union.

**B. Concurrent Representation Requires Informed Consent, Which Seaton Has Not Given**

Pursuant to the Rhode Island Rules of Professional Conduct, a conflict of interest based on concurrent representation may be waived only with the informed consent of each affected client. Rules of Prof'l Conduct R.1.7(b)(4). The duties of loyalty and confidentiality owed by attorneys to their clients require informed consent to the concurrent representation of parties with adverse interests. *See* Rules of Prof'l Conduct R.1.7, cmt. 6; Rules of Prof'l Conduct R.1.6. A client must have a reasonable opportunity to consider the risks and alternatives to the proposed concurrent representation before it can give informed consent. Rules of Prof'l Conduct R.1.7, cmt. 17, 19. A client cannot give informed consent unless the lawyer ensures that the client has enough information to make an informed decision. As stated in Rules of Prof'l Conduct R.1.0, cmt. 6:

> Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.

*Id.* Indeed, in a telling oversight, Illinois Union fails to quote (and instead omits with ellipses) the most salient aspect of the comments to the professional rules regarding blanket waivers:

> The effectiveness of such [future] waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonable foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. ***If the consent is general and open-***

> ***ended, then the consent ordinarily will be ineffective because it is not reasonably likely that the client will have understood the material risks involved.***

ABA Opinion 05-436 at 2 (emphasis added) [Ex. A hereto]. There are simply no facts presented from which the Court could find that these standards have been satisfied and that the "discussion" in 2003 included a comprehensive consideration of all possible claims scenarios and the material risks involved such that "informed consent" by Randall America (on behalf of all of its clients at the time) could be found to have been given with respect to all cases in the future, including the one here.

As the United States District Court for the District of Maine has stated, "[a] prospective waiver is valid if it identifies the potential opposing party and the nature of the likely subject matter in dispute and permits the client to appreciate the potential effect of the waiver." *Glenwood Farms, Inc. v. Ivey*, Civ. No. 03-217, 2005 U.S. Dist. LEXIS 24403, at *96, n.46 (D. Me. Oct. 20, 2005)(citing *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 583 (D. Del. 2001)). The lawyer who fails to provide the client with adequate information to make an informed decision assumes the risk that the purported consent is invalid. *Id.* (citing Restatement (Third) of the Law Governing Lawyers §122(1), cmt. c(i) (2000)). The American Bar Association recognizes that "open-ended" informed consent may be valid, ***but such consent must be clearly articulated so that the client understands the material risks involved***. ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 05-436 (2005)[Ex. A hereto].

Based on the foregoing requirements for a valid prospective waiver, the June 30, 2003 letter falls woefully short. The June 30, 2003 letter hardly gives any information at all about the proposed dual representation. The letter does not list Seaton by name, nor does it specify the nature or types of claims that may be at issue. The letter does not specify the duration of the waiver or its scope. In contrast, C&M clearly explained in the letter that Randall America (on its

own behalf) agreed that C&M could not bring cross-claims or bad faith/extra-contractual claims against the ACE Companies and that C&M could not take positions for Randall America that would create conflicts of interest for the ACE Companies. [*See* Plevin Decl., Ex. A]. In short, the type of claims scenario at issue here was never even contemplated at the time that C&M unilaterally issued the June 30, 2003 letter.

As previously discussed, Mr. Ryan had no intention of waiving all potential conflicts of interest for all time. Mr. Ryan did not agree to enter into a permanent general or "blanket" waiver on behalf of Seaton with respect to matters involving the ACE Companies. [Ryan Aff., ¶¶3, 5]. No C&M partner, including Mr. Hendler or Mr. Plevin, ever asked Mr. Ryan to waive future conflicts of interest on behalf of Seaton for all time. [Ryan Aff., ¶¶4, 6]. In 2003, Mr. Ryan understood that any agreement with C&M regarding conflicts of interest would be limited to cases involving multiple insurers where there might be (at most) a theoretical possibility that a divergence of interests could arise, a situation totally unlike the one of actual adversity that is present here.

