# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SEATON INSURANCE COMPANY, f/k/a UNIGARD MUTUAL INSURANCE COMPANY,

Plaintiff,

v.

ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY

Defendant.

Civil Action No. 07-332-S-DLM

**DECLARATION OF CLIFFORD B. HENDLER IN SUPPORT OF DEFENDANT ILLINOIS UNION'S OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL**

I, CLIFFORD B. HENDLER, declare as follows:

1. I am a partner at Crowell & Moring LLP. I make this declaration in support of Illinois Union's Opposition to Plaintiff's motion to disqualify counsel.

2. I am over the age of twenty-one years and am otherwise competent to give this declaration. I have personal knowledge of the matters stated herein and know them to be true and correct.

3. I joined Crowell & Moring in 1988 and have led the firm's insurance practice since that time. Today, I am co-chair of the firm's insurance group.

4. I began representing what are now the ACE USA Companies (originally Insurance Company of North America and related companies, and after that CIGNA and related companies) in 1982 and have continued to represent them through today.

5. Although Crowell & Moring currently represents numerous insurance companies, the vast majority of its work for almost twenty years has been for the ACE USA Companies and predecessors ("the ACE USA Companies"). Indeed, prior to 2001, the insurance group worked almost exclusively for the ACE USA Companies.

6. Throughout most of that period, the ACE USA Companies, taken together, were one of Crowell & Moring's largest clients. In return for that volume of business, the ACE USA Companies insisted that Crowell & Moring work almost exclusively for them in the insurance area. One reason for that insistence was that the ACE USA Companies wanted to maximize the chances that if they referred a new matter to us, we would be able to take it on. They were concerned that if we represented other carriers, and a new matter also involved other carriers represented elsewhere by Crowell & Moring, those other carriers might try to object on conflicts grounds to Crowell & Moring taking on the new matter for the ACE USA Companies and thus potentially have a veto power over the ACE USA Companies use of Crowell & Moring.

7. In short, up until the time that Randall America (later Cavell) ("Randall/Cavell") retained us, the ACE USA Companies had resisted the idea of Crowell & Moring taking on other insurance clients, for fear that Crowell & Moring might find itself in the position of having to decline work requests from the ACE USA Companies.

8. In 2001, Randall/Cavell sought to retain Crowell & Moring to represent Seaton and other Randall/Cavell carriers.

9. At that time, the ACE USA Companies agreed that Crowell & Moring could take on work for Randall/Cavell, with the clear understanding that we could only do so if it would not preclude the ACE USA Companies from turning to us, as they always had, to represent them in any dispute in which we were not already representing a Randall/Cavell-administered carrier. It is against this background that my negotiations with Randall/Cavell must be viewed.

10. Given that context, when my partner Andy Marks and I worked out terms of engagement with Randall/Cavell back in 2001, I had no choice but to obtain an agreement with Randall/Cavell that satisfied the ACE USA Companies' requirements. (Indeed, the ACE USA Companies originally insisted upon approving new Randall/Cavell representations on a case-by-case basis and insisted upon a right of first refusal, if a case were filed against both the ACE USA Companies and a Randall/Cavell-administered carrier.)

11. Robert Burns, an experienced, legally trained senior claims official, took the lead on these original negotiations for Randall/Cavell and the carriers for whom Randall/Cavell acted as a third-party administrator. Mr. Burns represented and I understood that he had authority to speak for the Randall/Cavell-administered carriers with respect to matters such as retention of counsel, billing rates, and waivers of conflicts. During the negotiations, I made clear the ACE USA Companies-imposed limitations that we had to operate under and Randall/Cavell understood and accepted that Crowell & Moring had to remain as free to take on new matters for the ACE USA Companies after we started representing Randall/Cavell-administered carriers as we had been before we started representing Randall/Cavell-administered carriers, which meant we had to be free to represent the ACE USA Companies adverse to Randall/Cavell-administered carriers. (Indeed, Mr. Burns already knew of our firm's historical role as National Coordinating Counsel for the ACE USA Companies' predecessors from when Mr. Burns had previously run a coverage litigation management unit for an the ACE USA Companies' predecessor that made extensive use of our firm.)

12. Accordingly, with this conflict waiver understanding in place, Crowell & Moring's insurance group undertook to represent Randall/Cavell-administered carriers, such as Seaton.

13. Importantly, we could never have taken on the representation of Randall/Cavell-administered carriers absent the conflicts waivers and assurances I received at the outset of this

representation. Nor would we have taken on these representations if Seaton, or any other Randall/Cavell-administered carriers, had tried to reserve an ability to revoke these conflicts waivers and assurances, since that could have threatened our ability to take on new matters for the ACE USA Companies without the ACE USA Companies having to worry about conflicts with other carriers.

14. This advance conflict waiver is confirmed in the June 30, 2003 letter I wrote to Thomas D. Ryan, Esq., who then was in charge of Randall America, with a copy to Robert A. Whitney, Esq., also of Randall America, confirming the understanding and agreement that Seaton (along with other entities, such as Stonewall and OneBeacon, for which Randall/Cavell is also responsible) waives any conflicts in connection with the firm's representation of other insurance carrier clients of the firm, such as ACE (which is mentioned by name in the letter), in unrelated matters in which Seaton may have an adverse interest. A copy of the June 30th letter is attached as Exhibit A.

15. Consistent with our approach to Randall/Cavell, and in light of Crowell & Moring's above-described relationship with the ACE USA Companies, we have insisted on and received an advance conflict waiver from each new insurance industry client that has retained Crowell & Moring's insurance group since then.

16. Seaton's continued agreement to its advance conflict waiver is and has been a condition of our firm continuing to represent Seaton; we would not have accepted the engagement without it.

