# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

SEATON INSURANCE COMPANY CA No. 07-332 S

Plaintiff

v PROVIDENCE, RI
MARCH 6, 2008

ILLINOIS UNION INSURANCE COMPANY

Defendant

BEFORE MAGISTRATE JUDGE DAVID L. MARTIN

APPEARANCES:

FOR THE PLAINTIFF: JOHN T. HARDING, ESQ.
Morrison Mahoney LLP
250 Summer St.
Boston, MA 02210
617-439-7558

FOR THE DEFENDANT: BARRY COHEN, ESQ.
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington, D.C.,
202-624-2500

MARCH 6, 2008 - MORNING SESSION

THE COURT: Good morning. This is the matter of Seaton Insurance Company vs Illinois Union Insurance Company, CA 07-332 S.

The primary motion before the Court this morning is plaintiff Seaton Insurance Company's motion to disqualify Jennifer R. Devery, Esq. and Paul W. Kalish, Esq., of Crowell & Moring LLP, that's docket number 24.

There are also some related motions that I put down for hearing, since they all seem to be related. The other motions that I had scheduled for hearing, going in order, the defendant's motion for admission pro hac vice, is docket number 13, regarding Ms. Devery, defendant's motion for admission pro hac vice regarding Mr. Kalish, document 14, plaintiff's motion to disqualify Devery and Kalish, document 24, which is what I've just announced, consent motion for permission pro hac vice, document 36, I believe that relates to Mr. Cohen, and then defendant's motion for leave to file surreply, that's document number 37, and then defendant's amended motion for leave to file surreply, document 39.

I'd like to have counsel identify themselves, please. I recognize that there's a, I guess I call a challenge to whether or not Mr. Cohen should be allowed to appear this morning, but I'd like all counsel to identify themselves.

MR. HARDING: Good morning, your Honor. For the

plaintiff Seaton, John Harding from Morrison Mahoney. With me is Thomas Robinson from Morrison Mahoney, as well. And just for the Court's information, our client, Joseph Follis is here just to attend.

THE COURT: Thank you, Mr. Harding.

MR. TAYLOR: Your Honor, Robert Taylor for Illinois Union, and again, by way of introduction, in the gallery we have Mr. Cohen seated in the front row and Mr. Kalish seated behind him, Ms. Devery, and Mr. Henler.

THE COURT: All right, thank you. Does the plaintiff continue to object to having Mr. Cohen argue this morning?

MR. HARDING: Yes, your Honor, we do. And just to put it in context, when the request was made, we had consented to it. On Friday, we were served with defendant's motion for leave to file a surreply. We promptly filed an opposition. The local rules clearly require that before any surreply is to, in fact, be filed with the Court. The Court is to grant leave. The Court did not grant leave and yet the defendants went ahead and filed their amended motion and attached to it the surreply even though no leave had been granted. Based on that, we do object to Mr. Cohen arguing it because we think it shows a failure to follow very simple and clearcut rules.

THE COURT: All right. I'm going to take about

five minutes of argument on each side on the issue of whether or not Mr. Cohen should be allowed to appear this morning, then I'll make a ruling on that, and then we're going to proceed to the hearing on the primary motion. Mr. Harding has just stated briefly the plaintiff's objection to having Mr. Cohen appear. I'll hear from defendant as to why Mr. Cohen should be allowed to appear this morning.

MR. TAYLOR: Thank you, your Honor. Your Honor, Mr. Cohen hopes to argue here this morning, and I believe that certainly on behalf of Illinois Union this is a motion -- the motion to disqualify is a motion that is significant enough that it warrants permitting Illinois Union's chosen lead counsel to argue that motion. This is obviously a motion that's going to affect the progress of the case going forward. Mr. Cohen is familiar with the facts and arguments in this particular motion, and again from the client's perspective, from Illinois Union's perspective, it would be preferable to have their lead Washington counsel argue the motion. There was consent given for Mr. Cohen to appear this morning and to argue. I'm not sure I quite see the connection between an objection to filing a surreply and withdrawing consent for Mr. Cohen to appear. If there's an objection to filing a surreply we can certainly discuss that. I will say to the extent that the court perceives that there was a -- in some way I overstepped the rules, that would be

my responsibility. In reading the Court's local rule, however, regarding the filing of the surreply, it seemed to me analogous to filing a motion for leave to file an amended complaint which you can file generally with the motion. So again, to the extent that the Court perceives that that was something that was overstepping the rules, it's my responsibility, and I would certainly take responsibility for that. But I don't believe that it should affect the prior consent that was given for Mr. Cohen to appear. And again, from the client's perspective, from Illinois Union's perspective, this is a significant motion that raises substantial significant arguments, and Mr. Cohen is in a much better position to present those arguments than I would be as local counsel. Thank you.

THE COURT: Mr. Harding,

MR. HARDING: Yes, your Honor.

THE COURT: What about that point? What is the connection between, for the sake of discussion, a violation of the local rules regarding the filing of a surreply memorandum and the withdrawal of the consent to having Mr. Cohen appear and argue this morning on behalf of Illinois Union.

MR. HARDING: I think with all due respect, your Honor, I would be, you know, I just think the rule is clear cut, and either -- and if your Honor disagrees, then that's

the end of it. And if it was appropriate to file a surreply, attach it, and eject it, even though the rules don't permit that, and if that's your Honor's determination as to how that rule is to be read, that ends it. But it's either local counsel or the pro hac counsel, proposed pro hac counsel, wrote that surreply, and I just think it's inappropriate to try to back door it. They certainly could have waited, let the Court rule on whether they can file it, and if the Court so rules, then it's in the record. So that's the only connection.

