# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SEATON INSURANCE COMPANY, f/k/a UNIGARD MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS UNION INSURANCE COMPANY, f/k/a GATX INSURANCE COMPANY,<br><br>Defendant. | Civil Action No.: 07-332-S |

**SUPPLEMENTAL AFFIDAVIT OF JOSEPH P. FOLLIS**
**<u>IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL</u>**

I, Joseph P. Follis, make the following supplemental affidavit under oath in support of Plaintiff's Motion to Disqualify Counsel. In particular, this affidavit is submitted to address certain matters that were raised by Defendant Illinois Union Insurance Company f/k/a GATX Insurance Company ("Illinois Union") in its Memorandum in Opposition to Plaintiff's Motion to Disqualify Counsel and the supporting Declarations of Clifford B. Hendler and Mark D. Plevin. As set forth below, Plaintiff Seaton Insurance Company f/k/a Unigard Mutual Insurance Company ("Seaton") is a current client of Crowell & Moring, and Seaton has not consented to Crowell & Moring appearing in this action on behalf of an adverse party. Moreover, Crowell & Moring has been well aware of Seaton's objections to Crowell & Moring concurrently representing Seaton and entities adverse to Seaton since at least October 2006, when I specifically advised Mr. Hendler that I never expected to be sued by my company's current attorneys and that I would not agree to waive any such conflicts going forward with respect to new claims such as the one involved in this case. I further state as follows:

1. I am the Vice President of Seaton and am fully familiar with its business, including the matters that are the subject of this case and that are discussed in the Opposition Brief dated February 4, 2008 filed on behalf of Illinois Union in response to the Motion to Disqualify Crowell & Moring filed by Seaton in this action.

2. The law firm of Crowell & Moring LLP ("C&M") currently represents Seaton in other active litigation and has previously represented Seaton in litigations in other jurisdictions.

3. Seaton has objected and continues to object to C&M's representation of parties adverse to Seaton, including C&M's proposed representation of Illinois Union here.

4. As of March 31, 1999, Seaton entered into an Agreement Relating to Administration of Run-Off Business (the "Run-Off Agreement") with Randall America, f/k/a Eastgate, Inc. ("Randall America"), pursuant to which Randall America acted as a third-party administrator for Seaton with respect to the handling of claims.

5. During the time that Randall America was handling claims on behalf of Seaton, I was not aware of the June 30, 2003 letter sent by Mr. Hendler to Mr. Ryan that is relied upon by C&M to support its claim that there was some type of agreement in place to waive conflicts involving the representation by C&M of the ACE Companies. In any event, as explained by Thomas Ryan in the affidavit that he has submitted in this action, it was never Mr. Ryan's intention to enter into any type of blanket waiver of conflicts involving the ACE Companies that would apply to all claims for all time. Instead, as Mr. Ryan explains, and as the June 30, 2003 letter clearly states, the only understanding that was in place as of that time was that companies whose claims were being handled by Randall America would not use the fact that C&M represented them in certain matters as a grounds for disqualifying C&M in large, multi-defendant insurance coverage cases based upon the fact that there could be a theoretical divergence in the

interests of such companies and the ACE Companies on particular issues. As Mr. Ryan clearly explains, the June 30, 2003 letter was never intended by him to constitute some type of blanket waiver of all future conflicts (such as this one) where the interests of a company whose claims had been handled by Randall America were actually adverse to the interests of the ACE Companies.

6. Seaton terminated the Run-Off Agreement and its relationship with Randall America as of March 31, 2006. Accordingly, as of that date, no employee of Randall America (including Mr. Bendig) had any authority to take any position on behalf of Seaton with respect to the issue of conflict waivers. Thus, any statement by Mr. Bendig concerning the June 30, 2003 letter is entirely beside the point, particularly as there is nothing to suggest that he had any role in negotiating the rates and discussing the other issues included in the letter at the time it was sent.

7. In August and September 2006, C&M, on behalf of certain ACE Companies, issued arbitration demands for two separate claims against Seaton, both of which are unrelated to the claims that are the subject of this litigation. No arbitration panel was selected in either matter as the parties attempted to reach a settlement, and both arbitrations were stayed until November 2007.

8. Upon learning of C&M's representation of parties adverse to Seaton in the arbitrations, I contacted C&M and explicitly objected to the dual representation. Specifically, on October 3, 2006, I sent an e-mail message to Clifford B. Hendler of C&M stating that "***today (and going forward), Seaton is not expecting to be sued by firms that represent us***." A copy of my October 3, 2006 e-mail is attached to Mr. Hendler's Declaration as Exhibit C. [For the Court's convenience another copy of this e-mail is attached as Exhibit A hereto].

9. In response to my objection to C&M's representation, Mr. Hendler forwarded to me by e-mail a copy of a letter from C&M to Thomas Ryan of Randall America dated June 30, 2003. [A copy of Mr. Hendler's October 3, 2006 e-mail is attached to Mr. Hendler's Declaration as Exhibit C, and a copy of the June 30, 2003 letter is attached to Mr. Hendler's Declaration as Exhibit A]. However, Mr. Hendler did not otherwise challenge my position on behalf of Seaton that C&M was disqualified from representing the ACE Companies in matters directly adverse to Seaton as there was no consent to such dual representation. Further, neither Mr. Hendler nor anyone else from C&M sought to negotiate a waiver agreement with Seaton at any time thereafter.