Though the courts of Rhode Island have not addressed the issue of informed consent, other federal courts have found the informed consent requirement to be substantive and inflexible. *See, e.g., Worldspan, L.P. v. Sabre Grp. Holdings, Inc.*, 5 F. Supp. 2d 1356, 1362 (N.D. Ga. 1998)(absence of informed consent is more than a technical violation of the Rules of Professional Conduct where there is the real possibility of substantial and meaningful conflict); *Blecher v. Northwest Airlines, Inc.*, 585 F. Supp. 1442, 1454 (C.D. Cal. 1994)(the requirement of informed consent is inflexible "because obtaining a written waiver requires little effort, informs and protects clients, and avoids costly evidentiary and credibility issues"). There are no facts from which the Court could find that Seaton consented to the adverse representation by C&M of the ACE Companies ***in this case.***

### C. Seaton Has Revoked Any Consent Given by the June 30, 2003 Letter.

Under any logical reading, the June 30, 2003 letter cannot be deemed an ***irrevocable*** waiver for all cases and to be effective for all time. However, it is axiomatic that a client who has consented to a conflict of interest may revoke its consent at any time. Rules of Prof'l Conduct R.1.7, cmt. 20. It is equally fundamental that a client has the right to select its counsel. Under Rule 1.16 of the Rules of Professional Conduct, a client can discharge its attorney at any time, with or without cause. The Restatement of the Law Governing Lawyers accords the client the same rights for the revocation of waivers. Restatement of the Law Governing Lawyers §122, cmt. f (1958). Similarly, the view of the authors of the Model Rules is that consent waivers are always revocable. Model Rules of Prof'l Conduct, cmt. 21.

A client who consents in advance to potential future conflicts of interest cannot be bound by that consent when actual conflicts arise. *Griva v. Davison*, 637 A.2d 830, 846 (D.C. 1994). An actual conflict of interest alters the facts and circumstances upon which the client gave its initial consent, and the earlier consent no longer constitutes "informed" consent. With changed circumstances, the validity of the prior consent comes into question. When an actual conflict of interest arises, the client must be afforded the opportunity to affirm or revoke its consent. *See Wellman v. Willis*, 400 Mass. 494, 499-500 (1987). Here, Seaton advised C&M in clear terms long before the present claim arose that it would not consent to any such dual representation in future cases such as this one. [Supp. Follis Aff. ¶8]. Seaton's revocation of any alleged "consent" is dispositive of the issue before the Court.

C&M never sought the informed consent of Seaton after the June 30, 2003 letter. In fact, Seaton, in no uncertain terms, objected to C&M's representation of companies with interests adverse to Seaton. [Supp. Follis Aff. ¶¶12, 13]. Despite Seaton's explicit objection to C&M's

dual representation, C&M, on behalf of certain ACE Companies, demanded arbitration against Seaton in seven new cases, and C&M now seeks to represent Illinois Union in this lawsuit. [*Id.*]. If "informed consent" ever existed (which Seaton disputes) it no longer exists. The Court has no choice other than to honor Seaton's revocation of the alleged consent.[10]

## II. SEATON HAS EXPRESSLY OBJECTED TO C&M'S REPRESENTATION OF THE ACE COMPANIES WITH ADVERSE INTERESTS

It would be manifestly inappropriate for the Court to rule that Seaton is forever bound by the purported "waiver" given by a third-party administrator whose contract has been terminated as to all cases for all time, especially after Seaton explicitly objected to C&M's dual representation before this case arose. In August 2006, Seaton became aware of C&M's representation of another ACE company with adverse interests in a proceeding unrelated to this lawsuit. [Supp. Follis Aff., ¶7]. Upon learning of the concurrent representation and conflict of interest, Seaton promptly objected to C&M's representation of the adverse party. [Supp. Follis Aff., ¶8]. Seaton's timely objection to C&M's representation of the adverse party provided notice to C&M that Seaton objected to any attempts by C&M to engage in concurrent representation in the future. [Follis Aff., ¶12].