17. Randall/Cavell, is and has been aware of this waiver, on which our firm has relied on more than one occasion.

18. For example, Brian Bendig, at the time a senior lawyer at Randall/Cavell, had previously acknowledged the waiver after he raised a conflict issue in the Spring of 2006 regarding

our firm's representation of another insurance carrier in a matter involving OneBeacon (an insurer that was also subject to the same waiver as Seaton). After initially asserting that there was a conflict with our firm's participation in that matter, Mr. Bendig acknowledged to my partner Mark Plevin that the waiver controlled and characterized it as a "broad waiver."

19. Although I have not worked on the reinsurance disputes that are going on between the ACE USA Companies and Seaton, I am generally aware that there are disputes going on.

20. In particular, I am aware that the firm has taken measures to protect the confidential information of both the ACE USA Companies and Seaton. Since 2006, a wall has been in place between individuals working on matters for Seaton, on the one hand, and those individuals working for the ACE USA Companies in the matters adverse to Seaton, on the other. This wall precludes any discussions of the substance of the firm's Seaton representations with the attorneys handling the ACE USA-related matters adverse to Seaton.

21. In the August to September 2006 time period in which the ACE USA Companies reinsurance arbitrations against Seaton were initiated, Mr. Ryan, to whom my June 2003 letter was addressed, called me about my firm's initiation of what I understand to be collection activity by the ACE USA Companies against Seaton. Mr. Ryan expressed concern that our undertaking these reinsurance arbitrations could place him in an awkward position politically, but did not dispute the validity of the waiver. Although it was clear that Mr. Ryan would have preferred it if our firm had declined to take on the ACE USA Companies work as a matter of client relations, Mr. Ryan did not contest the validity of the waiver.

22. Several weeks later, I learned from Mr. Burns (who at that time had gone to work in the same office in Rhode Island with Seaton's Joe Follis) that Mr. Follis was troubled by the firm's initiation of the arbitrations. Mr. Burns also did not dispute the validity of the wavier, but did suggest it might be a good idea if I tried to address Mr. Follis' concerns. In response, I emailed Mr.

Follis, with a copy to Mr. Burns, to explain to Mr. Follis the history and the terms of the waiver, the absolute right of the ACE USA Companies to have us initiate these proceedings against Seaton, and the existence of an ethical wall that would protect confidential Seaton information from being compromised by my partner's representation of the ACE USA Companies in these Seaton-related matters. A copy of this e-mail is attached as Exhibit B.

23. Mr. Follis responded that Seaton was concerned about the firm's filing of the arbitration against it on behalf of the ACE USA Companies and requested that I provide him with an explanation of the waiver and copy of the conflict letter. A copy of this e-mail is attached as Exhibit C.

24. In response to this, I then forwarded to Mr. Follis the June 2003 waiver letter. I also reiterated to Mr. Follis that, notwithstanding his concern, the firm's ability to represent the ACE USA Companies, even in matters adverse to Seaton, had been a critical agreement upon which Crowell & Moring had relied from the very beginning as a necessary precondition to our ability to represent Seaton. I noted specifically that those historical conflicts understandings, as negotiated with Mr. Burns, did not give Seaton a right to veto the ACE USA Companies having Crowell & Moring act adversely to Seaton. A copy of this e-mail is attached as Exhibit D.

25. Upon receiving my e-mail and waiver letter, Mr. Follis did not then respond that the waiver was ineffective.

26. Accordingly, there was no basis for me to believe that Mr. Follis was attempting to revoke the agreed to advance conflict waiver. To the contrary, I understood him to have accepted the fact that the advance conflict waiver was the cornerstone of Crowell & Moring's representation of Seaton, even if it was also clear that Mr. Follis probably wished that the waiver had not been given.

27. In fact, I did not hear anything more about this conflict waiver until late 2007, over a year later, when it was brought to my attention that Seaton might be challenging Crowell & Moring's representation of the ACE USA Companies in the connection with the ACE USA Companies reinsurance disputes with Seaton. At that point I called Mr. Bendig, who – along with the majority of people who had previously worked at Randall/Cavell – now worked for Resolute New England. Once again, I reiterated the existence of the advance waiver. During this call, Mr. Bendig stated that Seaton was taking the position that Crowell & Moring was conflicted from representing the ACE USA Companies adverse to Seaton. He did not, however, provide any reason that the advance waiver should not apply.

28. Shortly thereafter, Mr. Bendig called me to request a copy of the waiver letter. I provided him with another copy of this letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 1, 2008
in Washington, D.C.

Clifford B. Hendler

EXHIBIT A

crowell moring

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202 624-2500 ▪ f202 628-5116

June 30, 2003

Clifford B. Hendler
(202) 624-2928
chendler@crowell.com

**PRIVILEGED AND CONFIDENTIAL/
ATTORNEY-CLIENT COMMUNICATION/
ATTORNEY WORK PRODUCT**

**By Federal Express**

Thomas M. Ryan, Esq.
Randall America
2 Central Square
Cambridge, MA 02139-3311

Re: Crowell & Moring Billing Rates

Dear Tom:

Following up on our recent e-mails -- and recognizing that the last thing either of us wants to talk about any further is the economics as opposed to the substance of our firm's legal work on your behalf -- I am pleased to enclose as the last "piece of the puzzle" the Crowell & Moring 2003 lawyer-by-lawyer rate chart for Randall America matters. This lawyer-by-lawyer rate chart implements the May 21st e-mail that I sent to you accepting the "Rob Whitney February 14th proposal" for rates as summarized in the March 23, 2003 chart that we previously faxed up to you.

As you will see, to confirm our having followed the "old ACE rates" bands of billing rates approach agreed upon, the rates chart includes after each lawyer's name the year that lawyer graduated from law school and his or her position within the firm. Included on the chart are all of the lawyers who have worked on Randall America matters this year through 5/31/03.