The only other thing I would say is that before we reach the main motion that, of course, at this point in time, the two attorneys who are sought to represent Illinois Union substantively in the case have not been admitted. Before they filed their motion back in the fall, there were two attorneys from the Mound, Cotton firm in New York, very experienced reinsurance counsel who were admitted, consent was freely given because their appearance did not raise any of the issues here. And then that they were just simply -- a notice of withdrawal was filed and the motion to substitute, and the two people with a known conflict occurred. The very simple way for the Court to resolve this entire situation is to simply, as an exercise of discretion, deny the motion for the application pro hac vice were the two attorneys, from Crowell & Moring, since they did have experience national,

world recognized reinsurance counsel, from out of state admitted to represent their interests, made a decision to switch and asked for substitution of counsel who were known at the time to have a conflict, so the easy way to handle this situation is simply to deny those motions, then since they've never been admitted in the case the Court doesn't have to reach the issue of disqualification.

THE COURT: All right. I'm going to rule now on the consent motion for admission for pro hac vice regarding Barry E. Cohen. The papers reflect that the plaintiff initially consented to having Mr. Cohen appear this morning and argue on behalf of Illinois Union Insurance Company. The plaintiff subsequently withdrew its consent. It appears because plaintiff was of the belief that the defendant had violated the local rules by filing a surreply memorandum without permission, and for that reason, the consent was withdrawn.

It's the Court's judgment that if I determine that it was, in fact, improper for Illinois Union to file a surreply memorandum without first obtaining consent, that the appropriate remedy is to strike the memorandum and just disregard it totally, and I don't find the need for what appears to be an additional sanction which is to penalize Illinois Union Insurance Company by denying, and give the opportunity to have Mr. Cohen argue the motion scheduled for

hearing, the issue, the primary issue. Mr. Harding makes a point which I'm going to get to in a couple of minutes about the pro hac vice motions pending. But before I move on to that let me just say that I'm going to grant the consent motion for permission pro hac vice. Mr. Cohen will be allowed to argue this morning. Mr. Cohen, you may come forward.

Now, Counsel, again I just want to take about 5 minutes before we get to the meat of this matter to deal with this procedural question which is the fact as Mr. Harding has observed that the two attorneys, Ms. Devery and Mr. Kalish have not actually been admitted to practice here pro hac vice, and that he suggests that if the Court simply doesn't grant that motion, we never reach the issue of disqualification. Now, obviously, the reason the Court was not going to grant the motion for admission would apparently be on this conflict of interest issue, and that's the meat of what we have to -- that I want to have argument on this morning. But I am interested in listening to about 5 minutes from each side just procedurally what is the appropriate way for the Court to proceed. Mr. Harding seems to suggest that the Court should first address the motions for admission, those would be documents 13 and 14, and in deciding whether or not to grant those motions consider the objection that is being raised by the plaintiff concerning the conflict of

interest, and apparently concluding, if the plaintiff were to argue, should conclude there's a conflict and not allow the motions for admission pro hac vice to be granted. I am not sure but I gather Illinois Union may have a somewhat different view as to the appropriate course of action, first is to grant the motions for admission pro hac vice to have Ms. Devery and Mr. Kalish admitted, and then immediately take up the question of whether or not they should be disqualified because of the alleged conflict. So I'd like to have about 5 minutes of argument on procedurally how I should be proceeding. Mr. Harding.

MR. HARDING: Thank you, your Honor. As I suggested, it's plaintiff's view that the quickest way to resolve this is to simply deny the motion for pro hac vice admission. It is a matter strictly of the Court's discretion. I've been the beneficiary of that discretion in this case, and in other cases here and in many other jurisdictions. I don't take objecting to someone else coming into the case lightly at all, but this is a very serious matter for our client, and any way you slice it, there is a conflict in the sense that there is simultaneous representation right now of Crowell & Moring being counsel for our client Seaton and being against us. So the only issue that is really before the Court is whether, in fact, there was some sort of waiver, you know, what is the Court to

do under the Rhode Island ethics rules with the situation of simultaneous representation. But there is no dispute that there is a conflict. This is not a former representation situation, or anything else. This is current dual representation. And all I would suggest in that circumstance that it would be appropriate for the Court rather getting into the thicket of who said what to whom, 7 years ago, and what effect it's to be given today, and what the meaning is of this alleged waiver language that the defendant is relying upon. The clean way to end this and allow this case to move forward is to simply deny the pro hac application as a matter of the Court's discretion, taking into consideration the fact that there is no dispute, that there is concurrent representation. And also I think the Court should be mindful of the fact that when this case was initiated we gave a very lengthy extension for the defendant to respond to the complaint. He had counsel in place. And they retained one of the most experienced firms in the United States in reinsurance matters to do it, had them enter their appearance, and they were people that did not have any conflict with Seaton. We readily granted, or consented to their appearance in the case. We were about to make our initial disclosures, have them come over to our office in Warwick, and review documents, and then suddenly we get an e-filing that they've withdrawn and Crowell & Moring is

asking to appear knowing full well that there is a conflict, and that this would delay the case. So I think taking the whole situation in its context, and these other factors into account, it would be appropriate for the Court to simply deny the pro hac because I think we are in agreement that Mr. Kalish and Ms. Devery would have to be granted leave to appear before the Court could consider whether they would be disqualified from appearing as a formal matter under the ethics rules. Thank you.

THE COURT: Thank you.

MR. COHEN: Your Honor, I'm Barry Cohen. Thank you for allowing me to appear here. With all due respect to Mr. Harding, who wants to get his motion decided, his qualification motion decided in the context of a pro hac vice motion. There is a technical conflict, but if our waiver is valid, and we think it is, then it's not a conflict which should prevent Ms. Devery and Mr. Kalish from being admitted pro hac vice because the rule, Rule 1.7 says you can't do certain things unless your client consents. And we believe we have a consent.