10. Seaton has no record of ever receiving a copy of the June 30, 2003 letter until October 3, 2006, well ***after*** Seaton had terminated its relationship with Randall America. Further, to the extent that C&M relies upon an e-mail from Mr. Bendig dated June 16, 2006 regarding his "interpretation" of the June 2003 letter, his statement also post-dated the termination of Seaton's agreement with Randall America.

11. Seaton did not sign the June 30, 2003 letter, nor did Seaton agree to waive all conflicts of interest in perpetuity. Seaton did not receive any consideration from C&M for the purported "blanket" waiver of all conflicts of interest for all time, without regard to the facts and circumstances of any particular claim. Neither Seaton (nor Randall America) could have known about all cases and claims that might arise in the future, including the claims that are the subject of this case and therefore could not have given informed consent at the time. Moreover, as Mr. Ryan's affidavit makes clear, the arrangement that was reached between Randall America and C&M was limited to a very narrow category of cases totally unlike the circumstances here.

12. As set forth above, I explicitly advised C&M that Seaton did not consent to dual representation and did not expect C&M's attorneys to be representing parties whose interests are adverse to Seaton's. C&M did not seek a waiver from Seaton of the conflict of interest after Seaton clearly objected to C&M's representation of adverse parties in the 2006 arbitrations. Instead, C&M, on behalf of certain ACE Companies, issued to Seaton demands for arbitration for seven new matters in November 2007. Also in November 2007, the stays on the 2006 arbitrations were lifted as the parties were unable to reach a settlement.

13. In December 2007, defendant Illinois Union sought to replace its counsel with C&M. Again, C&M never sought Seaton's consent to the proposed representation of Illinois Union in this matter.

14. Seaton does not agree to waive the conflict of interest presented by C&M's current and prior representation of Seaton and the proposed representation of Illinois Union in this lawsuit. C&M has been on clear notice since October 2006 that Seaton would not consent to any such representation.

Signed under the pains and penalties of perjury this 19 day of February 2008.

Joseph P. Follis, Vice President

**EXHIBIT A**

**From:** Joe Follis [joe.follis@castlewood-us.com]
**Sent:** Tuesday, October 03, 2006 11:48 AM
**To:** Hendler, Cliff
**Subject:** Seaton Insurance and Crowell & Moring

Cliff, this development remains a significant concern to Seaton. Please provide me with a copy of the conflicts waivers that you refer to below. If such waivers are not in writing, then Seaton would like to know the specifics of such waivers, including who provided the waivers; when; and what, specifically, was provided for.

I don't know what might have occurred prior to my arrival, but today (and going forward), Seaton is not expecting to be sued by firms that represent us.... I trust that you can understand as much.

Joe

Joseph P. Follis
Vice President
Seaton Insurance Company

---

**From:** Hendler, Cliff [mailto:CHendler@crowell.com]
**Sent:** Monday, October 02, 2006 10:09 PM
**To:** Joe Follis
**Cc:** Robert Burns
**Subject:** Seaton Insurance and Crowell & Moring

Privileged and Confidential/ Attorney Client Communication/ Attorney Work Product

Joe I hope had a good weekend. I wanted to send you this e-mail to follow up on a discussion that I had with Bob Burns on Fri. afternoon regarding the fact that my new reinsurance partner, Bill O'Neill, has initiated some kind of reinsurance arbitration against Seaton. Bob thought it might make sense for me to share directly with you some of the ideas and background that I discussed with Bob.

As you may remember from a long voicemail that I left for you at the time back in August, Bill evidently initiated the arbitration on behalf of one or more ACE USA Companies. (Because of an ethics wall that we set up within the firm, and that I will say more about in a minute, I have never seen the actual document that Bill apparently sent to Seaton.)

Conflicts waivers going back to earliest days of our firm's representation of Stonewall and Seaton permitted Bill to initiate the reinsurance matter as a matter of legal ethics, but in talking with Bob on Friday afternoon, it seemed to me important to share with you more of the background.

Back in 2001 when my partner Andy Marks and I were first approached about representing Stonewall and Seaton, ACE USA Companies essentially had a monopoly on using Crowell & Moring's legal services. ACE USA Companies and predecessors had asked Crowell & Moring to do large volumes of cases for over a dozen years, and, in return, ACE USA Companies insisted that Crowell & Moring not represent other general liability carriers (a) so that there would never be a shortage of Crowell insurance team lawyers to help them and (b) so that Crowell & Moring would always be free as a conflicts matter to pursue claims on ACE USA Companies' behalf against other carriers, if necessary.