Illinois Union obscures this issue in its 34-page brief, three declarations and hundreds of pages of exhibits. The plain fact is that Seaton explicitly and in no uncertain terms objected to C&M's representation of the ACE Companies, including Illinois Union, in ***October 2006***, long before this case was filed. Since the time of Seaton's objection, C&M has not sought Seaton's informed consent to C&M's conflict of interest. Illinois Union and C&M are simply ignoring

---

[10] Illinois Union's assertion that the June 30, 2003 letter constitutes some form of *carte blanche* upon which C&M supposedly "relied" is far-fetched at best, particularly in light of the clear statements made by Mr. Follis that Seaton does not so consent. There is nothing in the ethics rules that permits the law firm's self-created "reliance" to trump the rights of the client.

the fact that Seaton does not, and has not since October 2006, waived the conflict of interest that arises from C&M's representation of Seaton and parties with adverse interests.

Where there is a conflict of interest and an attorney desires to undertake dual representation, the Rules of Professional Conduct ***require*** the informed consent by both clients. Illinois Union argues that Seaton does not have the right to veto the ACE Companies from having C&M act adversely to Seaton. [Opposition Br., at 10]. This is contrary to the Rules of Professional Conduct, which require that ***both*** affected clients consent to an adverse representation. The ACE Companies cannot unilaterally dictate that C&M is permitted to act adversely to Seaton. Seaton is entitled to make its own informed decision about whether C&M may represent both Seaton and the ACE Companies where their interests are adverse. Seaton made an informed decision about C&M's dual representation in October 2006 – Seaton did not and still does not want dual representation by C&M. Seaton explicitly objected to C&M representing parties with interests adverse to Seaton and continues to reject C&M's attempts to represent Illinois Union in this case while representing Seaton in other matters.

In addition, Illinois Union would not be prejudiced in any way by the disqualification of Attorneys Devery and Kalish and of C&M, nor does the disqualification adversely affect the progress of the current litigation. Illinois Union is well-represented by attorneys from the law firm of Partridge, Snow & Hahn LLP who are members in good standing of the bar of Rhode Island and do not have a conflict of interest. Illinois Union made the choice to have New York counsel from Mound Cotton who had been admitted in the case withdraw with absolutely no assurance that the Court would permit a substitution and with full knowledge that its newly chosen counsel was conflicted. Any doubt about disqualification because of conflict of interest in concurrent representation should be resolved in favor of disqualification to preserve the rights of the client. *Falvey v. A.P.C. Sales Corp.*, 185 F.R.D. 120, 126 (D.R.I. 1999).

## CONCLUSION

For the foregoing reasons, Seaton respectfully requests that the Court disqualify Jennifer R. Devery, Esq. and Paul W. Kalish, Esq., and any other attorneys associated with Crowell and Moring LLP, from representing Illinois Union in this matter and deny Illinois Union's Motion for Admission *Pro Hac Vice* of Attorneys Devery and Kalish. Further, insofar as Illinois Union persisted in seeking to have C&M appear in this action notwithstanding the presence of a clear conflict of interest that violates the Rhode Island Rules of Professional Conduct, Seaton should be awarded its attorneys' fees and costs incurred in bringing this Motion to Disqualify.

Respectfully submitted,
**SEATON INSURANCE COMPANY, f/k/a**
**UNIGARD MUTUAL INSURANCE COMPANY**
By its attorneys,

*/s/ John T. Harding*

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Thomas M. Robinson, RI Bar # 6193
MORRISON MAHONEY LLP
10 Weybosset Street, Suite 900
Providence, RI 02903-7141
(401) 331-4660

Dated: February 19, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the Electronic Case Filing (ECF) system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 19, 2008.

*/s/ John T. Harding*

John T. Harding