While the other categories are self-explanatory, let me here, per Rob Whitney's suggestion, address explicitly partner rates and staffing. First, Rob expressed an expectation that most of the asbestos/bankruptcy case work would be led by Mark Plevin and me and our asbestos/bankruptcy team partners as contrasted with Andy Marks and the partners who with Andy have taken the lead on the environmental matters now being transitioned to other law firms. While Andy and environmental team partners Robert Davis, Fred Souk and Alex de Gramont are on the chart and in the same bands that they were in last year, given

their 2003 work to date on the environmental matters being transitioned, Mark and I do not expect those partners to be working on the asbestos/bankruptcy docket over the second half of the year.[1]

As for our asbestos/bankruptcy team, the same partners are likewise on the chart and in the same partner bands as they were last year -- senior partner (Mark and me) and coverage/bankruptcy team partners (Ted Ebert and Dave Florin) -- with three changes that I want to flag for you. First, Thorpe partner Steve Rice has been moved from the "other partners/counsel" band to the "coverage/bankruptcy team partners" band per your agreement during the conference call that you, Brian Snover and I had in March (and as reflected in the March 23rd chart).

Second, two experienced, core insurance team partners who had not previously worked on Randall America matters -- Paul Kalish and Cliff Elgarten -- have been added to the Randall America chart as "coverage/bankruptcy team partners" given their work for Randall on the Combustion Engineering asbestos/bankruptcy litigation. By way of background, Paul is now the co-chair of the Crowell & Moring insurance practice with me having dedicated the vast majority of his legal work over the past 15 years to insurance coverage litigation. Paul also serves as "de facto general counsel" to the Coalition for Asbestos Justice. ACE USA routinely turns to Paul to handle high profile matters. For example, Paul is leading the defense of the ACE USA Companies in the Wise, Cashman, and related asbestos tort cases along with Andy Marks.

Cliff Elgarten -- a former U.S. Supreme Court clerk and perhaps our firm's leading appellate lawyer -- has likewise been called upon by ACE USA for many years to litigate high profile coverage matters. For example, earlier this month, Cliff argued the 3M breast implant coverage case to the Minnesota Supreme Court. Several years ago, he won the Helena Chemicals case in South Carolina by prevailing on a series of summary judgment motions. And several years before that, in Bristol Myers Squibb, Cliff argued and won for the carriers in state court in Beaumont, Texas the pre-merger issue.[2]

---

1 If subsequent developments did appear to us to warrant involving Andy or another one of those partners, we would, of course, discuss that staffing question with the responsible Randall America in-house counsel and claim official.

2 Our billings for Thorpe for April will also reflect six hours of time at the coverage partner rate for Luther Zeigler who served as a mock Fifth Circuit Judge

(continued...)

Finally, you will see in our $295/hour "other partners/counsel" band, a group of six counsel with an average of over 12 years of legal experience. As you will note, and we hope appreciate in terms of our efforts to keep down the total number of billable hours spent on Randall America matters, we have so far this year not had to utilize the services of any of our generalist litigation partners who, lacking coverage/bankruptcy experience, might have to spend additional hours, albeit at a heavily discounted rate, to get "from point A to point B."

Crowell & Moring's standard billing rates are expected to increase effective September 1, 2003. Nonetheless, as we have agreed, the specially discounted bands of rates that we have agreed upon for lawyers at the different levels of seniority will for Randall America remain in effect through December 31, 2003.[3] Likewise, as we have agreed, Randall America will process Crowell & Moring billing statements at those specially discounted rates for payment within 45 days after receipt by Randall America.

Lastly, as we formally renew our business relationship with you for 2003, our Professional Responsibility Committee requests that we reiterate that the same conflicts understandings and waivers that have enabled our firm both to represent Randall America carriers and other firm insurance clients will remain in effect. Thus, you will recall that Crowell & Moring also represents other carriers such as ACE Companies, RiverStone-administered entities, United Educators, St. Paul, and Liberty in numerous multi-carrier insurance matters, including matters in which Randall-administered companies may have an adverse interest, and that it is understood that Crowell & Moring can continue to do such present and future cases

---

(...continued)

for Mark Plevin's moot court. An eighteen year lawyer, Luther's insurance coverage experience goes back to the late 1980's and includes his originally co-chairing ACE USA's Exxon environmental litigation with Mark Plevin.

[3] When our new first-year associates arrive in September after taking the bar, current first years become second years, current second years become third years and so forth. Thus, consistent with the "old ACE rates," a couple of fourth years will become fifth years and move into the senior associates rate band at that time. However, the billing rate for that senior associate band will remain fixed, and we have agreed not to seek an adjustment of it, even as the firm's standard rates for senior associates are almost certain to go up, further widening the discount between standard rates and Randall rate bands.

for other carriers as a matter of course where Crowell & Moring is not in such cases representing Randall-administered carriers. Also, with respect to the ACE Companies, Randall has agreed (1) that Crowell & Moring would not itself bring cross-claims or bad faith/extracontractual claims against ACE-related companies; (2) to case-by-case approval from ACE for new Randall representations (with ACE reserving a right of first refusal and/or to propose a counsel sharing arrangement, but also pledging to act reasonably and expeditiously); and (3) that Crowell & Moring itself would not take positions for Randall on substantive matters that would create positional conflicts with ACE. As you and I discussed last fall in connection with Thorpe, such conditions do not preclude Randall from advocating positions opposite to ACE's (or bringing cross-claims or bad faith claims against ACE), so long as Randall uses one of its other law firms to do so.

* * * *

Tom, having finished writing you this long letter about "business matters," I am eager now to get back to work on substance. Let me close, if I may, for all of us here on the Crowell & Moring/Randall America team by thanking you and your colleagues for the opportunity to represent you on the important and interesting cases entrusted to us. While such "business matters" do have to be addressed, we are pleased now to have them behind us for 2003.

Sincerely,

Clifford B. Hendler

Enclosure

cc (w/encl.): Robert A. Whitney, Esq.