I think the appropriate course for the Court is to decide the disqualification motion first, and clearly, as I hope it will, that there is no basis for disqualification, and then Illinois Union should then be given the right to choose the counsel that it wants to represent it in this

case. I don't know why it de-selected the former firm, but the client made a decision that they wanted Crowell & Moring to represent it in this case. And that decision, I believe, should be respected unless there is an ethical objection. The only ethical objection in this case would be if we don't have a valid consent to the waiver, and that's the issue on the disqualification motion.

THE COURT: All right, thank you, Mr. Cohen. I'm going to take under advisement those two motions -- frankly, I'm going to be taking everything under advisement and hopefully issue a decision which will address everything that was scheduled for hearing today. So, now I want to move ahead to argument on the substantive issue which is whether or not Ms. Devery and Mr. Kalish should be disqualified from representing Illinois Union. So I'm now going to hear from plaintiff's counsel, Mr. Harding, on that main issue.

MR. HARDING: Thank you, your Honor, and I realize that all parties have submitted very lengthy submissions. I'm going to try to be brief and just review some very critical points out of the whole group of facts, exhibits, and everything else that's been put before your Honor. Of course I'm happy to answer any questions your Honor may have about any aspect of this. Certainly if there's any question about some of the changes in corporate forum and the mergers that have happened, Mr. Follis has the

personal knowledge of that, but otherwise I'd like to just highlight a few points and not repeat everything we've said in our papers.

I think what the Court needs to focus on, that what is at stake here, is the interest of the client Seaton, and specifically their interest and their right not to have their current law firm sue them or be adverse to them in a situation where it is a direct claim. The basic claim here is that we purchased reinsurance from them to cover certain underlying umbrella liability policies that we had issued to Borg Warner. Borg Warner has submitted millions of dollars of asbestos claims to us. We've paid those claims. We've submitted claims for reimbursement under the reinsurance, and that payment has not been forthcoming and that's why we sued.

So there is a direct claim here. It's about $4 million to date. It's a very significant claim. And in these circumstances, we believe that we have an absolute right not to have our current counsel sue us or be adverse to us in this type of direct claim situation. Contrast that with what the defendants are asking you to find. They are asking you to find that a third party administrator who was acting at the time on behalf of a number of companies, Seaton, and a whole host of companies that have absolutely no corporate connection to Seaton, such as Commercial Union, and dozens of others, they're asking you to find that in 2001 a person from

that third party administrator entered into a blanket labor of conflicts for all cases for all time.

THE COURT: What year was that?

MR. HARDING: 2001. I would suggest that the record doesn't bear out that that ever happened. But even if it did, or if it's somehow be construed --

THE COURT: Forgive me for interrupting but the letter is 2003.

MR. HARDING: Yes. And I think that's an important point, and I was going to point that out.

THE COURT: All right, please continue. I don't want to interrupt you.

MR. HARDING: No, that's fine. Mr. Henler, who's here, gave an affidavit in front of the Court and he says that the genesis of this agreement took place in 2001 between himself and Mr. Byrnes on behalf of the third party administrator, and he says in his affidavit without, you know, being very specific, as to when, where, and under what circumstances he says that there was some type of oral agreement reached between himself and Mr. Byrnes on behalf of Randall America in 2001. Interestingly, they do not point to any signed agreement from 2001, any letter that they sent unilaterally to the administrator in 2001, or any other document which supposedly memorializes this agreement, instead while saying that this was a matter of extreme

importance to ACE, and notwithstanding the rules of professional conduct, they never bothered to reduce this all-encompassing waiver that would apply to all cases for all time, for all eternity, into a written document of any form, and instead the first and only document they rely upon is the June 2003 letter to Mr. Ryan, an excerpt of which this is the critical language we've had blown up and put on this just so the Court could focus on that.

So I think, first of all, you have a question about if this was so important, why didn't they do an actual waiver agreement, some separate document, something to memorialize this if, in fact, it was as all-encompassing as they now contend. I think without that proof there is certainly no reason to credit that any such agreement was ever formed.

Then you get to 2003. Where we do have the letter sent to Mr. Ryan, and as the Court is aware, we have put in an affidavit from Mr. Ryan who acknowledges receipt of this letter and disagreeing, that he was, first of all, that he was ever asked to give a waiver that would apply to the type of situation that we're here today in this case. He does not agree, and disputes that even a request was made to him to give that type of all-encompassing broad waiver that they now claim exists, or that when he received the letter dated June 30, 2003, that he had any understanding at the time that what was set forth in that letter, which was not signed by him,

there was no provision for him to countersign and send it back that he agrees, but simply a letter sent by Crowell & Moring he directly disputes that, in fact, he understood that letter to represent the kind of all-encompassing waiver that's now being claimed to have been in place.

I think the Court should also carefully look at the context of that letter. It's a multi-page letter. The focus of it, and nearly all of the discussion of it, concerns retaining Crowell & Moring on behalf of various entities that would be administered through Randall America, and who was going to staff the cases, what rates were they going to charge. It talks only specifically about 2003. Nothing about the agreement extending into perpetuity. And Crowell & Moring and ACE have not come forward with any letter from 2004, 2005, or 2006 which says, you know, we're re-upping and re-agreeing that the letter we put in place in 2003 is still the state of affairs. I think that is telling as well.