While Andy and I greatly appreciated the opportunities to represent the ACE USA Companies, Andy and I and our colleagues also very much wanted to take on the new work for Stonewall and Seaton, where it sounded like we might have an opportunity to build an innovative partnership with Stonewall and Seaton and help Stonewall and Seaton achieve better financial results by upgrading the calibre of their legal representation and by participating in strategic planning for the books of business to be defended. But we absolutely could not take on those two proposed new representations, unless we could first persuade the ACE USA Companies to drop their insistence on having a monopoly over our firm's legal work.

One of the most difficult negotiations -- but for my firm, most important negotiations -- that I ever conducted was the process of dialogue through which the ACE USA Companies ultimately agreed to drop their insistence that our firm represent only ACE USA Companies. In the end, ACE USA Companies decided to trust that we had the depth of expertise and commitment to them to deliver the services that they needed, even if key partners like myself also become dedicated to helping Stonewall and

Seaton. But a key term that ACE USA Companies insisted upon, [redacted] in order to obtain o[redacted] AC[redacted] Stonewall or Seaton, Stonewall or Seaton would not object on [redacted] that Crowell & Moring could not proceed on behalf of ACE USA Com[redacted]wall and Seaton are Crowell & Moring clients too.

Stonewall and Seaton agreed to ACE USA Companies' conditions; Crowell & Moring had the opportunity to begin wo... g with Stonewall and Seaton on some of their most significant matters, even as we continued to meet ACE USA Companies' needs; our firm thanked both groups of clients very much; and – at least until August – things had worked out fine as a conflicts matter for five and a half years.

When my reinsura[redacted] reinsurance matter adverse to Seaton – exercising the right that ACE USA Companies [redacted] half years earlier – I immediately left voicemails for you and Ray and Bob, and I set up [redacted] that Bill and attorneys working with him adverse to Seaton on the reinsurance issues do [redacted] with those of us like me who represent Seaton. Likewise, those of [redacted] discuss our wo[redacted] with the att[redacted] against Seaton. [redacted] Island to meet [redacted] out [redacted] had high hopes that [redacted] for our firm to w[redacted]n and Ston[redacted] results with the cost-[redacted] n off have no [redacted] require. And I so did not want Bill's initiation of the reinsurance [redacted] Bob about [redacted]on zealously to represent Seaton and Stonewall in the current matters entrusted to us (and hopefully future matters as well, if we could earn that work through successes with our current docket).

Bottom line, the fa[redacted] the fact that the ethics wall ins[redacted] in the reinsurance arbitration [redacted]g you to [redacted] discussion. You and your [redacted]and with [redacted] for you[redacted] looking to protect [redacted] to us. To [redacted] that you [redacted] to you to decide not to retain us for any future work or even to fire us [redacted]esenting you, subject to your recognizing the disadvantages that bringing [redacted] Stonewall in particular ongoing cases.

Thus, my goal with this e-mail is to figure out the best way to reassure you and your colleagues of our loyalty and ded...ation to the Seaton and Stonewall work that you have been counting on us to do for you. In sum, I am looking to have you co... le that our experience and lawyering skills make us the best possible lawyers to get the best possible substantive results in those cases for you, and to have you conclude that you can fully count on our dedication and loyalty to apply that experience and those skills on your behalf.

In that connection, Bob shared with me that you have reason to believe that Carl Wall himself may be concerned about this situation of my defending Seaton in some cases, even as a partner of mine has initiated a reinsurance arbitration against Seaton. You, Ray and Bob have met me personally and had the chance to work with me and a number of my colleagues for several months now (and Bob, and Ray to a lesser extent, have had experience working with me and colleagues of mine from prior positions). But so far as I can recall, Carl Wall and I have never met, and I may be just a name to him.

In these circumstances, I thought of two things that I might do to help work all of this out. First, it seemed to me to make sense for the two of us to talk either by phone or face to face, so that I can answer any questions that you might have about the historical background and I can reassure you directly of my continued dedication to partnering with Seaton and Stonewall, as we discussed when I flew up to meet with you before the mediation this summer.

REDACTED

Second, to underscore for Carl Wall my continued commitment to representing Seaton and Stonewall, notwithstanding my partner's having initiated a reinsurance arbitration, it occurred to me that it might make sense for me to fly down Carl's office in Florida, so that I could explain the historical background to him and give him an opportunity to size up for himself one of the lead partners from a firm that is very much hoping to get to continue to do important work for Seaton and Stonewall. At a minimum, by suggesting such a trip, I would want to convey how seriously we take wanting to maintain your, Ray, Bob and Carl's confidence in us. Do you think that it would be a good idea for me to try to arrange such a meeting, and, if so, would the best approach be for me to call Carl directly or would it be to ask if you might be willing to help set up a such meeting, since you know both of us?

Anyhow, as I mentioned in my voicemail for you Sunday night, I will [redacted] Tuesday afternoon to see if you have had an opportunity to read through this long e-mail, and, if so, if you have any [redacted]. I so much enjoyed the spirit of our discussions in August, and really hope that we will all be able to [redacted] that my partner's initiating the rei... ance arbitration has raised. Thank you very much for your consideration! Cliff Hendler

Clifford B. Hendler, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Ph 202-624-2928
Fa 202-628-5116
chendler@crowell.com

1/31/2008