2052802

| NEW RANDALL AMERICA RATES FOR 2003 | | |
|---|---|---|
| 10374 | | |
| Name | Position | 2003 Randall Rates |
| Hendler, Clifford B. '78 | Senior Partner | $360 |
| Marks, Andrew H .'76 | Senior Partner | $360 |
| Plevin, Mark D. '81 | Senior Partner. ($375 as of 6/1/03) | $360 |
| Davis, Jr., Robert C. '78 | Coverage Partner | $350 |
| de Gramont, Alexandre G. '90 | Coverage Partner | $350 |
| Ebert, Robert T. '76 | Coverage/Bankruptcy Team Partner | $350 |
| Elgarten, Clifton S. '79 | Coverage/Bankruptcy Team Partner | $350 |
| Florin, David '77 | Coverage Partner | $350 |
| Kalish, Paul W. '86 | Coverage/Bankruptcy Team Partner | $350 |
| Rice, Steven P. '80 | Coverage/Bankruptcy Team Partner | $350 |
| Souk, Fred S.'75 | Coverage Partner | $350 |
| Ackerman, Peter B. '84 | Counsel | $295 |
| Alp Paul N. '95 | Counsel | $295 |
| Eaton, Mark R. '75 | Counsel | $295 |
| Parham, Monica G, '93 | Counsel | $295 |
| Pittman, Jonathan H. '90 | Counsel | $295 |
| Underhill, Kathryn A. '84 | Counsel | $295 |
| Bagley, Andrew W. '94 | Senior Associate | $240 |
| Corrao, Stephanie '91 | Senior Associate | $240 |
| Devery, Jennifer '98 | Senior Associate | $240 |
| Gold, Kimberly J. '95 | Senior Associate | $240 |
| Koehler, Beth '97 | Senior Associate | $240 |
| Kramer, Beth M. '95 | Senior Associate | $240 |
| Owens, Amy E. '98 | Senior Associate | $240 |
| Parsons, Barry '95 | Senior Associate | $240 |
| Abelow, Michael G. '00 | Associate | $180 |
| Allison, Bridget K. '99 | Associate | $180 |
| Boone, Laural S. '01 | Associate | $180 |
| Borchert, John W. '99 | Associate | $180 |
| Epley, Leslie '01 | Associate | $180 |
| Kang, Suzanna '00 | Associate | $180 |
| Keith, F. Ryan '00 | Associate | $180 |
| Linde, Jonathan T. '01 | Associate | $180 |
| Lopez, Theresa '99 | Associate | $180 |
| Marshall, Sean '02 | Associate | $180 |
| Martin, Stephen D. '02 | Associate | $180 |
| Murphy, Justin P. '01 | Associate | $180 |
| Newman, Amy B. '01 | Associate | $180 |
| | | |
| Friedt, Christopher F. | Law Clerk | $135 |
| Peterkin, Donna M. | Law Clerk | $135 |
| Zaprauskis, Maya | Law Clerk | $135 |
| Anderson, Lakeitha | Legal Assistant | $130 |
| | | |

6/30/2003
(2046038)

EXHIBIT B

## Hendler, Cliff

| | |
|---|---|
| **From:** | Hendler, Cliff |
| **Sent:** | Monday, October 02, 2006 10:09 PM |
| **:** | 'Joe.Follis@Castlewood-US.com' |
| **Cc:** | 'robert.burns@stonewall-insurance.com' |
| **Subject:** | Seaton Insurance and Crowell & Moring |

Privileged and Confidential/ Attorney Client Communication/ Attorney Work Product

Joe: I hope had a good weekend. I wanted to send you this e-mail to follow up on a discussion that I had with Bob Burns on Friday afternoon regarding the fact that my new reinsurance partner, Bill O'Neill, has initiated some kind of reinsurance arbitration against Seaton. Bob thought it might make sense for me to share directly with you some of the ideas and background that I discussed with Bob.

As you may remember from a long voicemail that I left for you at the time back in August, Bill evidently initiated the arbitration on behalf of one or more ACE USA Companies. (Because of an ethics wall that we set up within the firm, and that I will say more about in a minute, I have never seen the actual document that Bill apparently sent to Seaton.)

Conflicts waivers going back to earliest days of our firm's representation of Stonewall and Seaton permitted Bill to initiate the reinsunce matter as a matter of legal ethics, but in talking with Bob on Friday afternoon, it seemed to me important to share with you more of the background.

Back in 2001 when my partner Andy Marks and I were first approached about representing Stonewall and Seaton, ACE USA Companies essentially had a monopoly on using Crowell & Moring's legal services. ACE USA Companies and predecessors had asked Crowell & Moring to do large volumes of cases for over a dozen years, and, in return, ACE USA Companies insisted that Crowell & Moring not represent other general liability carriers (a) so that there would never be a shortage of Crowell insurance team lawyers to help them and (b) so that Crowell & Moring would always be free as a conflicts matter to pursue claims on ACE USA Companies' behalf against other carriers, if necessary.

While Andy and I greatly appreciated the opportunities to represent the ACE USA Companies, Andy and I and our colleagues also very much wanted to take on the new work for Stonewall and Seaton, where it sounded like we might have an opportunity to build an innovative partnership with Stonewall and Seaton and help Stonewall and Seaton achieve better financial results by upgrading the calibre of their legal representation and by participating in strategic planning for the books of business to be defended. But we absolutely could not take on those two proposed new representations, unless we could first persaude the ACE USA Companies to drop their insistence on having a monopoly over our firm's legal work.

One of the most difficult negotiations -- but for my firm, most important negotiations -- that I ever conducted was the process of dialogue through which the ACE USA Companies ultimately agreed to drop their insistence that our firm represent only ACE USA Companies. In the end, ACE USA Companies decided to trust that we had the depth of expertise and commitment to them to deliver the services that they needed, even if key partners like myself also become dedicated to helping Stonewall and Seaton. But a key term that ACE USA Companies insisted upon, and that Stonewall and Seaton ultimately agreed to accept in order to obtain our services, was the proviso that if ACE USA Companies needed Crowell & Moring to pursue claims against Stonewall or Seaton, Stonewall or Seaton would not object on conflicts grounds, i.e. Stonewall and Seaton would not argue that Crowell & Moring could not proceed on behalf of ACE USA Companies against Stonewall and Seaton on the basis that Stonewall and Seaton are Crowell & Moring clients too.