But I think the most important thing the Court should focus on here is the language of the letter which we've put on the board, and the key point which Mr. Ryan makes directly in his affidavit, that the understanding at the time was that ACE, Seaton, other carriers, are frequently involved in these large multi-party cases, multi-insurer cases, such as the Emhart case that Judge Smith had, and which I was involved in the trial of that in this court for 6 weeks back in 2006, and

in those circumstances, there was an understanding that if a entity, let's just take for example, Borg Warner, since it's in this case, were to sue 30 insurers claiming that they owed defense an indemnity fee to the company for the costs they've incurred for asbestos claims, that Seaton, or the carriers administered by Randall America, were not going to take a position that they can automatically say that because you're doing some work for us we can veto your using Crowell & Moring to represent ACE in those cases. That's what's specifically referenced in this letter, multi-insurer litigation. There is no reference in the language of this letter that can possibly be construed in any way as relating to direct claims between insurers where, as in our case Seaton is suing one of the ACE companies to recover on a claim. That language, there is nothing in this letter about direct claims or what would happen in those circumstances. And the cornerstone of the ethics rules, under the Rhode Island professional rules, and the ABA opinion that we've cited, and attached to our papers, is that there has to be informed consent, and specifically in the context where you're dealing with a proposed blanket waiver of claims going into the future, it has to be set forth clearly in a writing. If they're now saying that this writing can be construed as constituting a blanket waiver of all conflicts for all time and all circumstances, including direct claims by one insurer

against another, that language buried in a rate letter sure doesn't do the job, and for that reason alone, the courts should say the requirements for consent haven't been met.

The other important point is that under the ethics rules any consent that's given has to be informed consent. How in 2001 could a third-party administrator acting on behalf of dozens of insurance companies that have issued thousands of policies, possibly even give informed consent, to waiting conflicts on behalf of all of those companies, in every single case that might arise dozens of years in the future, or all time. It can't be done. And the ABA opinion specifically says that in that type of situation where the law firm cannot advise the client of all the situations that might arise, and all the circumstances in which there might be a conflict, there can't be a basis for finding informed consent because the party who is asked to give the consent doesn't have all the facts in front of him to make an informed decision. So I would respectfully suggest that there is no informed consent here.

Now the other critical point is that even if the Court were to get over these hurdles that we start down the road with an alleged oral agreement, never reduced to writing. Two years later it's buried in a rate letter. After that, there's no mention of it again.

2006, the third-party administrator is terminated by

Seaton, and as the defendants point out, there's, in fact, a court case between them in which Seaton has alleged that Randall America has engaged in fraudulent conduct in connection with the affairs that are handled on behalf of the insurance company. How can there possibly be a requirement that in those circumstances we would be stuck for all time, in all cases, even if the Court could somehow read this language as constituting the sort of waiver that they claim exists. But then move forward in time. This case wasn't filed until around the start of September 2007. In October 2006, when Mr. Follis, who's a direct vice-president at Seaton, became aware of all this situation and was provided with a copy of the letter, he sent an e-mail to Crowell & Moring saying, "I don't agree to your suing us or being adverse to us." So even if the Court had a record to find that there was some type of consent before that, certainly as of October 2006, Seaton directly told Crowell & Moring you can't do this any more. That ought to be enough right there to end any suggestion that they can continue to appear in cases directly adverse to us from here to eternity when a senior vice-president of the company has said, "No, I don't agree to that."

So it couldn't be any clearer that none of the requirements have been met. It's the burden of the party, I suggest, in this circumstance, claiming that there's some

type of waiver to prove it up, and some of the cases, at least, talk about a need for there to be clear and convincing evidence because what is ultimately at stake is the rights of the client. It's not the right of the law firm to maximize its business by trying to play both sides of the fence. It's the rights of the client. They are our current counsel, and under these circumstances, and this factual record, they should not be allowed to appear against us in this case. Thank you.

THE COURT: Thank you, Mr. Harding. Mr. Cohen.

MR. COHEN: Thank you, your Honor. I want to explain first while I'm here arguing this motion. I'm the Chair of the Professional Responsibility Committee of Crowell & Moring. We take our professional responsibility obligations seriously and when this motion was filed I asked the lawyers who were retained by Illinois Union and my firm if I could argue this motion and that led to the request for pro hac vice admission. We take our responsibility seriously. When Seaton first approached us to request that we represent them, Randall, the third party administrator who approached us, we examined the conflict situation and we, at the time, made what we thought was a proper and correct ethical decision to do so. And I think it's still an ethical decision that we did and I want to explain to you why it is. But before I get to that, I do think it's appropriate to

mention to the Court that this is an opportunistic and a tactical motion that Seaton has filed. Why is it opportunistic? It's opportunistic because Crowell & Moring has the thinnest of threads of an attorney/client relationship to Seaton. We have barely two cases that we're working on. And I say, barely, because one of the two cases has been settled in principal, and all that remains is the negotiation of some language in a settlement agreement. And I understand even that the settlement funds have been paid in that case. So we're not really advocating on behalf of Seaton in that case anymore. We're trying to work out the details of a settlement that has been agreed to in principle.

In the other case, we were retained by Seaton because they were brought into a bankruptcy case called the Quiggly case by another interest.

THE COURT: Mr. Cohen, when you say you were retained by Seaton in this other case, were you retained by Seaton or by Randall?

MR. COHEN: I'm sorry. By Randall on behalf of Seaton. By Randall to represent Seaton.

THE COURT: Thank you.

MR. COHEN: CNA, another insurance company, brought Seaton into a bankruptcy in another matter. The bankruptcy judge stayed the bankruptcy proceedings pending completion of an arbitration in that case involving other

parties. We haven't billed a minute of time to that case in over 12 months. It's inactive. Technically are we representing Seaton? Yes, we are. Do we have what you'd call a real attorney/client relationship with them? Not at all. The motion was tactical because there's no legitimate interest that Seaton has in seeking Crowell & Moring's disqualification. We have no confidential information that is in any way relevant to this Borg Warner Reinsurance Agreement that's in issue here, and so Seaton has no legitimate interest in seeking to disqualify us. Disqualification is a remedy to be exercised by the Court when appropriate. When appropriate to promote a client's interest. Seaton has no interest in disqualifying us. Illinois Union, their rights to retain counsel of their choice, does need to be respected. And a disqualification motion, the only thing it would do would harm Illinois Union by preventing them from having Crowell & Morning, the lawyers they selected to represent them, be their lawyer here. That is enough. Without even getting into the merits, that is enough for the Court to deny the motion to disqualify. But let me get to the merits because they are important and they'll provided another reason for the Court.