Stonewall and Seaton agreed to ACE USA Companies' conditions; Crowell & Moring had the opportunity to begin working with Stonewall and Seaton on some of their most significant matters, even as we continued to meet ACE USA Companies' needs; our firm thanked both groups of clients very much; and -- at least until August -- things had worked out fine as a conflicts matter for five and a half years.

When my reinsurance partner was instructed to initiate that reinsurance matter adverse to Seaton -- exercising the right that ACE USA Companies had so emphatically reserved five and a half years earlier -- I immediately left voicemails for you and Ray and Bob, and I set up an internal ethics wall here at the firm so that Bill and attorneys working with him adverse to Seaton on the reinsurance issues do not discuss that work against Seaton with those of us like me who represent Seaton. Likewise, those of us who represent Seaton do not discuss our work for Seaton with the attorneys doing reinsurance work against Seaton. Especially after my trip to Rhode Island to meet with you about : , I had high hopes that there might be new possibilities for our firm to work for Seaton and Stonewall, if we could deliver superior results with the cost-effectiveness that companies in run off have no choice but to

REDACTED

require. And I so did not want Bill's initiation of the reinsurance proceeding to confuse you or Ray or Bob about my dedication zealously to represent Seaton and Stonewall in the current matters entrusted to us (and hopefully future matters as well, if we could earn that work through successes with our current docket).

Bottom line, the fact that ACE USA Companies had a "right" to have our firm initiate the reinsurance arbitration, l the fact that the ethics wall insures that ACE USA Companies cannot, as a practical matter, somehow obtain an unfair advantage in the reinsurance arbitration by getting me or other attorneys representing you to help them, does NOT, of course, end the discussion. You and your colleagues need to be comfortable with me (and with the other Crowell & Moring lawyers working for you), and you need to have confidence that we are zealously looking to protect your interests in all of the matters entrusted to us. To the extent that you are not sure about us, it is completely up to you to decide not to retain us for any future work or even to fire us off of some or all of the existing cases in which we are representing you, subject to your recognizing the disadvantages that bringing in new counsel at this point could have for Seaton or Stonewall in particular ongoing cases.

Thus, my goal with this e-mail is to figure out the best way to reassure you and your colleagues of our loyalty and dedication to the Seaton and Stonewall work that you have been counting on us to do for you. In sum, I am looking to have you conclude that our experience and lawyering skills make us the best possible lawyers to get the best possible substantive results in those cases for you, and to have you conclude that you can fully count on our dedication and loyalty to apply that experience and those skills on your behalf.

In that connection, Bob shared with me that you have reason to believe that Carl Wall himself may be concerned about this situation of my defending Seaton in some cases, even as a partner of mine has initiated a reinsurance arbitration against Seaton. You, Ray and Bob have met me personally and had the chance to work with me and a number of my colleagues for several months now (and Bob, and Ray to a lesser extent, have had experience working with me and colleagues of mine from prior positions). But so far as I can recall, Carl Wall and I have never met, and I may be just a name to him.

In these circumstances, I thought of two things that I might do to help work all of this out. First, it seemed to me to make sense for the two of us to talk either by phone or face to face, so that I can answer any questions that you might have about the historical background and I can reassure you directly of my continued dedication to partnering with Seaton and Stonewall, as we discussed when I flew up to meet with you before the REDACTED mediation this summer.

Second, to underscore for Carl Wall my continued commitment to representing Seaton and Stonewall, notwithstanding my partner's having initiated a reinsurance arbitration, it occurred to me that it might make sense for me to fly down Carl's office in Florida, so that I could explain the historical background to him and give him an opportunity to size up for himself one of the lead partners from a firm that is very much hoping to get to continue to do important work for Seaton and Stonewall. At a minimum, by suggesting such a trip, I would want to convey how seriously we take wanting to maintain your, Ray, Bob and Carl's confidence in us. Do you think that it would be a good idea for me to try to arrange such a meeting, and, if so, would the best approach be for me to call Carl directly or would it be to ask if you might be willing to help set up a such meeting, since you know both of us?

Anyhow, as I mentioned in my voicemail for you Sunday night, I will give you a call Tuesday afternoon to see if you have had an opportunity to read through this long e-mail, and, if so, if you have any initial questions or reactions. I so much enjoyed the spirit of our discussions in August, and really hope that we will all be able to get past the concerns that my partner's initiating the reinsurance arbitration has raised. Thank you very much for your consideration! Cliff Hendler

Clifford B. Hendler, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Phone: 202-624-2928
Fax: 202-628-5116
chendler@crowell.com

EXHIBIT C

**Hendler, Cliff**

**From:** Joe Follis [joe.follis@castlewood-us.com]
**Sent:** Tuesday, October 03, 2006 11:48 AM
Hendler, Cliff
**Subject:** Seaton Insurance and Crowell & Moring

Cliff, this development remains a significant concern to Seaton. Please provide me with a copy of the conflicts waivers that you refer to below. If such waivers are not in writing, then Seaton would like to know the specifics of such waivers, including who provided the waivers; when; and what, specifically, was provided for.

I don't know what might have occurred prior to my arrival, but today (and going forward), Seaton is not expecting to be sued by firms that represent us.... I trust that you can understand as much.

Joe

Joseph P. Follis
Vice President
Seaton Insurance Company

---

**From:** Hendler, Cliff [mailto:CHendler@crowell.com]
**Sent:** Monday, October 02, 2006 10:09 PM
**To:** Joe Follis
**Cc:** Robert Burns
**Subject:** Seaton Insurance and Crowell & Moring

Privileged and Confidential/ Attorney Client Communication/ Attorney Work Product

Jo[illegible] I hope had a good weekend. I wanted to send you this e-mail to follow up on a discussion that I had with Bob Burns on Fri[illegible] afternoon regarding the fact that my new reinsurance partner, Bill O'Neill, has initiated some kind of reinsurance arbitration against Seaton. Bob thought it might make sense for me to share directly with you some of the ideas and background that I discussed with Bob.