THE COURT: Mr. Cohen, before you go on to that, you're saying, in effect, there's no prejudice to the plaintiff by allowing Mr. Kalish and Miss Devery to be

admitted?

MR. COHEN: None at all. None at all.

THE COURT: Does the case law indicate that when the Court is addressing that as a conflict of interest that prejudice, or the lack thereof, is a consideration in determining whether or not there is a conflict?

MR. COHEN: What the case law says both in this Circuit and elsewhere is that tactical motions to disqualify should be denied where there's no legitimate interest to be furthered. And I believe Judge Torres has issued an opinion to that effect. Because disqualification is a remedy, it does not follow. Even if there were a conflict that was unremedied by a waiver, that does not necessarily lead to a disqualification.

Well, let me go to the merits. And we really do need to start with this company, Randall America. They are, as Mr. Hardy mentioned, a third-party administrator. They contracted with Seaton in 1999 to run Seaton's insurance business. Seaton was in at the time what they call run-off. They weren't writing any new policies. They needed to stay in business to administer the policies that they had issued, perhaps collect premiums, but certainly to administer claims. That's the important business of insurance companies in run-off. Now at the time Randall approached us, this was Mr. Byrnes who was an employee of Randall, we have never seen the

contract between Randall and Seaton that established Randall's authority. It was described to us the firm practices in the insurance area. We understand what third-party administrators do. Mr. Byrnes represented to Mr. Henler that he had the authority to hire counsel, and that he had the authority to negotiate the terms of the representation of counsel. We now, in this motion to disqualify, we've seen the contract between Seaton and Randall. It's Exhibit A to Mr. Follis's affidavit which was attached to Seaton's initial memorandum of law. And it grants Randall broad authority to run the business of Seaton, including monitoring the regulatory requirements of the insurance business, administering claims, hiring counsel. They have the authority -- they were given the authority to do what they actually did although Seaton originally in their early motion denied that Randall had that authority. In the New York litigation that Mr. Hardy mentioned, the litigation in which Seaton has sued Randall for fraud, Seaton's court papers say this, They say, we entrusted Ca velle, who is a successor to Randall, to manage virtually all of Seaton's affairs. And I am quoting, "To manage virtually all of Seaton's affairs." And they further said, and Seaton no longer had any staff of its own. So they entrust their company, Randall, to run the business. Running the business involved hiring counsel to represent the company in claims.

Hiring -- having the authority to represent counsel in claims means you have to negotiate the terms of the representation. One of the terms of our representation was the conflict waiver. Even if we didn't have these express terms of authority in the contract between Randall and Seaton, Randall had apparent authority. They were put out in the world to run the business of Seaton. They acted like they had full authority, we justifiably relied on it. So even if for some reason there was some defect in the actual authority that Seaton granted Randall to run its run-off business, Randall had apparent authority. Under the law of apparent authority we were entitled to rely on this agent that Seaton sent out in the world to represent its interests, and we did. I didn't see anything in Mr. Harding's papers in which he contested apparent authority at all, and he didn't mention anything this morning about the authority question. All right, so now we get to the negotiations that Mr. Henler had when Mr. Byrnes approached him and asked Crowell & Moring to represent the companies that Randall was administering at the time which included Seaton, Mr. Henler --

THE COURT: Is this 2001, Mr. Cohen?

MR. COHEN: Are there --

THE COURT: Is this 2001?

MR. COHEN: It may have begun a year before, but 2001 was the year of the relationship, the attorney/client

relationship began. Now Mr. Harding suggests that there was some defect in the fact that Mr. Henler and Mr. Byrnes discussed the terms of the engagement orally, and I think the implication of his comments was that there was something unethical about having the terms of that, the terms of the waiver not reduced to writing. Keep in mind that in 2001 we had no idea that there was going to be litigation brought in Rhode Island, so we looked at the District of Columbia Rules of Professional Conduct. That's where we practice law. They did not require that a conflict waiver be in writing and --

THE COURT: The District of Columbia Rules?

MR. COHEN: Yes. And indeed, in Rhode Island, until Rhode Island amended its Rules of Professional Conduct last year, conflict waivers didn't need to be in writing here either. And so even if we knew that this lawsuit were going to be brought in Rhode Island at some later point, and of course we obviously didn't know that, the oral conflict waiver discussions that Mr. Byrnes and Mr. Henler had in 2001 were valid under District of Columbia law and they were valid under Rhode Island law. A couple of years later though, Mr. Henler decided it was -- in the context of the rate negotiations for 2003, Mr. Henler decided that perhaps the conflict waiver that he had negotiated with Mr. Byrnes should be put down in writing. Now Mr. Byrnes was gone by then, and

so he writes a letter which codifies the hourly rates for the lawyers for 2003 to Mr. Thomas Ryan, and in it he includes a paragraph about the conflicts waiver. The paragraph is not buried in the letter. Indeed, it's the longest single paragraph in the entire letter that discusses the conflict waiver, and I'm going to talk about the specific terms of the waiver, but it's not obscure. It's not buried. It wasn't in a footnote. It was a permanent part of the letter.

Now, I'm going to hope that Mr. Harding is not pushing a point that he mentioned in his paper and that is that Mr. Ryan is some stranger to this transaction. If you read Seaton's opening brief, you wonder why is Mr. Henler writing to Thomas Ryan? Who is he? Well, we find out -- we know who Ryan was, and we find out finally in Seaton's reply brief that he was secunded from another company to work on the runoff matters that Randall was having. He was, in effect, a sub agent. He was not a stranger to this matter at all.