As you may remember from a long voicemail that I left for you at the time back in August, Bill evidently initiated the arbitration on behalf of one or more ACE USA Companies. (Because of an ethics wall that we set up within the firm, and that I will say more about in a minute, I have never seen the actual document that Bill apparently sent to Seaton.)

Conflicts waivers going back to earliest days of our firm's representation of Stonewall and Seaton permitted Bill to initiate the reinsunce matter as a matter of legal ethics, but in talking with Bob on Friday afternoon, it seemed to me important to share with you more of the background.

Back in 2001 when my partner Andy Marks and I were first approached about representing Stonewall and Seaton, ACE USA Companies essentially had a monopoly on using Crowell & Moring's legal services. ACE USA Companies and predecessors had asked Crowell & Moring to do large volumes of cases for over a dozen years, and, in return, ACE USA Companies insisted that Crowell & Moring not represent other general liability carriers (a) so that there would never be a shortage of Crowell insurance team lawyers to help them and (b) so that Crowell & Moring would always be free as a conflicts matter to pursue claims on ACE USA Companies' behalf against other carriers, if necessary.

While Andy and I greatly appreciated the opportunities to represent the ACE USA Companies, Andy and I and our colleagues also very much wanted to take on the new work for Stonewall and Seaton, where it sounded like we might have an opportunity to build an innovative partnership with Stonewall and Seaton and help Stonewall and Seaton achieve better financial results by upgrading the calibre of their legal representation and by participating in strategic planning for the books of business to be defended. But we absolutely could not take on those two proposed new representations, unless we could first persaude the ACE USA Companies to drop their insistence on having a monopoly over our firm's legal work.

One of the most difficult negotiations -- but for my firm, most important negotiations -- that I ever conducted was the process of dialogue through which the ACE USA Companies ultimately agreed to drop their insistence that our firm represent only ACE USA Companies. In the end, ACE USA Companies decided to trust that we had the depth of expertise and commitment to them to deliver the services that they needed, even if key partners like myself also become dedicated to helping Stonewall and

Seaton. But a key term that ACE USA Companies insisted upon, and that Stonewall and Seaton ultimately agreed to accept in order to obtain our services, was the proviso that if ACE USA Companies needed Crowell & Moring to pursue claims against Stonewall or Seaton, Stonewall or Seaton would not object on conflicts grounds, i.e. Stonewall and Seaton would not argue that Crowell & Moring could not proceed on behalf of ACE USA Companies against Stonewall and Seaton on the basis that Stonewall and Seaton are Crowell & Moring clients too.

Stonewall and Seaton agreed to ACE USA Companies' conditions; Crowell & Moring had the opportunity to begin woi. g with Stonewall and Seaton on some of their most significant matters, even as we continued to meet ACE USA Companies' needs; our firm thanked both groups of clients very much; and -- at least until August -- things had worked out fine as a conflicts matter for five and a half years.

When my reinsurance partner was instructed to initiate that reinsurance matter adverse to Seaton -- exercising the right that ACE USA Companies had so emphatically reserved five and a half years earlier -- I immediately left voicemails for you and Ray and Bob, and I set up an internal ethics wall here at the firm so that Bill and attorneys working with him adverse to Seaton on the reinsurance issues do not discuss that work against Seaton with those of us like me who represent Seaton. Likewise, those of us who represent Seaton do not discuss our work for Seaton with the attorneys doing the reinsurance work against Seaton. Especially after my trip to Rhode Island to meet with you about REDACTED had high hopes that there might be new possibilities for our firm to work for Seaton and Stonewall, if we could deliver superior results with the cost-effectiveness that companies in run off have no choice but to require. And I so did not want Bill's initiation of the reinsurance proceeding to confuse you or Ray or Bob about my dedication zealously to represent Seaton and Stonewall in the current matters entrusted to us (and hopefully future matters as well, if we could earn that work through successes with our current docket).

Bottom line, the fact that ACE USA Companies had a "right" to have our firm initiate the reinsurance arbitration, and the fact that the ethics wall insures that ACE USA Companies cannot, as a practical matter, somehow obtain an unfair advantage in the reinsurance arbitration by getting me or other attorneys representing you to help them, does NOT, of course, end the discussion. You and your colleagues need to be comfortable with me (and with the other Crowell & Moring lawyers working for you), and you need to have confidence that we are zealously looking to protect your interests in all of the matters entrusted to us. To the extent that you are not sure about us, it is completely up to you to decide not to retain us for any future work or even to fire us off of some or all of the existing cases in which we are representing you, subject to your recognizing the disadvantages that bringing in new counsel at this point could have for Seaton or Stonewall in particular ongoing cases.

Thus, my goal with this e-mail is to figure out the best way to reassure you and your colleagues of our loyalty and ded'-tion to the Seaton and Stonewall work that you have been counting on us to do for you. In sum, I am looking to have you coı .e that our experience and lawyering skills make us the best possible lawyers to get the best possible substantive results in those cases for you, and to have you conclude that you can fully count on our dedication and loyalty to apply that experience and those skills on your behalf.

In that connection, Bob shared with me that you have reason to believe that Carl Wall himself may be concerned about this situation of my defending Seaton in some cases, even as a partner of mine has initiated a reinsurance arbitration against Seaton. You, Ray and Bob have met me personally and had the chance to work with me and a number of my colleagues for several months now (and Bob, and Ray to a lesser extent, have had experience working with me and colleagues of mine from prior positions). But so far as I can recall, Carl Wall and I have never met, and I may be just a name to him.

In these circumstances, I thought of two things that I might do to help work all of this out. First, it seemed to me to make sense for the two of us to talk either by phone or face to face, so that I can answer any questions that you might have about the historical background and I can reassure you directly of my continued dedication to partnering with Seaton and Stonewall, as we discussed when I flew up to meet with you before the mediation this summer.