THE COURT: He was a sub agent to whom?

MR. COHEN: Randall. He was an employee of National Indemnity Company who was secunded to Randall to help it run Randall's runoff business, and that's what Mr. Ryan says in his affidavit. This is in the reply brief. So Mr. Henler writes to him, includes the lawyer rate information for 2003, and the conflict waiver language. Mr. Ryan doesn't object to it at all. He doesn't say this is

not what we agreed to.

So was the 2003 letter that Mr. Henler wrote to Mr. Ryan, was that part of the negotiations that was in Randall's authority. It's absolutely clear there's either actual, implied or apparent authority. That document was issued with authority, and so to resolve --

THE COURT: Which document?

MR. COHEN: The 2003. The 2003 letter was sent to Mr. Ryan --

THE COURT: The letter was issued by authority from whom?

MR. COHEN: When Mr. Henler wrote to Mr. Ryan in 2003, he was writing to Mr. Ryan in his capacity as a representative of Randall which was running the Seaton runoff business.

Let me move to the waiver language itself, and explain why it applies to this case.

THE COURT: Here's what I'd like to do --

MR. COHEN: I can barely read this. Maybe you can't, either.

THE COURT: Well, I can't, but I am interested in your argument on this point. So I was going to suggest that you might move the easel to about the middle of the jury box facing that wall so that you might be able to see it and I might be able to see it. You can turn it more your way. I

want you to be able to see it. You have a copy?

MR. COHEN: I have a copy.

THE COURT: All right, fine. Well, if that's the case, if you have a copy, and I assume, Mr. Harding, you have a copy, too, right?

MR. HARDING: Yes.

THE COURT: Could we move it even closer so then I can see it? Very good. Thank you.

MR. COHEN: I want to focus on the sentence in the middle. Mr. Henler writes, "Thus, you will recall that Crowell & Moring also represents other carriers such as ACE companies." And then he mentions some others. And by the way, Illinois Union is part of the ACE companies. We represent them in numerous multi-carrier insurance matters, including matters in which Randall administered companies may have an adverse interest. And that it is understood that Crowell & Moring can continue to do such present and future cases for other carriers as a matter of course where Crowell & Moring is not in such cases representing Randall administered carriers." What the sentence says is that it is understood that Randall can be adverse to the insurance companies administered by Randall in the present and in the future. Seaton says -- Seaton offers Mr. Ryan's affidavit to try to explain this, but he can't. What Mr. Ryan says about this are refuted by its terms. He said, and Mr. Harding

said, well, the waiver is limited to the year 2003. It was not renewed in later years. It doesn't say that. It doesn't say this only applies in the year 2003. In fact, that would have been a foolish statement to make because Randall, at the time, was hiring Crowell & Moring on coverage cases. These coverage cases last for years. Could Crowell & Moring possibly have agreed to a waiver of the 2003 while these cases continued in the future, and then like Cinderella's carriage, at midnight and January 2004, all of a sudden all of our ACE companies were conflicted out of representing them? 2003 isn't mentioned in that paragraph. Nor is the waiver limited to situations in which the insurers are only co-defendants.

THE COURT: Mr. Cohen, when you say that 2003 is not mentioned in that paragraph, in fact, the first line says, "Lastly, as we formally renew our business relationship with you for 2003, our professional responsibility committee requests that you..." (inaudible). It does reference 2003.

MR. COHEN: Well, because that was the setting of the letter we are including the rates that we're going to charge you for 2003. It doesn't say you're negotiating the waiver, only for the calendar year 2003. It doesn't say that, and it wouldn't have made sense to say that. The letter doesn't say -- the waiver language doesn't say that

it's limited only to situations in which the insurers are only co-defendants in the case. That's a gloss that Seaton tries to put on it. But that's not what it says. It talks about multi-insurance matters in which Randall administered companies may have an adverse interest. This case is a multi-insurer matter, insurer plaintiff and insurer defendant, and the Randall administered company, Seaton, has an adverse interest to our client. So it covers this situation.

What's interesting about Mr. Ryan's affidavit is that he acknowledges all of the lack of authority arguments that Seaton first proposed. He's being offered as a witness as to the meaning of this agreement that Seaton first said Randall didn't have the authority to enter, so now here's Mr. Ryan coming and offering his explanation of what the agreement means. His explanation is wrong because it's not supported by the language of the letter. It does support that he was acting in a representative capacity on behalf of Randall, and Randall on behalf of Seaton when this waiver was granted.

Now Seaton raises some questions that even if we have a waiver which by its terms applies to this situation, it's invalid for legal reasons. Seaton mentioned in its papers that there was no consideration given for the waiver. Well, the consideration was Crowell & Moring's agreement to represent the Randall administered carriers, and the ACE

companies agreement to waive their objection to having Crowell & Moring represent competing insurance carriers. We all know from contract law that a commitment to do something, or not to do something, can be consideration for a promise. And that's what happened here. So there was consideration. Seaton argues that the waiver is invalid because Seaton, or Randall, couldn't give informed consent to a conflict that was to arise in the future. But that's an old concept in the law. Advance conflict waivers are now warmly endorsed by the law, and indeed in Rhode Island, when the updated Rules of Professional Conduct were adopted, in this state last year, Rule 1.7, which is the conflicts rule, included a comment which says that there's no objection to advance waivers so long as they are described to the client and the client understands them. Well, this waiver was explained to the client. It was explained as a waiver on behalf of insurance company clients that Crowell & Moring represented concerning insurance disputes. So it's not broad and open-ended. It's rather narrow. It allows Crowell & Moring insurance clients to be adverse to Randall administered companies in insurance matters, and it's not open-ended as to time. As soon as the matters that Seaton referred to us are completed, Seaton's free to revoke the waiver at that time. If it later seeks Crowell & Moring's services as counsel, it can negotiate the engagement agreement on a completely clean sheet of paper.