REDACTED

Second, to underscore for Carl Wall my continued commitment to representing Seaton and Stonewall, notwithstanding my partner's having initiated a reinsurance arbitration, it occurred to me that it might make sense for me to fly down Carl's office in Florida, so that I could explain the historical background to him and give him an opportunity to size up for himself one of the lead partners from a firm that is very much hoping to get to continue to do important work for Seaton and Stonewall. At a minimum, by suggesting such a trip, I would want to convey how seriously we take wanting to maintain your, Ray, Bob and Carl's confidence in us. Do you think that it would be a good idea for me to try to arrange such a meeting, and, if so, would the best approach be for me to call Carl directly or would it be to ask if you might be willing to help set up a such meeting, since you know both of us?

Anyhow, as I mentioned in my voicemail for you Sunday night, I will give you a call Tuesday afternoon to see if you have had an opportunity to read through this long e-mail, and, if so, if you have any initial questions or reactions. I so much enjoyed the spirit of our discussions in August, and really hope that we will all be able to get past the concerns that my partner's initiating the rei ance arbitration has raised. Thank you very much for your consideration! Cliff Hendler

Clifford B. Hendler, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Ph 202-624-2928
Fa. 202-628-5116
chendler@crowell.com

1/31/2008

EXHIBIT D

**Hendler, Cliff**

---

**From:** Hendler, Cliff
**Sent:** Tuesday, October 03, 2006 12:46 PM
**To:** 'Joe Follis'
**Subject:** FW: Seaton Insurance and Crowell & Moring
**Attachments:** SFX41B8.pdf

Privileged and Confidential

Joe: These conflicts understandings that enabled us to obtain ACE USA Companies' consent to begin representing Seaton a Stonewall, and ultimately other carriers as well, went back to the very early days of what was then called Randall America, w Bob Burns sought to bring us in to replace certain prior counsel that Bob had less confidence in.

Soon into that process, Tom Ryan took over the leadership of that organization, and we worked directly with Tom Ryan c conflicts issues. In that connection, you may find helpful (and I have attached as a PDF) a June 30, 2003 letter to Tom Ryan t memorialized billing rates for 2003, but also included a recap of conflicts understandings at pages 3-4. Essentially, ACE USA Companies -- which had the power to refuse to consent to our firm taking on the Seaton and Stonewall representations -- ins on conditions under which ACE USA Companies would be "no worse off" for granting the consents than they would have bee had they refused the consents. Seaton and Stonewall acquiesced in order to obtain our firm's services, apparently figuring tha advantages to Seaton and Stonewall from the upgrade in representation would be real and immediate, and the potential dowi that Crowell & Moring might at times be adverse to Seaton and Stonewall was speculative (and probably that even if Crowell Moring itself did not take the positions adverse to Seaton and Stonewall, some other firm would be retained to take those ven same positions against Seaton and Stonewall anyway).

I hear your concerns. Things had worked smoothly as to conflicts matters for five and a half years, and I am very frustrate that concerns have arisen at this time, just when the circumstances might suggest possibilities for our firm to play a greater r defending Seaton and Stonewall. I will give you a call to follow up, but wanted to send you this PDF right away to be respons to your e-mail.

Thanks very much for taking the time to try understand the background of the conflicts understandings that, on the one h did not give Seaton and Stonewall a right to veto ACE USA Companies having Crowell & Moring act adversely to Seaton anc Stonewall, but did, on the other hand, win for Seaton and Stonewall the ability to use Crowell & Moring legal services over w ACE USA Companies had, to that point, essentially had a monopoly. I very much appreciate your consideration. Cliff H

Clifford B. Hendler, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Phone: 202-624-2928
Fax: 202-628-5116
chendler@crowell.com

---

**From:** Joe Follis [mailto:joe.follis@castlewood-us.com]
**Sent:** Tuesday, October 03, 2006 11:48 AM
**To:** Hendler, Cliff
**Subject:** Seaton Insurance and Crowell & Moring

Cliff, this development remains a significant concern to Seaton. Please provide me with a copy of the conflicts waivers that y refer to below. If such waivers are not in writing, then Seaton would like to know the specifics of such waivers, including whc provided the waivers; when; and what, specifically, was provided for.

I don't know what might have occurred prior to my arrival, but today (and going forward), Seaton is not expecting to be sued firms that represent us.... I trust that you can understand as much.

Joe

Joseph P. Follis
Vice President
Seaton Insurance Company

---

**From:** Hendler, Cliff [mailto:CHendler@crowell.com]
**Sent:** Monday, October 02, 2006 10:09 PM
**To:** Joe Follis
**Cc:** Robert Burns
**Subject:** Seaton Insurance and Crowell & Moring

Privileged and Confidential/ Attorney Client Communication/ Attorney Work Product

Joe: I hope had a good weekend. I wanted to send you this e-mail to follow up on a discussion that I had with Bob Burns c Friday afternoon regarding the fact that my new reinsurance partner, Bill O'Neill, has initiated some kind of reinsurance arbitra against Seaton. Bob thought it might make sense for me to share directly with you some of the ideas and background that I discussed with Bob.

As you may remember from a long voicemail that I left for you at the time back in August, Bill evidently initiated the arbitration on behalf of one or more ACE USA Companies. (Because of an ethics wall that we set up within the firm, and that say more about in a minute, I have never seen the actual document that Bill apparently sent to Seaton.)

Conflicts waivers going back to earliest days of our firm's representation of Stonewall and Seaton permitted Bill to init the reinsunce matter as a matter of legal ethics, but in talking with Bob on Friday afternoon, it seemed to me important to sha with you more of the background.

Back in 2001 when my partner Andy Marks and I were first approached about representing Stonewall and Seaton, USA Companies essentially had a monopoly on using Crowell & Moring's legal services. ACE USA Companies and predecessors had asked Crowell & Moring to do large volumes of cases for over a dozen years, and, in return, ACE USA Companies insisted that Crowell & Moring not represent other general liability carriers (a) so that there would never be a shor of Crowell insurance team lawyers to help them and (b) so that Crowell & Moring would always be free as a conflicts matter t pursue claims on ACE USA Companies' behalf against other carriers, if necessary.