It only lasts -- the waiver only lasts so long as the matters that Seaton referred to us are still being worked on, and as I mentioned earlier, those cases are almost over.

THE COURT: Is your position that the waiver can't be revoked until such time as those cases have been completed?

MR. COHEN: Yes. I wanted to get to that because Mr. Harding mentioned that in 2006 Mr. Follis informed Mr. Henler that the waiver was revoked. Actually, he didn't say that. He said we're not happy that Crowell & Moring is adverse to us. It really wasn't until this litigation was filed that Seaton formulated its position that the waiver that we believe was given to us in 2003 is not valid any more. What Mr. Follis told us in 2006 that he wasn't happy that we were adverse to them. But why couldn't it be revoked? Because it is in the nature of an advance waiver that it is intended to apply to future conduct.

Just consider this case. Let's say we were retained pursuant to the 2003 letter by Randall, and Randall says to us on behalf of Seaton, "You can represent other insurance companies adverse to us on unrelated matters." And we do that, which we did, and it was intended to allow us to do that in the future. It's an advance consent. And then now Randall comes, or Seaton comes in 2006 and 2007 and says we revoke that. All of these attorney/client relationships that

we established over the years in reliance on the advance waiver, they say, reach them because we're revoking our consent.

If the Court agrees that an advance waiver is permissible in Rhode Island, and I believe it's clear that it is, then it follows that it can't be revoked absent some exception or circumstances. And the comments of the Rhode Island Rule 1.7 on advance waivers mentions that the waiver can't be revoked except under exceptional circumstances. Now Seaton, they can fire Crowell & Moring if they want. That's certainly within their power to do, and then the problem is cured and we're hardly doing anything for them. So maybe that's what they should do to cure the problem.

I guess I wanted to just mention in closing that the Court should be mindful of the point I mentioned earlier and that is the harm to Illinois Union if a disqualification is ordered. They do, like any litigant, they have the right to counsel of their choice, and absent some consideration, some prejudice, to Seaton, they should not be denied that right. It is important in this regard that there's no harm whatever. Maybe Mr. Harding wants to stand up and say why they're going to be harmed if the disqualification motion is not granted. But in his papers, I haven't seen that. And without such a showing, it seems to me that the Court should deny the motion even without regard to consideration of these technical

conflict issues. Thank you.

THE COURT: Thank you, Mr. Cohen. Mr. Harding.

MR. HARDING: Just a very few brief points in response, your Honor, because I think we do have sort of a fundamental disagreement on a number of issues, the first of which is the role of the ethics rules before this Court. It's not a question of just whether somebody objects. The ethics rules, if in fact your Honor decides to admit the attorneys from Crowell & Moring are binding upon them and they must follow them, and they say concurrent representation you can't do it unless the client waives the conflict. It's just that black and white and has to be enforced by the Court.

The other thing is that the ethics rules do not turn --

THE COURT: So, Mr. Harding, do I understand your point being there's no -- prejudice doesn't come into it. If the client objects, the conflict exists, then that attorney is not allowed to represent that client?

MR. HARDING: That's our position. I think the cases bear that out. It's a different situation. If we're dealing with a former, a situation of former representation where there's an allegation that because in the past you obtained confidential information that could be used to harm the interest. In fact, that is the situation here. They have -- Crowell & Moring has represented Seaton in a number

of matters. They do have confidential information concerning the client. I didn't raise it because when they put in their papers that if they were allowed to proceed in this case, they are not going to share that among attorneys, I take them at their word, that they will not do that. And I'd also like to say that we're not suggesting that back in 2001 or 2003, you know, anything objectionable or underhanded, or anything like that, was done. We are not making any such claim. What we're simply saying is that the language that they're relying upon can't support the interpretation they're now putting on it as to its scope, and I think that's borne out in a number of ways, first of which is, I think, it's a real misnomer to even call this a waiver. This document, of which the excerpt on the board is a part, is a letter unilaterally sent by Crowell & Moring to Mr. Ryan. It's not a contract. It doesn't have a line, you know, please acknowledge that this accurately reflects all of our terms and agreements, and you understand them, and send it back to me. It wasn't put into a separate document, and if you look at most of the cases that are cited by both parties dealing with waivers, it's where there was a separate agreement called a waiver a contract, and the affected parties signed it. So what they're trying to say is that because Crowell & Moring sends a letter and they don't get a letter back saying you've misstated the terms of our agreement, that somehow we're

bound by the interpretation they now want to put on it. And I think Mr. Ryan in his affidavit makes perfectly clear why he didn't write back to them at the time, and that's because this language doesn't deal with the kind of situation we're in here today. In Mr. Henler's declaration, nowhere in there does he say I discussed with Mr. Byrnes or anyone else at Randall America that there could be cases where our companies are suing one another, and in that circumstance we want carte blanch to represent the ACE companies. That's not in his affidavit, it's not in the paragraph in the letter, and I think to construe this reference to multi-insurer cases, as accompanying in this type of situation, it's not borne out by the language, and Mr. Ryan directly disputes that he had any such understanding at the time. He had no reason to write back to them and say, look, if ACE sues Seaton, or Seaton sues ACE, this deal is off, because that was never even discussed with him as a possible scenario. So in that circumstance, he could not have waived something that he didn't know about that wasn't even discussed, that Mr. Henler never even asked him to agree to. And, you know, if this situation boils down to a he said he said, and what's the scope of this, and whatever, the ethics rules, I think, are pretty clear that it's got to be clearcut, you know, cut and dried. If you're going to try to enforce an advanced waiver of a conflict, you've got to spell it out in black and white,

and clear language, and the Court has to be able to determine that there was, in fact, a meeting of the minds as to what the scope of the agreement was. And in the absence of that, the party claiming the waiver loses. It's just that simple because that's the only way to effectively protect the client's right in avoiding concurrent representation which is not measured under the ethics rules by what volume of business you're doing for a client. The fact that some of these matters aren't very active, and they're not, you know, huge billing opportunities for Crowell & Moring doesn't change the ethics obligation. They are counsel of record in these cases. We've objected. We told them we objected before this case was ever filed, before they entered their appearance in it, and given what at best can be described as a highly ambiguous situation that wasn't documented at the time, that wasn't reduced to a very explicit written agreement, we would suggest that the Court has no choice in this matter under the ethics rules other than to disqualify counsel from appearing. Thank you.