While Andy and I greatly appreciated the opportunities to represent the ACE USA Companies, Andy and I and our colleagues also very much wanted to take on the new work for Stonewall and Seaton, where it sounded like we might have a opportunity to build an innovative partnership with Stonewall and Seaton and help Stonewall and Seaton achieve better finan results by upgrading the calibre of their legal representation and by participating in strategic planning for the books of busine be defended. But we absolutely could not take on those two proposed new representations, unless we could first persaude t ACE USA Companies to drop their insistence on having a monopoly over our firm's legal work.

One of the most difficult negotiations -- but for my firm, most important negotiations -- that I ever conducted was the process of dialogue through which the ACE USA Companies ultimately agreed to drop their insistence that our firm represen ACE USA Companies. In the end, ACE USA Companies decided to trust that we had the depth of expertise and commitme them to deliver the services that they needed, even if key partners like myself also become dedicated to helping Stonewall Seaton. But a key term that ACE USA Companies insisted upon, and that Stonewall and Seaton ultimately agreed to accept order to obtain our services, was the proviso that if ACE USA Companies needed Crowell & Moring to pursue claims against Stonewall or Seaton, Stonewall or Seaton would not object on conflicts grounds, i.e. Stonewall and Seaton would not argue Crowell & Moring could not proceed on behalf of ACE USA Companies against Stonewall and Seaton on the basis that Ston and Seaton are Crowell & Moring clients too.

Stonewall and Seaton agreed to ACE USA Companies' conditions; Crowell & Moring had the opportunity to begin working with Stonewall and Seaton on some of their most significant matters, even as we continued to meet ACE USA Companies' needs; our firm thanked both groups of clients very much; and -- at least until August -- things had worked out f a conflicts matter for five and a half years.

When my reinsurance partner was instructed to initiate that reinsurance matter adverse to Seaton -- exercising the r that ACE USA Companies had so emphatically reserved five and a half years earlier -- I immediately left voicemails for you Ray and Bob, and I set up an internal ethics wall here at the firm so that Bill and attorneys working with him adverse to Seat the reinsurance issues do not discuss that work against Seaton with those of us like me who represent Seaton. Likewise, th us who represent Seaton do not discuss our work for Seaton with the attorneys doing the reinsurance work against Seaton.

Especially after my trip to Rhode Island to meet with you about REDACTED , I had high hopes tha there might be new possibilities for our firm to work for Seaton and Stonewall, if we could deliver superior results with the cos effectiveness that companies in run off have no choice but to require. And I so did not want Bill's initiation of the reinsurance proceeding to confuse you or Ray or Bob about my dedication zealously to represent Seaton and Stonewall in the current mat entrusted to us (and hopefully future matters as well, if we could earn that work through successes with our current docket).

Bottom line, the fact that ACE USA Companies had a "right" to have our firm initiate the reinsurance arbitration, and th fact that the ethics wall insures that ACE USA Companies cannot, as a practical matter, somehow obtain an unfair advantage the reinsurance arbitration by getting me or other attorneys representing you to help them, does NOT, of course, end the discussion. You and your colleagues need to be comfortable with me (and with the other Crowell & Moring lawyers working fo you), and you need to have confidence that we are zealously looking to protect your interests in all of the matters entrusted to To the extent that you are not sure about us, it is completely up to you to decide not to retain us for any future work or even to us off of some or all of the existing cases in which we are representing you, subject to your recognizing the disadvantages th bringing in new counsel at this point could have for Seaton or Stonewall in particular ongoing cases.

Thus, my goal with this e-mail is to figure out the best way to reassure you and your colleagues of our loyalty and dedication to the Seaton and Stonewall work that you have been counting on us to do for you. In sum, I am looking to have y conclude that our experience and lawyering skills make us the best possible lawyers to get the best possible substantive resu those cases for you, and to have you conclude that you can fully count on our dedication and loyalty to apply that experience those skills on your behalf.

In that connection, Bob shared with me that you have reason to believe that Carl Wall himself may be concerned abo this situation of my defending Seaton in some cases, even as a partner of mine has initiated a reinsurance arbitration agains Seaton. You, Ray and Bob have met me personally and had the chance to work with me and a number of my colleagues for several months now (and Bob, and Ray to a lesser extent, have had experience working with me and colleagues of mine fro prior positions). But so far as I can recall, Carl Wall and I have never met, and I may be just a name to him.

In these circumstances, I thought of two things that I might do to help work all of this out. First, it seemed to me to ma sense for the two of us to talk either by phone or face to face, so that I can answer any questions that you might have about historical background and I can reassure you directly of my continued dedication to partnering with Seaton and Stonewall, as discussed when I flew up to meet with you before the REDACTED mediation this summer.

Second, to underscore for Carl Wall my continued commitment to representing Seaton and Stonewall, notwithstandi my partner's having initiated a reinsurance arbitration, it occurred to me that it might make sense for me to fly down Carl's offi Florida, so that I could explain the historical background to him and give him an opportunity to size up for himself one of the l partners from a firm that is very much hoping to get to continue to do important work for Seaton and Stonewall. At a minimum suggesting such a trip, I would want to convey how seriously we take wanting to maintain your, Ray, Bob and Carl's confiden us. Do you think that it would be a good idea for me to try to arrange such a meeting, and, if so, would the best approach be me to call Carl directly or would it be to ask if you might be willing to help set up a such meeting, since you know both of us?

Anyhow, as I mentioned in my voicemail for you Sunday night, I will give you a call Tuesday afternoon to see if you had an opportunity to read through this long e-mail, and, if so, if you have any initial questions or reactions. I so much enjoye spirit of our discussions in August, and really hope that we will all be able to get past the concerns that my partner's initiating reinsurance arbitration has raised. Thank you very much for your consideration! Cliff Hendler

Clifford B. Hendler, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Phone: 202-624-2928
Fax: 202-628-5116
chendler@crowell.com