THE COURT: Mr. Harding, would you agree that Seaton had authorized Randall America to retain counsel on its behalf?

MR. HARDING: Yes. And, you know, our affidavit, we did not say anything other than Mr. Ryan was not a technical employee of Randall America. We did not, you know,

disclaim the authority, and I think the authority issue, you know, really is a side issue. The issue is, what was, in fact, agreed to at the time; what was understood; what was reduced to writing, and Mr. Ryan, who was the recipient of this letter, has given the Court his understanding that it did not encompass this type of situation. He's not trying to suggest that the multi-carrier case, the Emhart case, wasn't within this. When all he has said is this type of situation that we're here today about was never in the contemplation of the parties. It wasn't discussed. Thank you.

THE COURT: So your argument, Mr. Harding, at least with regard to Mr. Ryan, is not Mr. Ryan didn't have the authority to make a waiver, a conflict waiver on behalf of your client, but simply the document that has been presented by Illinois is, in fact, not a valid waiver.

MR. HARDING: That's correct. And he never signed it. I mean, we don't have a situation where he even signed that letter, or countersigned it, or wrote a letter back saying got your letter, agree with it a hundred percent, so we're in the territory of a law firm sending out a unilateral letter, and if they don't get, you know, someone screaming back in their face that you've got it wrong, then somehow they're bound. His affidavit makes clear that really they didn't get it wrong. What had been discussed with him and Mr. Byrnes was memorialized in that letter, and that's

the big multi-party case, and we're not going to try to say that anytime, you know, there's a Seaton carrier in the case that we can, or a Randall America carrier in the case that we can just say, ah-ha, Crowell & Moring, you can't represent ACE because you're representing us. That was the context of the discussion, and to the extent there was an attempt to memorialize it in the June 30th letter, that's what it pertains to, not our case here.

THE COURT: I gather that the statement that Seaton had no staff, had virtually no employees at the time that it retained Randall America to administer its runout of affairs, or whatever, is that correct?

MR. HARDING: I believe so. I mean, it's a very common practice in the insurance industry to hire these third-party administrators, companies that are in runoff hire them, companies, you know, like obviously Commercial Union was one of the other clients of Randall at the time who was, you know, very active. They're under a different name now but it's certainly a very active writer. So it's a very common practice to, you know, hire these sorts of companies instead of having a full time dedicated staff do it.

THE COURT: So, Mr. Harding, before I let you sit down.

MR. HARDING: Sure.

THE COURT: These points, the fact that Mr. Ryan

was not an employee technically of Randall America, that he was an employee of Seaton Insurance, those points, if I understand your argument, are not essential to your position. Your position is that the document that Illinois Union claims constitutes the waiver is not a waiver.

MR. HARDING: That's exactly right, your Honor.

THE COURT: All right, thank you. Counsel, I noticed that there was some redacted documents in the filings, and it's not clear to me whether the redactions contain material that might bear on any of the issues that I have to consider in deciding the motions before me. I'll leave it to your judgment. If you think there is some material contained within the redaction that I should be aware of in order to rule intelligently on these motions, then I direct you to send me directly to my chambers copies of the unredacted documents. I'm asking you to use some judgment. If what's been redacted has been redacted because it pertains to some other case and has nothing to do with this case, I'm not interested in seeing it, but I don't want to rule in a vacuum, that if there's something that has been redacted that is relevant to the issues before me, then send it to me, is that clear, Mr. Harding?

MR. HARDING: Yes, your Honor. None of our papers had a redacted document. I think they were all in the attachments to certain of the affidavits by the defendants.

THE COURT: Mr. Cohen, are you clear on what I'm asking for?

MR. COHEN: I am clear, and what we did redact was pretty much in the category of what you described as information relating to some business affairs.

THE COURT: Fine. Then please don't send it to me. Now, I notice both counsel apparently have charts and things and I gather that they all pertain to the letter of 2003, and I actually find it helpful to have a blown-up size because the copy of the 2003 letter is not the clearest that I have.

MR. HARDING: Right. And, your Honor, we had blown up the two pages from the actual letter that, you know, the best copy that we could find, and we have those here if your Honor wants them, and then we had just typed up this language that's on that chart --

THE COURT: All right.

MR. HARDING: -- from that letter, realizing that no one seems to have a real clear copy of that original letter.

THE COURT: All right. What I intend to do, unless there's an objection, is to designate these documents as hearing exhibits. Do all the documents belong to the plaintiffs?

MR. HARDING: Yes.

THE COURT: All right. If you haven't satisfied yourself, Mr. Cohen, if there's nothing objectionable in these blowups, do so after the conclusion of this hearing and I'll direct the clerk to mark them as plaintiff's hearing exhibits and we'll have them available.

All right, I'll take these matters under advisement. I'll issue a written decision. I'll try to get to it as soon as I can. I thank the attorneys for their arguments. The Court will stand in recess.

THE CLERK: All rise.

(RECESS)

C E R T I F I C A T I O N

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/sJoseph A. Fontes/

JOSEPH A. FONTES, COURT REPORTER

June 25, 2008

DATE